**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | | |
|---|---|---|
| MARY MISS, | ) | CASE NO. 4:24-CV-00123 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **RESISTANCE TO PLAINTIFF'S** |
| | ) | **APPLICATION FOR A** |
| EDMUNDSON ART FOUNDATION, INC., | ) | **TEMPORARY RESTRAINING** |
| d/b/a DES MOINES ART CENTER, | ) | **ORDER AND/OR PRELIMINARY** |
| | ) | **INJUNCTION** |
| Defendant. | ) | |

## <u>PRELIMINARY STATEMENT</u>

As Greek philosopher Heraclitus said, "All is flux, nothing stays still."[1]   In 1989, the Des Moines Art Center engaged New York resident Mary Miss to design a landscape installation that transformed a marshy wetland near the Art Center into a usable outdoor space for Des Moines residents.   The multi-faceted installation, Greenwood Pond: Double Site ("Double Site"), was officially completed in 1996.   The project is comprised almost exclusively of natural materials, some anchored directly into the ground and embedded within the city park in which it's located.

The ephemeral nature of the Double Site is its aesthetic; and it's the same reason the project must be now removed.   Despite years of regular maintenance and repairs to individual elements of the Double Site, the project has deteriorated to a state beyond repair and constitutes an active public safety hazard.   To protect the safety of Greenwood Park visitors, the Art Center made the difficult decision to deaccession the Double Site.

Now, Mary Miss sues and requests injunctive relief before the Double Site is removed. She does so pursuant to the federal Visual Artists Rights Act; however, Congress chose to exempt

---

[1] Plato, *Cratylus* (388 B.C.) 402a = DK22A6.

site-specific works such as the Double Site from the Act's protection.  She claims breach of

contract with the Arts Center; but she has no right to demand the Art Center make repairs and

restorations of this magnitude.  Especially considering the very real public safety concerns now at

play, this Court should deny the request for a temporary restraining order.

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND..................................................................................................3

ARGUMENT ........................................................................................................................9

I.      PLAINTIFF IS UNLIKELY TO SUCCEED ON HER CLAIMS. ...................................10

        A.      VARA protections do not extend to site-specific art such as the
                Double Site..........................................................................................................10

        B.      The Plaintiff has no contractual right to demand the repair or
                restoration of the Double Site. ................................................................13

                1.      There is no contractual basis or compelling justification for
                        injunctive relief based on the terms of the Artist Agreement and
                        the Operating Agreement. ................................................................15

                2.      Requiring the Art Center to rebuild the Double Site is barred by
                        the doctrines of impracticability and frustration of purpose............17

II.     PLAINTIFF HAS NOT DEMONSTRATED THAT MONEY DAMAGES
        ARE INADEQUATE..............................................................................................18

III.    THE  BALANCE  OF  HARMS  FAVORS  DENYING  INJUNCTIVE
        RELIEF...................................................................................................................19

IV.     INJUNCTIVE  RELIEF  DISCOUNTS  THE  PUBLIC'S  INTEREST  IN
        SAFETY AND SECURITY OF PROPERTY AND CONTRACT RIGHT ...................20

V.      NECESSITY OF SECURITY UNDER RULE 65(C).......................................................21

CONCLUSION......................................................................................................................22

## FACTUAL BACKGROUND

The Des Moines Art Center opened its first permanent building in 1948 with funds from the estate of James D. Edmundson on land owned by the City of Des Moines at the northeast corner of Greenwood Park.  (Declaration of Kelly Baum ¶ 10 (hereinafter "Baum Decl.").)  Greenwood Park consists of approximately eighty acres, including what has generally been described as wetlands, a lake, lagoon, or a pond.  (Baum Decl. ¶ 11.)  A master landscape plan for the Art Center grounds was prepared by landscape architect Thomas Church and has been periodically revised ever since.  (Baum Decl. ¶ 11.)

By the late 1980s, the pond had fallen into a derelict state of disrepair.  (Baum Decl. ¶ 12.)  In 1989, the Art Center began discussions with Plaintiff Mary Miss to design an outdoor installation near the pond.  (Baum Decl. ¶ 12.)  Miss's early concept of the installation was comprised of wooden walkways, a bridge, lighting, and a warming house.  (Baum Decl. ¶ 13.)  Ultimately, the concept became Greenwood Pond: Double Site ("Double Site"), the subject of this dispute.  (Baum Decl. ¶ 14.)  Over the next several years, Miss visited Des Moines multiple times to develop plans for the Double Site.  (Baum Decl. ¶ 14.)

By its very nature, the Double Site would be integrated into, and become a part of, the land.  (Baum Decl. ¶ 15.)  Because those wetlands were owned by the City of Des Moines, the Art Center began negotiations with the City at the same time it was discussing the project with Miss.  (Baum Decl. ¶ 16.)  In 1990, the Art Center entered into a 28E agreement with the City ("Operating Agreement") regarding what was called the "Sculpture Park Area."  (Baum Decl. ¶ 17; Ex. A.)  The Operating Agreement designated the rights of the parties and assigned responsibility for the ownership, maintenance, and integrity of the work within the Sculpture Park Area.  The Operating Agreement contains the following relevant provisions:

- <u>Unsafe Conditions</u>.  The City reserved the right to require the Art Center to repair or remove a sculpture "to correct any unsafe condition within a sculpture."

- <u>Casualties</u>.  The Art Center reserved the right to "restore and/or rehabilitate or remove, at its option," any portion of a sculpture "damaged or destroyed by any casualty whatsoever, including but not limited to damage caused by fire or storms or vandalism."

- <u>Preemption</u>. Any contract entered into between the Art Center and an artist for work located within the Sculpture Park Area "shall be subject to the terms of this agreement."

(Ex. A, pp. 5, 6, 13.)  Notably, the Operating Agreement also purports to require the Art Center to indemnify the City against any loss or damage arising out of the design, construction, installation, maintenance, or presence of any sculpture in the Sculpture Park Area.  (Ex. A, p. 8.)

In 1992, the Art Center and Miss entered into an initial agreement for the design development phase of the Double Site project.  (Baum Decl. ¶ 18; Ex. B.)  In exchange for design documents, Miss was paid $10,000 upfront and $10,000 upon delivery of the final plans.  (Ex. B, p. 2.)  This initial agreement anticipated future agreements and acknowledged that any such agreement was subject to the Operating Agreement.  (Ex. B, p. 4.)

In 1994, the Art Center and Miss entered an "Agreement for Artistic Services" ("Artist Agreement").  (Baum Decl. ¶ 19; Ex. C.)  The Artist Agreement covered a wide range of subjects and was a natural evolution of the parties' progress from the 1992 initial design development agreement.  The Artist Agreement addressed the budget for the project, in addition to the $125,000 payment Miss received to design the Double Site.  (Ex. C, pp. 3, 5, 6.)  It also specified that while Miss retained all artistic rights to the Double Site, the Art Center would own and hold title to the Double Site upon its completion.  (Ex. C, p. 6, 7.)  Consistent with that intent, the Artist Agreement contains the following relevant provisions:

- <u>Alterations</u>.  The Art Center agreed it would not "intentionally damage, alter, relocate, modify or change" the Double Site without Miss's approval.

- <u>Maintenance</u>.  The Art Center agreed to maintain and protect the Double Site, within reason: "ART CENTER…shall reasonably protect and maintain the Project against the ravages of time, vandalism and the elements."

- <u>Repairs or Restoration</u>.  The Art Center held the exclusive right to determine "*when and if*" repairs and restorations to the Double Site would be made.  If the Art Center wished to make repairs or restorations, "the Artist shall have the right to approval all repairs and restorations."

- <u>Preemption</u>. The Agreement is "subject to the terms of the 28E agreement between the City and the Art Center," of which Miss was provided a copy.

(Ex. C, pp. 7, 8, 10.)

After the Artist Agreement was signed, Miss submitted her preliminary design plans to the Art Center in late 1994.  (Baum Decl. ¶ 20; Ex. D.)  These plans included a large wooden pavilion (later known as a "warming hut"), freestanding wooden elements, wooden bridges and ramps, a viewing pavilion, wooden boardwalks surrounding a pond, and a concrete walkway that recessed into the water (later known as the "observation box").  (Ex. D.)  Notably, the wooden boardwalks were "overhanging," i.e., cantilevered and fixed only on one end and hanging over the water.  (Ex. D.)  The Art Center retained an engineer in 1995 to produce construction documents and materialize Miss's vision of the Double Site.  (Baum Decl. ¶ 21.)  Given the nature of the integrated installation, the architects would need to consider a variety of building code and permitting requirements.  (Baum Decl. ¶ 21.)

In early 1995, the City conducted a plan review of the architectural drawings for the Double Site.  (Baum Decl. ¶ 22; Ex. E, pp. 1-9.)  The City did not approve the project, in part due to concerns about user safety, building code compliance, liability, structural integrity of the materials, and long-term maintenance issues.  (Baum Decl. ¶ 22; Ex. E, p. 12.)  The City noted disapproval of the project's use of cedar wood to anchor the project directly into the earth—including on its overhanging boardwalks—because cedar is not used or treated for that purpose.  (Baum Decl. ¶ 22; Ex. E, p. 6.)  A second set of drawings was submitted to the City, this time replacing all cedar

wood with pine wood.  (Baum Decl. ¶ 22; Ex. E, p. 12.)  Though still hesitant, the Des Moines Park and Recreation Board ultimately approved the project for construction.  (Baum Decl. ¶ 22.) The project was officially completed in 1996, with an estimated total original cost of $1,200,000.00.  (Baum Decl. ¶ 23.)

Though initially described as "permanent," the Double Site was made with ephemeral materials using techniques inappropriate to an outdoor environment.  (Baum Decl. ¶ 24.)  The Double Site has been battered by Iowa's dramatic weather cycles, floods, rampant vandalism, and the wear and tear of everyday use.  (Baum Decl. ¶ 25.)  Nonetheless, the Art Center diligently repaired and restored individual elements of the Double Site.  (Baum Decl. ¶ 26.)  It commissioned condition reports, engineer reviews, and rehabilitation plans to ensure, the best it could, the structural integrity and continued safety of the Double Site.  (Baum Decl. ¶ 26; Exs. F-L.)  Some observations and comments from those reports are striking:

- 2002: "Substructure of the Walkway—This is my biggest area of concern.  In addition to the fact that the structure is not built as specified, there are inherent problems under the structure:  a) the 'shims' that 'control' the height of the deck are missing in some cases, and are feeble attempts to shore up the structure; b) the concrete piers are not consistently installed at heights relevant to changing slope of the deck surface; and c) in many areas the drawings called for no piers, and the structure is supported on an existing retaining system, which may not be supported below the frost line; d) there are other substructural construction techniques that were quickly and sloppily executed (see photos), and the work reminds me of a cheap deck tacked on a speculative home."

- 2008: "Poor condition—safety concerns. Structural problems including inherent problems in design and construction and materials for long term outdoor public use."

- 2008: "There are inherent problems with the design, construction and materials for an outdoor and under water environment used, long term, by the public."

- 2010: "The budget for the project was limited but a significant amount of construction was desired.  To accommodate the desire to maximize the amount of work that could be done within the limited budget, residential deck construction materials and techniques were used…. The Art Center has performed maintenance over the years, but deterioration of portions of the

> project have exceeded their budget and ability to maintain this functional work
> of art."

(Ex. F, pp. 2-3; Ex. H, p. 1; Ex. I, p. 1; Ex. J, p. 1.)

In the decades since the Double Site's construction, the Art Center has devoted major staff and financial resources of approximately $1,000,000.00 to the Double Site, including a major campaign from 2012 to 2014 to repair and restore numerous elements of the Double Site that sustained damage through environmental degradation as well as 2011 flooding.  (Baum Decl. ¶ 27-28.)  Obtaining funding for necessary repairs and restorations to the Double Site, whether through grant opportunities, private donors, or public incentive programs, has proven challenging.  (Baum Decl. ¶ 29.)  Indeed, in 2012, Miss even acknowledged that in the absence of a successful major fundraising campaign, there may be no alternative than to deinstall the project.  (Baum Decl. ¶ 30; Ex. M.)

In October 2023, several individual elements of the Double Site were taken down or fenced off because of immediate and necessary public safety concerns.  (Baum Decl. ¶ 31.)  Individual, free-standing elements next to the warming hut were removed because their structural integrity had reached the point of being dangerously unsafe.  (Baum Decl. ¶ 32.)  The warming hut and boardwalk along the southern portion of the pond were fenced off because of public safety and structural integrity concerns.  (Baum Decl. ¶ 33.)  The Art Center retained an engineering firm to assess the structural integrity and safety of the entire Double Site.  (Baum Decl. ¶ 34.)  The conclusion was tragic:

> There are significant structural concerns with the boardwalk, pavilion, and wood
> pieces north of the pavilion. Dry rot in the wood members and connections have
> resulted in number of unsafe unstable conditions. In my professional opinion, the
> wood has deteriorated to a point it is not feasible to replace just a few members.
> Total replacement with new treated wood or a more durable wood species (Ipse is
> one option) is the best route forward. If the decision is made to rebuild the art pieces,
> there are a number of connection details that could be improved to prolong the life
> of the structure. For example, most wood columns were originally direct buried in

> soil resulting in accelerated decay. [The engineering firm] can help revise the
> original connection details to extend the life of the art pieces.

(Baum Decl. ¶ 34; Ex. N; *see also* Ex. O.)  In response to that report, the Art Center obtained a

cost estimate should the Art Center repair and restore only the wooden and metal sections of the

Double Site back to its original condition, i.e., a 1:1 rebuild of the original design but with materials

more appropriate for an outdoor environment.  (Baum Decl. ¶ 35.)  Accounting for the labor,

materials, equipment, insurance, and taxes necessary to perform the work, the estimate was for

$2,652,675.00—more than double the original cost of the project and approximately one-third of

the entire annual operating budget for the Art Center. (Baum Decl. ¶ 35; Ex. P.)  Importantly, this

estimate did not include needed repairs to the observation box or other construction-related

expenses, such as fencing.  (Baum Decl. ¶ 35.)

The Art Center made the difficult decision to begin the process of deaccessioning the

Double Site in early 2024.[2]  (Baum Decl. ¶ 36.)  As part of that process, the Art Center contacted

all still-existing original funders of the Double Site.  (Baum Decl. ¶ 37.)  No objections to

deaccessioning have been lodged.  (Baum Decl. ¶ 37.)  The Art Center will derive no income from

the deaccessioning of the Double Site; in fact, it will incur costs to deinstall it.  (Baum Decl. ¶ 38.)

According to the Art Center's proposal to deaccession:

> Allowing [the Double Site] to exist in this manner not only goes against the
> aesthetic intention of the artist; it also threatens the integrity and reputation of the
> Art Center. We would not exhibit an artwork inside the museum that was damaged
> and/or a potential health hazard to the public. We must hold works installed
> outdoors to the same standards.
>
> …

---

[2] Deaccessioning is defined as the "formal process of removing an accessioned object or group of
objects from the museum's collections.  A museum still owns a deaccessioned object until it
disposes of it but no longer holds it in the public trust.  Removing the object from the museum's
possession is commonly referred to as *disposal*."  *National Standards & Best Practices for U.S.
Museums* 88, American Association of Museums (2008).

The Art Center staff fully acknowledges the gravity of recommending the deaccessioning and destruction of [the Double Site]. This outdoor environment is not only a historic commission by the Art Center; it is also important, ambitious work of land art by a major woman artist. A series of very unfortunate circumstances have brought us to this moment, and we would not have adopted the position we have if there was a feasible way forward and if the work was not a literal threat to public safety.

…

It is important to note that Mary Miss is not in agreement with the museum about our recommendation to deinstall and deaccession. However, the position voiced here still stands as a matter of public safety and a realistic assessment of the artwork's compromised state.

(Ex. Q, pp. 3, 4, 5.)

On April 2, 2024, the Art Center secured all initial necessary permits from the City to begin its deinstallation and removal of the Double Site.  (Baum Decl. ¶ 39.)  At this time, the process over the next 30 days will first require the Art Center to install temporary construction fencing around the Double Site while the City drains the pond, loading in any necessary equipment and installing pumps to continuously pump water from the pond.  (Baum Decl. ¶ 40.)  Once that is accomplished, the warming hut and certain bridges on the northern portion of the pond will first be dismantled.  (Baum Decl. ¶ 40.)  A temporary culvert will be installed to permit access to the east side of the Double Site.  (Baum Decl. ¶ 40.)  Next, the cantilevered boardwalk and observation box will be dismantled, as those elements of the Double Site are treacherously unsafe.  (Baum Decl. ¶ 40.)

## **ARGUMENT**

A temporary restraining order "is an extraordinary remedy never awarded as of right." *ARC of Iowa v. Reynolds*, 559 F. Supp. 3d 861, 873 (S.D. Iowa 2021) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).  Rather, the court must balance the competing claims of injury and consider the effect on both parties of granting or withholding the requested

relief.  *Id.*  The court must also consider the four familiar factors that apply to either a request for a temporary restraining order or a preliminary injunction: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other litigants; (3) the probability that movant will succeed on the merits; and (4) the public interest."  *Rodriguez v. Molina*, 608 F. Supp. 3d 791, 796 (S.D. Iowa 2022) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (cleaned up)).  Miss's request to delay removal of the Double Site must be denied when balanced against the threat to public safety and considered in light of her unlikely success on the merits.

## I.      PLAINTIFF IS UNLIKELY TO SUCCEED ON HER CLAIMS.

Though no factor is dispositive, a movant's likelihood of success on the merits "is the most significant."  *Reg Seneca, LLC v. Harden*, 938 F. Supp. 2d 852, 857 (S.D. Iowa 2013).  The court must decide if the movant has a "fair chance of prevailing" on the merits of its claims.  *Id.* (quoting *Planned Parenthood v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008)).  Significantly, it requires more than merely raising a grant or serious *question* for litigation.  *Sarsour v. Trump*, 245 F. Supp. 3d 719, 729 (E.D. Va. 2017).  Rather, success means "at least…sufficiently likely to support the kind of relief it requests" supported by the governing law.  *Uncle B.'s Bakery, Inc.*, 920 F. Supp. 1405, 1424 (N.D. Iowa 1996) (quoting *Sanborn Mfg. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 488 (8th Cir. 1993)).  Miss is unlikely to succeed on her claims and has not shown otherwise.

### A.      VARA protections do not extend to site-specific art such as the Double Site.

Plaintiff claims she is entitled to injunctive relief pursuant to the Visual Artists Rights Act of 1990 ("VARA"), which allows an author of certain works of visual art to prevent the destruction of their work once it reaches a "recognized stature."  17 U.S.C. § 106A(a)(3); *see* 17 U.S.C. §§ 501(a) & 502(a) (permitting a court to grant injunctive relief for infringements under VARA). The purpose of VARA is to protect the "moral rights" of artists, including the right of integrity.

*Williams v. Hy-Vee, Inc.*, 661 F. Supp. 3d 871, 882 (S.D. Iowa 2023).  The right of integrity "allows the [artist] to prevent any deforming or mutilating changes to his work, even after title in the work has been transferred."  *Id.* at 882–83 (quoting *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 81 (2d Cir. 1995) (alteration in original)).

Assuming the Double Site is a work of visual art as defined by VARA, VARA's protections do not apply because the Double Site is undoubtedly site-specific art: it can exist in no other location except Greenwood Park.  *See* 17 U.S.C. § 601A(c)(2).  First, VARA provides an exception known as the "presentation exclusion":

> The modification of a work of visual art which is the result…of the public presentation…of the work is not a destruction, distortion, mutilation, or other modification described in subsection (a)(3) unless the modification is caused by gross negligence.

*Id.*  VARA's legislative history recognizes the exception's application to site-specific works, "[g]enerally, the removal of a work from a specific location comes within the [presentation] exclusion because the location is a matter of presentation."  H.R. Rep. No. 101–514, at 12, *reprinted in* 1990 U.S.C.C.A.N. 6915, 6917.  In other words, "for site-specific art, the location of the work is an integral element of the work.  Because the location of the work contributes to its meaning, site-specific art is destroyed if it is moved from its original site."  *Phillips v. Pembroke Real Estate, Inc.*, 459 F.3d 128, 134 (1st Cir. 2006).  Thus, if the act complained of is removal, the presentation exclusion applies.  Beyond this exception, skeptical that VARA would "protect site-specific art and then permit its destruction by removal from its site" under the public presentation exception, the First Circuit concluded: "VARA does not apply to site-specific art at all."  *Id.* at 143; *accord Urbain Pottier v. Hotel Plaza Las Delicias, Inc.*, 379 F. Supp. 3d 130, 133 (D. P.R.

2019) (recognizing that VARA does not apply to a site-specific mural).[3]  Whether reviewed as an exception to VARA or the inapplicability of VARA, the conclusion is the same, Miss's claim fails.

There's no dispute the Double Site is a site-specific work.  Though composed of numerous elements, the Plaintiff has repeatedly referred to the work as an indivisible whole, both in correspondence with the Art Center and in this lawsuit.  (*See, e.g.*, Compl. ¶¶ 20, 47 ("part of the project"; Ex. M ("It would be unacceptable for portions of the work to remain on the site.").)  The Artist Agreement characterizes the project as "a concept plan designating in general, areas and elements to be developed for an environmental sculpture for the Art Center permanent collection." (Ex. C, p. 1.)  Modifying the Double Site would "destroy[] its meaning and purpose, effectively obliterating its existence."  Francesca Garson, *Before That Artist Came Along, it was Just a Bridge: the Visual Artists Rights Act and the Removal of Site-Specific Artwork*, 11 Cornell J.L. & Pub. Pol'y 203, 239 (2001).  Given these inherent qualities, Congress exempted site-specific arts from protection under VARA.

Congress's decision does not "denigrate the value or importance of site-specific art, which unmistakably enriches our culture and the beauty of our public spaces."  *Phillips*, 459 F.3d at 143. Rather, it is a reasonable compromise that balances the real property interests of landowners—

---

[3] Only one court, in dicta, has questioned the First Circuit's conclusion that site-specific works are excluded from VARA.  *See Kelley v. Chicago Park Dist.*, 635 F.3d 290 (7th Cir. 2011).  But even then, *Kelley* focused on whether site-specific works are *categorically* excluded.  *Id.* at 306.  The panel reasoned that that at least some site-specific art could be moved without necessarily being destroyed, and further, that VARA contains a building exception, which applies to works "incorporated in or made part of a building."  *Id.* at 307 (quoting 17 U.S.C. § 113(d)(a)(A)).  Even accepting Seventh Circuit dicta as true, the Double Site still falls in the narrow class of site-specific art that must be exempted from VARA protection. It is inconceivable to propose moving the Double Site to another location without its destruction: it has become part-and-parcel of the land upon which it sits. For the same reason, any modification of the Double Site would not be protected by the building-exception, but the same principle applies: the location of the work is integral to its meaning and purpose.  It falls within the public presentation exception.

here, the City of Des Moines—with an author's integrity rights.  *Id.* at 142 (rejecting a contrary approach because "[s]uch a conclusion could dramatically affect real property interests and laws").  That legislative decision is especially sound when, as here, Plaintiff has never held any underlying ownership rights or title to the Double Site or the underlying property.  (Ex. C, p. 7.)[4]  Permitting an artist to control the Art Center's personal property and the City's real property would set a dangerous precedent.  *See Phillips*, 459 F.3d at 142 ("Once a piece of art is considered site-specific, and protected by VARA, such objects could not be altered by the property owner absent consent of the artist.").

For all these reasons, Plaintiff does not stand a fair chance of prevailing on the merits of her VARA claims.  Put simply, the law does not support the kind of relief Plaintiff is requesting.  Accordingly, no injunction should be issued on the basis of Plaintiff's federal law claims.

B.    The Plaintiff has no contractual right to demand the repair or restoration of the Double Site.

In addition to her VARA claims, Plaintiff alleges common-law breach of contract claims based on the terms of the 1994 Artist Agreement.  In addition to money damages, she requests an order directing the Art Center to specifically perform "the terms of the contract."  (Compl. Ct. III (Relief).)  While the Complaint contains several quoted provisions from the Artist Agreement, Plaintiff fails to clearly identify which term the Art Center has breached or what duty or obligation has been violated.  *See Goss v. Stream Global Srvcs., Inc.*, No. C14-0433, 2015 WL 1268192, at *9 (N.D. Iowa Mar. 19, 2015) (dismissing a claim in part because "[t]he Complaint completely fails to identify…what terms of the agreement that Stream purportedly breached, other than to mention an 'employment contract' twice in passing").  For purposes of this resistance, the Art

---

[4] Because Miss's work on the project was limited to design plans and all materials were purchased and installed by the Art Center, Miss never held title to any aspect of the work and the Art Center has held title to the work since its creation.

Center assumes Plaintiff demands the Art Center not deinstall the Double Site, and rather require it to repair and restore the Double Site to its original condition, which would also have the effect of protecting and maintaining the Double Site, at least until the cycle of deterioration begins anew.[5] Indeed, this can be the only conclusion as simply stopping the removal of the Double Site would be asking this Court to order the Art Center to maintain a safety hazard in the middle of a city park.

Plaintiff only provides this Court half the story. Any consideration of the Art Center's rights, duties, or obligations under the Artist Agreement necessarily includes the Operating Agreement between the Art Center and the City. (Ex. A.) Section 15 of the Artist Agreement requires as much:

> 15. **COOPERATION OF CITY –** The parties acknowledge that the performance of certain aspects of this agreement requires the cooperation of the Parks and Recreation Department or other units of government of the City of Des Moines. The failure of the City of Des Moines to perform as contemplated by this agreement shall not be deemed a breach of either party of this contract but may constitute an event causing a failure to fulfill the contractual obligations beyond either party's control. *The Artist acknowledges this agreement is subject to the terms of the 28E agreement between the City and the Art Center, a copy of which agreement has been supplied to the Artist prior to the execution of this agreement.* The terms of this agreement are subject to the terms of the 28E agreement which shall take precedence over conflicting terms, if any, in this agreement.

(Ex. C, p. 10 (emphasis added).)

A review of these contracts demonstrates the Art Center has breached no obligation or duty owed to Mary Miss. The Court need not resort to extrinsic evidence because the meaning and legal effect of the contracts is clear. *Postell v. Am. Fam. Mut. Ins. Co.*, 823 N.W.2d 35, 41 (Iowa

---

[5] Despite its burden as the movant, Plaintiff failed to file a brief in support of its request for a temporary restraining order, which it is required to do under this Court's local rules. *See* LR 7(d); LR 65. It is too late for Plaintiff to satisfy this requirement and the Court should strike as untimely any brief submitted by Plaintiff. LR 7(b)(3) ("If a brief is not filed on the same day as the motion it supports, it may be stricken by the court as untimely.").

2012) ("When the district court determines the meaning of words used in a contract, it interprets the contract…. When the court decides the legal effect of such words, it construes the contract").

> 1.   <u>There is no contractual basis or compelling justification for injunctive relief based on the terms of the Artist Agreement and the Operating Agreement.</u>

At its core, Miss would like the Art Center to cease deinstallation of the Double Site and repair it to its original condition—or at least repair it to a level that does not endanger the public. That's not Miss's decision:

> 9.3  Repairs and Restoration.
>
>    (i) *<u>ART CENTER shall have the right to determine</u>*, after consultation with a professional conservator, *<u>when</u>* and *<u>**if**</u>* *<u>repairs and restorations to the project will be made</u>*. During the Artist's lifetime, the Artist shall have the right to approve all repairs and restorations, provided, however, that the Artist shall be paid a reasonable fee for any such services, provided that the ART CENTER and the Artist shall agree in writing, prior to the commencement of any significant repairs or restorations, upon the Artist's fee for such services.

(Ex. C, p. 8 (emphasis added).)  Under the plain language of the Artist Agreement, the Art Center decides, in its sole discretion, whether repairs and restorations will be made to the Double Site. That makes sense, considering the Art Center's obligation to ensure public safety in Greenwood Park pursuant to its Operating Agreement with the City:

> D.  <u>Fire/Casualty/Vandalism.</u>
>
> The ART CENTER shall restore and/or rehabilitate or remove, *<u>at its option</u>*, any designated portion of any sculpture damaged or destroyed by *<u>any casualty whatsoever</u>*, including but not limited to damage caused by fire or storms or vandalism.

(Ex. A, p. 6 (emphasis added).)  If the Art Center refuses to act on damaged portions of the Double Site, the Operating Agreement also allows the City to demand the Double Site be repaired or removed.  (Ex. A, p. 5.)

Miss also points to the Art Center's responsibility to "reasonably protect and maintain" the Double Site.  (Ex. C, p. 8.)  But especially at this stage of the litigation—when requesting such

extraordinary relief as a TRO—it's unclear what an order to "maintain" the Double Site accomplishes.  *See Foxx v. Davis*, 890 S.E.2d 519, 526 (N.C. Ct. App. 2023) ("'Maintenance' is defined as 'to keep in an existing state….' 'Repair' is defined as 'to restore to good condition.'") (quoting *The Merriam-Webster Dictionary* 431, 613 (2016) (cleaned up)).  The Double Site is built with materials that deteriorate by their very nature.  (Exs. F-L.)  An order to maintain its current state, without repair or restoration, only continues an existing public safety hazard.

Miss's final retreat is the Artist Agreement's "alteration" provision:

8.2 Alteration of the Work or of the Site.

(i) Art Center agrees that it will not intentionally damage, alter, relocate, modify or change the Work without the prior written approval of the Artist.

(ii) Art Center shall notify the Artist of any proposed alteration of the Site that would affect the intended character and appearance of the Work and shall consult with the Artist in the planning and execution of any such alteration and shall make a reasonable effort to maintain the integrity of the Work.

(Ex. C, p. 7.)

Read together with the remainder of the Artist Agreement and the Operating Agreement, this provision does <u>not</u> provide Miss veto-power over any deinstallation of the Double Site.  *See Hartig Drug Co. v. Hartig*, 602 N.W.2d 794, 797–98 (Iowa 1999) ("[P]articular words and phrases are not interpreted in isolation.").  It provides Miss protection over the aesthetic nature of the Double Site and secures her moral rights to the work.  *See Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 81 (2d Cir. 1995) ("[Moral] rights spring from a belief that an artist in the process of creation injects his spirit into the work and that the artist's personality, as well as the integrity of the work, should therefore be protected and preserved.").  Painting the Double Site neon yellow is an "alteration" requiring approval of the artist.  *See* Alter, *Webster's New Collegiate Dictionary* 34 ("[T]o make different without changing into something else.").  Removing the Double Site, because it risks the public's safety, is not.  *See* Remove, *Webster's New Collegiate Dictionary* 978

("[T]o get rid of").  Indeed, the Operating Agreement confirms that Miss's approval is not required

for removal in every circumstance.  The Art Center is entitled to remove any part of the Double

Site based upon "any casualty whatsoever" or where the structural integrity of the Double Site is

compromised or unsafe.  (Ex. A, pp. 5, 6.)  Reading the term "removal" or "destruction" into the

Artist Agreement's alteration provision—requiring artist permission before correcting an active

threat to public safety—is therefore unreasonable and would lead to absurd results.  *Winfield State*

*Bank v. Snell*, 226 N.W. 774, 777 (Iowa 1929) (recognizing that construction of a contract should

be "in accordance with the object sought to be accomplished" and "reasonable and fair and not

absurd").

At bottom, Miss cannot point to a contractual obligation, breached by the Art Center, that

justifies specific performance or a temporary restraining order.  *See Breitbach v. Christenson*, 541

N.W.2d 840, 843 (Iowa 1995) ("[Specific performance] is to be granted only in extraordinary,

unusual cases in which irreparable harm will result in its absence, not as a matter of grace."); *see*

*also Homeland Energy Sols., LLC v. Retterath*, 938 N.W.2d 664, 993–94 (Iowa 2020 (recognizing

that specific performance of contracts in relation to personal property "will not be enforced

ordinarily").

2.   <u>Requiring the Arts Center to rebuild the Double Site is barred by the</u>
<u>doctrines of impracticability and frustration of purpose.</u>

Even if Miss could demonstrate a contractual hook to require the Art Center to repair or

restore the Double Site to its original condition, that obligation would be discharged for

impracticability, frustration of purpose, and bordering on absurdity.  Under Iowa law, a court may

grant relief to an obligor, and discharge a contractual duty, when some intervening circumstance

"has made his own performance impracticable."  *Mel Frank Tool & Supply, Inc. v. Di-Chem Co.*,

580 N.W.2d 802, 806 (Iowa 1998) (quoting Restatement (Second) of Contracts ch. 11, at 309

(1981)); *Emp. Mut. Cas. Co. v. United Fire & Cas. Co.*, 682 N.W.2d 452, 455–56 (Iowa Ct. App. 2004).

At the time the Artist Agreement was executed in April 1994, no plans for the Double Site existed.  (Baum Decl. ¶¶ 19, 20; Exs. C, D.)  Once those designs were created, the Art Center discovered the Double Site would be constructed out of green-treated lumber.  (Ex. E, p. 6.)  The lumber would be sunk into or rest upon the ground or water, to which other structures could be anchored.  (Ex. D, p. 6.)  At that point, all parties acknowledged the materials would carry a natural lifespan because it was not constructed with more permanent, sustainable materials.  (Ex. E, p. 12.)

To the extent this Court concludes the contract obligates the Art Center to rebuild and restore the Double Site in perpetuity, rather than repair and maintain during the reasonable lifespan of its materials in situ, its obligation must be discharged as impracticable.  Reconstructing the Double Site, to a 1:1 rebuild of its original design, would cost the Art Center over two-and-a-half times the original cost of construction.  (Baum Decl. ¶¶ 23, 35.)  The materials, just as with the original design, would immediately begin to deteriorate, necessitating future repairs and restorations.  No party adequately understood the rapid rate at which those materials would deteriorate, even with reasonable maintenance.  *See Water Dev. Co. v. Lankford*, 506 N.W.2d 763, 767 (Iowa 1993) (recognizing frustration of purpose upon "the occurrence of an event the non-concurrence of which was a basic assumption on which the contract was made" (quoting Restatement (Second) of Contracts § 265 (1981))).  The cases do not require such unreasonable, impracticable results.

## II.    MISS HAS NOT DEMONSTRATED THAT MONEY DAMAGES ARE INADEQUATE.

In addition to assessing the likelihood of Miss's success on the merits, this Court must be satisfied that "the harm is certain and great and of such imminence that there is a clear and present

need for equitable relief." *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 4425 (8th Cir. 1996). "Proof that an adequate legal remedy exists supports an inference that no irreparable harm will occur." *Am. Express Fin. Advisors, Inc. v. Yantis*, 358 F. Supp. 2d 818, 835 (N.D. Iowa 2005). Here, Miss's breach of contract claim is pled in the alternative, requesting specific performance and damages in an amount to be proven at trial. (Compl. Ct. IV). The same is true under the federal VARA claims: Miss requests $150,000 for the "intentional destruction of Plaintiff's artwork." (Compl. Ct. II). In other words, Miss expressly acknowledges and attests that an adequate legal remedy exists for the claims raised in the Complaint. And there is no additional harm, beyond money damages, to which the Miss can legally be entitled, either because she has no protection under the law (Counts I-II) or has no contractual rights to the property she does not own (Counts III-IV).

## III. THE BALANCE OF HARMS FAVORS DENYING INJUNCTIVE RELIEF.

This Court balances any harm to the movant with "the injury that the injunction's issuance would inflict on other interested parties, and the public interest." *Bellino Fireworks, Inc. v. Ankeny*, No. 4:17-cv-212, 2017 WL 11446135, at \*19 (S.D. Iowa June 29, 2017) (quoting *Pottgen v. Mo. State High Sch. Activities Ass'n*, 40 F.3d 926, 928–29 (8th Cir. 1994)) (cleaned up). Without discounting the purported harm in removing the Double Site, enjoining the removal efforts of the project, at this specific point in time, causes more harm than it avoids.[6]

The Art Center's decision to deaccession and remove the Double Site was not only reasonable, but it was also necessary. Three individual elements are already closed to the public because the Art Center, its engineers, and City employees agreed the elements are unsafe. Even

---

[6] Indeed, the American Association of Museums recognizes that deaccessioning of collection items commonly "attract[s] the attention of policymakers, press and the public." *National Standards & Best Practices for U.S. Museums* 11 & 83, American Association of Museums (2008).

then, those elements are closed by temporary fencing and there is no guarantee the fencing will withstand weather or vandalism.  The Double Site sees increased foot traffic as spring turns to summer.  An injunction delays even further the removal efforts for the entire project.  These risks are relatively straightforward.  It is not inconceivable that a member of the public—walking on a wooden boardwalk anchored in dirt, cantilevered over open water, with missing or splintered spindles—could face harm if the boardwalk gives way.  The Art Center will be required to pay for additional supervision and security to ensure, the best it can, no danger occurs.

This Court *must* "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.  "The aim is to minimize the costs of a wrong decision." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013).  The harm to the public that would result from the Art Center being required to maintain a public safety hazard is self-evident, and it must be afforded significant weight.  *See, e.g.*, *Belton v. Bryan*, 71 F. Supp. 3d 802, 818–19 (N.D. Ill. 2014) (refusing to enjoin a governmental licensing firearms system).

## IV.   INJUNCTIVE RELIEF DISCOUNTS THE PUBLIC'S INTEREST IN SAFETY AND SECURITY OF PROPERTY AND CONTRACT RIGHTS.

The public interest favors safe parks.  Notwithstanding all the legal arguments, caselaw, and historical records raised in this litigation, spring is turning to summer and Iowans will be outside.  Injunctive relief therefore puts at risk the safety of all who visit the Double Site, which must be considered.  *Laclede Gas Co. v. St. Charles County*, 713 F.3d 413, 420 (8th Cir. 2013) (affirming injunctive relief when inaction would "enhance[e] the risk of a potential explosion or leak and endangers the public safety"); *Johnson v. Bayens*, No. 4:20-cv-00306, 2020 WL 12618873 at *11 (S.D. Iowa Dec. 10, 2020) (recognizing a "substantial public interest in maintaining a safe environment" in a publicly accessible building).

The public also has an interest in "protecting and enforcing valid property and contract rights." *Quaker Oats Co. v. QO Chemicals, Inc.*, No. C 93–262, 1995 WL 17217909, at *11 (N.D. Iowa June 15, 1995); *see also Christenson v. Iowa Dist. Ct.*, 557 N.W.2d 259, 262 (Iowa 1996). The Art Center greatly respects the rights of the artists that have works within the Art Center's inventory.   But without some legally valid justification otherwise, the Art Center has reached a decision on the future of the Double Site—in which the Art Center has complete title—after considering information from every conceivable source: its Board of Trustees, the City, Mary Miss, Double Site's original donors, and members of the public.   The Art Center has made the reasonable decision to remove the Double Site and remediate a public safety hazard.   The public interest favors this reasonable decision.

## V.    NECESSITY OF SECURITY UNDER RULE 65(c).

For the reasons stated herein, the Court should deny the request for injunctive relief.   In the event the Court issues a preliminary injunction or temporary restraining order, it must require the Plaintiff to give security in an amount the Court believes appropriate to "pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."   Fed. R. Civ. P. 65(c).

Placing a pause on the Art Center's efforts to deinstall the Double Site will delay the remediation of an active public safety hazard and increase the chance of serious injury—or worse—to a park visitor, dog walker, city resident, or school child.   The Art Center's risk increases multi-fold considering the increased traffic from spring to summer, along with gatherings and "rallies" held in response to the issues surrounding this litigation.

To account for this increased risk of liability, the Art Center requests bond be set at $2,000,000.00.   This figure is fair, just, and reasonable given the liability imposed upon defendants

in similar factual scenarios in Iowa courts, should a danger or harm occur during the pendency of the injunctive relief.[7]

## **CONCLUSION**

Defendant Edmundson Art Foundation, Inc., d/b/a Des Moines Art Center respectfully requests that this Court deny the Plaintiff's request for a temporary restraining order and/or a permanent injunction.  If the Court grants the relief requested, Defendant respectfully requests that the Court require Plaintiff to give security in this matter in the amount of $2,000,000.00.

Dated:  April 7, 2024

Respectfully submitted,

BELIN McCORMICK P.C.

Wayne E. Reames                                AT0006392
Kelsey J. Knowles                               AT0004233
Michael S. Boal                                   AT0012649
666 Walnut Street, Suite 2000
Des Moines, IA  50309-3989
Telephone: (515) 283-4631
Facsimile:  (515) 558-0631
wereames@belinmccormick.com
kjknowles@belinmccormick.com
msboal@belinmccormick.com
ATTORNEYS FOR DEFENDANT

D0608\1006\ (4411342)

---

[7] *Peebler et al v. Heartland Health Management, Inc.*, Henry County LALA012227 (Feb. 8, 2023) ($350,000 plaintiff's verdict in wrongful death/negligence case); *Arends & Fidirlick v. Timely Mission Nursing Home*, Winnebago County LACV017850 (June 17, 2021) ($6,000,000 plaintiff's verdict in negligence/wrongful death case); *Jessica Malone et al v. USAA et al.*, Polk County LACL134770 (Sept. 18, 2017) ($1,800,000 plaintiff's verdict in wrongful death parental consortium case); *Heppner v. Prairie Hills*, Clinton County LACV040064 (Nov. 16, 2015) ($2,000,000 plaintiff's verdict in wrongful death/negligence case).