**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| MARY MISS,  )<br><br>       Plaintiff,  )<br><br>v.  )<br><br>EDMUNDSON ART FOUNDATION, INC.,  )<br>d/b/a DES MOINES ART CENTER,  )<br><br>       Defendant.  ) | CASE NO. 4:24-CV-00123<br><br><br>**DECLARATION OF<br>DR. KELLY BAUM** |

I, Kelly Baum, pursuant to 28 U.S.C. § 1746(2), declare under the penalty of perjury, the following:

1.     I am over the age of 21 and have personal knowledge of several items set forth below. To the extent I have no personal knowledge of such items, I have consulted with employees and colleagues at the Des Moines Art Center who have such knowledge or have reviewed documents containing such information.  I am competent to testify about the matters set forth herein.

2.     I am the John and Mary Pappajohn Director of the Des Moines Art Center.  The Des Moines Art Center is a museum of Modern and Contemporary Art located primarily at 4700 Grand Avenue, Des Moines, Iowa, 50312.  The Art Center also includes the John and Mary Pappajohn Sculpture Park, a school for studio art education, and a museum gift shop.

3.     The Des Moines Art Center opened its first permanent building in 1948 with funds provided from the estate of James D. Edmundson.  In the early 1940s, the City of Des Moines and the Art Center agreed to build the Art Center in Greenwood Park as part of the City's existing master plan for the park.

4.      The Des Moines Art Center is accredited by the American Alliance of Museums and has amassed an important collection of art from the 19th century to the present, with a major emphasis on contemporary art.

5.      In my role, I lead the Des Moines Art Center in furthering its mission to provide opportunities for transformational art experiences through its collections, exhibitions, and educational programming.

6.      Prior to my role as Director of the Des Moines Art Center, I worked as a curator of modern and contemporary art for 23 years, holding positions at four civic and university art museums: The Metropolitan Museum of Art (The Met), Princeton University of Art Museum, the Blanton Museum of Art at the University of Texas at Austin, and the Museum of Fine Arts in Houston.

7.      I hold a Ph.D. in Art History and an M.A. in Art History, both from the University of Delaware.

8.      Over the course of my career, I have curated or co-curated almost thirty exhibitions.

9.      In my role as Director of the Des Moines Art Center, I am familiar with the historical background, reports, and documents related to the Greenwood Pond: Double Site installation ("Double Site").  Since I became Director of the Arts Center, I am familiar with the ongoing discussions, proposals, and decisions related to the Double Site's current condition and the Art Center's plans for its deinstallation.

10.     The Des Moines Art Center opened its first permanent building in 1948 with funds provided from the estate of James D. Edmundson on land owned by the City of Des Moines at the northeast corner of Greenwood Park.

11.     Greenwood Park consists of approximately eighty acres, including what has generally been described as wetlands, a lake, lagoon, or a pond.  A master landscape plan for the Art Center grounds was prepared by landscape architect Thomas Church and has been periodically revised ever since.

12.     By the late 1980s, the pond had fallen into a derelict state of disrepair.  In 1989, the Art Center began discussions with Plaintiff Mary Miss to design an outdoor installation near the pond.

13.     Miss's early concept of the installation was comprised of wooden walkways, a bridge, lighting, and a warming house.  Over the next several years, Miss visited Des Moines multiple times to develop plans for the Double Site.

14.     Ultimately, the concept became Greenwood Pond: Double Site ("Double Site"), the subject of this dispute.

15.     By its very nature the Double Site is integrated into, and has become a part of, the land.

16.     The land on which the Double Site sits is owned by the City of Des Moines.  In 1990, the Art Center began negotiations with the City at the same time it was discussing and negotiating the project with Miss.

17.     In 1990, the Art Center entered into a 28E agreement with the City ("Operating Agreement") regarding what was called the "Sculpture Park Area."  A true and accurate copy of the 1990 Operating Agreement is attached hereto as **Exhibit A**.

18.     In 1992, the Art Center and Miss entered into an initial agreement for the design development phase of the Double Site project.  A true and accurate copy of the agreement is attached hereto as **Exhibit B**.

19.     In 1994, the Art Center and Mary Miss entered into an "Agreement for Artistic Services" ("Artist Agreement").  A true and accurate copy of the 1994 Artist Agreement is attached hereto as **Exhibit C**.

20.     After the Artist Agreement was signed, Mary Miss submitted her preliminary design plans to the Art Center in late 1994.  A true and accurate copy of those design plans are attached hereto as **Exhibit D**.

21.     The Art Center retained an engineer in 1995 to produce construction documents and materialize Mary Miss's vision of the Double Site.  Given the nature of the integrated installation, the architects would need to consider a variety of building code and permitting requirements.

22.     In early 1995, the City conducted a plan review of the architectural drawings for the Double Site.  The City did not approve the project, in part due to concerns about user safety, building code compliance, liability, structural integrity of the materials, and long-term maintenance issues.  A second set of drawings was submitted to the City.  The City of Des Moines Park and Recreation Board ultimately approved the project for construction.  A true and accurate copy of documents and correspondence to and from the City of Des Moines are attached hereto as **Exhibit E**.

23.     The Double Site was officially completed in 1996, with an estimated total original cost of $1,200,000.00.

24.     Though initially described as "permanent," the Double Site was made with ephemeral materials using techniques inappropriate to an outdoor environment.

25.     The Double Site has been battered by Iowa's dramatic weather cycles, floods, rampant vandalism, and the wear and tear of everyday use.

26.     The Art Center diligently repaired and restored individual elements of the Double Site since its completion.  The Art Center commissioned numerous condition reports, engineer reviews, and rehabilitation plans to ensure, the best it could, the structural integrity and continued safety of the Double Site.  A true and accurate copy of several of those reports are attached hereto as **Exhibit F through Exhibit L**.

27.     In the decades since the Double Site's construction, the Art Center has devoted major staff and financial resources of approximately $1,000,000.00 to the Double Site.

28.     The Art Center initiated a major campaign from 2012 to 2014 to repair and restore numerous elements of the Double Site that sustained damage through environmental degradation as well as 2011 flooding.

29.     Obtaining funding for necessary repairs and restorations to the Double Site, whether through grant opportunities, private donors, or public incentive programs, has proven challenging.

30.     In 2012, Mary Miss acknowledged that in the absence of a successful major fundraising campaign, there may be no alternative than to deinstall the project.  A true and accurate copy of that letter is attached hereto as **Exhibit M**.

31.     In October 2023, several individual elements of the Double Site were taken down or fenced off because of immediate and necessary public safety concerns.

32.     Individual, free-standing elements next to the warming hut were removed because their structural integrity had reached the point of being dangerously unsafe.

33.     The warming hut and boardwalk along the southern portion of the pond were fenced off because of public safety and structural integrity concerns.

34.     The Art Center retained an engineering firm to assess the structural integrity and safety of the entire Double Site.  A true and accurate copy of the 2023 engineering report is attached hereto as **Exhibit N**.  A true and accurate copy of an updated report from 2024 is attached hereto as **Exhibit O**.

35.     The Art Center obtained a cost estimate should the Art Center repair and restore only the wooden and metal sections of the Double Site back to its original condition, i.e., a 1:1 rebuild of the original design but with materials more appropriate for an outdoor environment. Accounting for the labor, materials, equipment, insurance, and taxes necessary to perform the work, the estimate was for $2,652,675.00—more than double the original cost of the project and approximately one-third of the entire annual operating budget for the Art Center. Importantly, this estimate did not include needed repairs to the observation box or other construction-related expenses, such as fencing.  A true and accurate copy of that cost estimate is attached hereto as **Exhibit P**.

36.     The Art Center made the difficult decision to begin the process of deaccessioning the Double Site in early 2024.  A true and accurate copy of the topline summary of Art Center's Recommendation for Deaccessioning is attached hereto as **Exhibit Q**.

37.     As part of that process, the Art Center contacted all still-existing original funders of the Double Site.  No objections to deaccessioning have been lodged.

38.     The Art Center will derive no income from the deaccessioning of the Double Site; in fact, it will incur costs to deinstall it.

39.     On April 2, 2024, the Art Center secured any initial necessary permits from the City to begin its deinstallation and removal of the Double Site. A true and accurate copy of the permits obtained on April 2 is attached hereto as **Exhibit R**.

40.     At this time, the process over the next 30 days will first require the Art Center to install temporary construction fencing around the Double Site while the City drains the pond, loading in any necessary equipment and installing pumps to continuously pump water from the pond.  Once that is accomplished, the warming hut and certain bridges on the northern portion of the pond will first be dismantled.  A temporary culvert will be installed to permit access to the east side of the Double Site.  Next, the cantilevered boardwalk and observation box will be dismantled, as those elements of the Double Site are treacherously unsafe.

41.     Requiring the Art Center to stop deinstallation of the Double Site will, at this point, cause more harm than it avoids.

42.     It is in the public interest to eliminate public safety hazards and protect and enforce valid property and contract rights.

43.     I do not believe the Plaintiff is likely to succeed on the merits of her claims.

44.     I declare under penalty of perjury that the foregoing is true and correct.

[SIGNATURE ON FOLLOWING PAGE]

Kelly Baum

POLK COUNTY, IOWA
AT DEC 07 1990
TIMOTHY J. BRIEN, Recorder
By J. Quilitano Deputy

GREENWOOD PARK SCULPTURE PARK
DES MOINES ART CENTER

Date    NOV 19 1990
Agenda Item    83
Roll Call # 90-4882

OPERATING AGREEMENT

This Operating Agreement, made and entered into this 5Th day of _November_, 1990, by and between the City of Des Moines, Iowa, acting through the DES MOINES CITY COUNCIL, hereinafter called the "CITY," whose address for the purpose of this Agreement is City Manager, City Hall, 400 East First Street, Des Moines, Iowa  50307 and Edmundson Art Foundation, Inc., an Iowa non-profit institution, d/b/a the Des Moines Art Center, hereinafter called the "ART CENTER" whose address for the purpose of this Agreement is Director, Des Moines Art Center, 4700 Grand Avenue, Des Moines, Iowa 50312, NOW WITNESSETH:

WHEREAS, Iowa Code (1989) Chapter 28E allows any public agency in Iowa, including municipalities, to enter into agreements with public or private agencies for joint or co-operative action with respect to any power, privilege or authority exercised or capable of exercise by the public agency;

WHEREAS, the CITY pursuant to its authority under Chapter 28E, desires to cooperate with the ART CENTER in the development of a site-related or environmental sculpture area for the enjoyment of the public in Greenwood Park;

WHEREAS, the ART CENTER intends to commission and purchase original site related and environmental sculptures which shall be exhibited for the general public within a specific area of Greenwood Park;

NOW THEREFORE, in consideration of the mutual covenants, promises and agreements hereinafter set forth, the parties agree as follows:

I. SCULPTURE PARK AREA

The CITY hereby designates the area of Greenwood Park which is described in Exhibit A attached hereto, for installation and maintenance of environmental sculptures. Such area is hereinafter referred to as the "Sculpture Park Area."

II. SCULPTURE PARK DEVELOPMENT

A. Master Plan and Amendments. The ART CENTER shall prepare and submit to the CITY a Master Plan idenfifying a maximum of eight sites for the location of sculptures

Return to: CITY CLERK-DES MOINES
400 East First Street
DES MOINES, IA  50307

BOOK 6316 PAGE 489

within the Sculpture Park Area. The Master Plan shall describe the current uses of the land, any known change in land use contemplated by the proposed sculptures, and the general area to be occupied by each sculpture. The Master Plan, and any Amendments which may be made to it, shall be subject to approval by the City Council after it has been submitted for review and recommendations by the Park Board and Plan and Zoning Commission.

B. Individual Sculptures. Recognizing that certain individual sculptures may be what are sometimes referred to as "environmental sculptures," that is, sculptures occupying large extents of physical space such that the dimensions are not always obvious to the observer and which incorporate as elements in the sculpture the topography and features of the site, plans for individual sculptures shall in all events specify the boundaries and dimensions of what shall be considered the sculpture for purposes of this Agreement. In addition, such plans shall specify the area of ambience for the individual sculpture, that is, the area of the Sculpture Park within which the design of each sculpture is focused, and which cannot be changed without detracting from the sculpture. Such areas shall hereinafter be referred to as the "Areas of Ambience." Selection of sculptures shall be made in a manner consistent with the selection of other art work for the ART CENTER'S permanent collection.

C. Review of Plans. Prior to their acquisition, site plans and elevations for individual sculptures to be located within the Sculpture Park Area shall be provided to the CITY Park and Recreation Board (hereinafter called "the Board"). The ART CENTER shall provide the Board with a presentation relating to each sculpture, including background information and other pertinent data in order to give the Board a practical

BOOK 6316 PAGE 490

review of the functional uses of spaces proposed for sculptures and their Areas of Ambience, the probable impact of the proposed sculpture on existing facilities and uses of the Park, and compliance with the Master Plan.  No sculpture shall be placed in the Sculpture Park Area which does not conform to the Master Plan, or which the Park Board reasonably finds unduly interferes with existing uses or safe use of the Sculpture Park Area or facilities located there.  The Park Board shall act to review and comment to the ART CENTER on the plans within thirty (30) days after formal submission of the plans by the ART CENTER.

D. <u>Park Board Membership on Art Center Acquisition Committee</u>.

During the term of this Agreement, the Chairperson of the Board shall nominate one member of the Board (which may include the Chairperson) to be a voting member of the Acquisition  Committee of the ART CENTER concerning the selection of sculptures for the Sculpture Park Area. The ART CENTER covenants and agrees that it will appoint that nominee to the Acquisition Committee and, with respect to each sculpture to be located in the Sculpture Park Area, no action will be taken by the Board of Trustees of the ART CENTER to commission or acquire such sculpture until it has received a recommendation from the Acquisition Committee.

E. <u>Funding and Acquisition</u>.

Following the selection procedure described above, the ART CENTER shall be solely responsible for the acquisition of sculptures for the Sculpture Park Area and for all costs associated with the commissioning or acquisition and installation of said works.

F. <u>Coordination of Installation of Sculptures</u>.

The ART CENTER shall coordinate the installation of each individual piece of art with the CITY'S Park and Recreation Director in order to get approval for access to the installation site, and to minimize interference

BOOK 6316 PAGE 491

-4-

with normal use of Greenwood Park and damage to the grounds.

1. <u>Trees</u>. No trees or shrubs within Greenwood Park shall be removed, trimmed or otherwise altered by the ART CENTER during the term of this Agreement without the prior approval of the CITY Council.

2. <u>Site Restoration</u>. The ART CENTER shall promptly repair any damage to the grounds and/or plant materials resulting from the installation of sculptures. Any site restoration shall be completed promptly after the occurrence at the sole expense of the ART CENTER, and shall return the area to its condition prior to the damage, provided that a sculpture installed in accordance with the Master Plan shall not be construed as creating damage to the grounds.

3. <u>Supervision</u>. The ART CENTER shall supervise the construction and installation of each sculpture in such a manner to insure that it shall be installed in a workmanlike and prudent manner and in accordance with any applicable city and state codes.

4. <u>Permits</u>. The ART CENTER shall secure at its sole expense and responsibility all necessary permits. (See, e.g., Municipal Code § 2.205.30).

G. <u>Ownership of the Sculptures</u>

All sculptures located wholly on that property granted to the ART CENTER by Ordinance #4580 (July 8, 1940); Ordinance #4870 (September 5, 1946); Ordinance #4984 (March 4, 1948) and Ordinance #7374 (July 5, 1966), or within the Sculpture Park Area, shall be the property of the ART CENTER. Upon termination of this Agreement, sculptures within the Sculpture Park Area which have not been removed by the ART CENTER shall in accordance with Section XII.B., become the property of the CITY.

-5-

III. <u>MAINTENANCE</u>

A. <u>Sculpture Sites</u>

At the time the ART CENTER presents an individual
sculpture for review, pursuant to Section II.C above,
the ART CENTER and the CITY shall mutually agree to the
portions of each sculpture which each party shall main-
tain.  All structural elements of the sculptures shall
be the responsibility of the ART CENTER.  In the event
the Director of the ART CENTER and the Director of
Parks and Recreation are unable to agree, the City
Manager, or such other person designated by the City
Council, shall determine the portions to be maintained
by each party.  Each party shall, at its sole expense
and responsibility, perform necessary maintenance to
assure that the designated portion of the sculptures
for which it is responsible shall not become damaged,
deteriorated or unsafe.  The CITY may require the ART
CENTER to repair or remove a sculpture if the ART CEN-
TER has failed to either maintain the structural inte-
grity of a sculpture or to correct any unsafe condition
within a sculpture.

B. <u>Utilities</u>.

At the time of submission of plans for individual
sculptures, the parties shall agree to an allocation
between the ART CENTER and the CITY of the cost of uti-
lities, if any, supplied to sculptures.  In the event
the Directors of the ART CENTER and of Parks and
Recreation are unable to agree, the City Manager, or
other City Council designee, shall determine the por-
tions to be paid by each party.  The ART CENTER shall
be obligated to pay its portion of utility charges for
gas, electricity, light, heat and power, and telephone
and other communication service supplied to sculptures
in the Sculpture Park Area and shall indemnify the CITY
for such charges in fact paid by the CITY.

-6-

C. Surrounding Grounds.

The ART CENTER shall maintain its areas of responsibility to standards of the surrounding grounds maintained by the CITY'S Park and Recreation Department. Except for those areas agreed to be maintained by the ART CENTER, the CITY shall maintain the Sculpture Park Area.

D. Fire/Casualty/Vandalism.

The ART CENTER shall restore and/or rehabilitate or remove, at its option, any designated portion of any sculpture damaged or destroyed by any casualty whatsoever, including but not limited to damage caused by fire or storms or vandalism.

E. Notification.

The ART CENTER shall have a reasonable time from the date of notice by the CITY to correct any damage. Any unsafe condition shall be made safe by corrective action taken within a reasonable time thereafter. All notices shall be provided as stated in Section VII.A. of the Agreement.

F. Reasonable Time.

As used in this Agreement, a reasonable time shall mean fifteen (15) days unless a longer period is needed due to weather conditions, or the need to preserve the artistic integrity of the sculpture.

IV. INTEGRITY

A. Protection of Areas of Ambiance.

To assure that the Sculpture Park Area is maintained in its current state in order to preserve the ambience into which the sculptures will be installed, and subject to paragraph IV.B., below, no physical improvement to existing facilities or substantial change in use of the Areas of Ambiance shall be permitted during the term of this Agreement without the mutual consent of the ART CENTER and the CITY.

BOOK 6316 PAGE 494

B. <u>Improvements</u>

The CITY may remove or replace damaged or diseased plants or trees in the Sculpture Park Area without ART CENTER approval.  When diseased plants or trees must be removed within an Area of Ambience, the CITY agrees to inform and consult the ART CENTER concerning an appropriate replacement.  Moreover, in its sole discretion, the CITY may repair, replace, enlarge or otherwise improve any facilities or improvements now or subsequently located in Greenwood Park outside of the Areas of Ambience.

C. <u>Other Works of Art</u>

The CITY will not authorize the installation of other works of art within the Sculpture Park Area.

V. <u>RIGHTS RESERVED BY THE CITY AND THE PUBLIC</u>

Except for specific events, such as "Art in the Park," for which the City Council has granted a permit to use the Sculpture Park Area and charge an entrance fee, or events or usage regulated by the CITY, the public shall have cost-free access to the Sculpture Park Area during normal operating hours for Greenwood Park, as established by the CITY.  The  existing uses of Greenwood Park shall not be interfered with by the ART CENTER.  It is the intent of the parties that the CITY may continue to allow the Sculpture Park Area to be the site of weddings, events at the amphitheater, and other similar usages and that the public may continue to picnic, stroll, ice skate, fish or otherwise use the Park subject to any ordinance or regulation established by the CITY.  Except as may be approved by the Park Board where alternative facilities or accommodations are provided, practical uses of the Area, such as for storm drainage, shall not be impaired by any sculpture.  The ART CENTER's rights hereunder shall be subject to the right of the CITY to inspect, maintain, repair and replace underground water, sewer, electric and gas lines.

Within fifteen (15) days of the execution of this Agreement, the CITY shall provide to the ART CENTER the location of all existing water, sewer, electric and gas lines, together with any other agreements affecting the land.

VI. <u>INSURANCE AND HOLD HARMLESS</u>

   A. <u>Hold Harmless</u>

As part of the consideration for this Agreement, the ART CENTER agrees to indemnify, defend and save harmless the CITY, its officers, employees, and agents, hereinafter referred to as the "Indemnitees," from any and all loss or damage (including, without limiting the generality of the foregoing, all legal fees and disbursements paid or incurred by the CITY (including the value of services rendered by the City's Legal Department) to enforce this provision) which may be imposed upon, incurred by, or asserted against the Indemnitees by reason of negligent or tortious act, error, or omission resulting in personal injury, bodily injury, sickness, disease, or death to persons; or damage to, loss of, or destruction of tangible or intangible property, including the loss of use thereof, arising out of the design, construction, installation, maintenance or presence of sculptures pursuant to the terms of this Agreement.

   B. <u>Assumption of Risk</u>.  The ART CENTER undertakes and assumes for its directors, officers, agents, employees, and contractors all risk of dangerous conditions, if any, on or about the Sculpture Park Area.  The ART CENTER also agrees to indemnify, defend and hold harmless the Indemnitees against and from any claim asserted against or liability imposed upon the Indemnitees for personal injury or property damage sustained by the aforesaid persons during the term of this Agreement and arising out of activities related thereto.

BOOK 6316 PAGE 496

C. <u>Insurance</u>.  The ART CENTER covenants and agrees that at
all times during the term of this Agreement, it will at
its own expense procure and maintain commercial general
liability insurance, on an occurrence basis, in a re-
sponsible company or companies authorized to do busi-
ness in the State of Iowa, in amounts not less than
five hundred thousand dollars ($500,000) combined
single limit, or such increased amount as the CITY may,
from time to time, reasonably deem necessary to protect
its interests.  Certificates of Insurance naming CITY
and providing for mandatory notice to CITY at least
thirty (30) days before cancellation of the policy
shall be delivered to CITY on or before the date of the
beginning of the term of this Agreement and each
renewal of the insurance policy thereafter.

VII. <u>NOTICES AND COMPLAINTS</u>

A. <u>Notices</u>

Notices as provided for in this Agreement shall be
given in writing to the parties hereto at the respec-
tive addresses designated on page one of this Agreement
unless either party notifies the other, in writing, of
a different address.  Without prejudice to any other
method of notifying a party or making a demand or other
communication, any notice shall be considered given
under the terms of this Agreement when deposited in a
United States mailbox, addressed as above designated,
certified mail, return receipt requested, postage pre-
paid.

B. <u>Complaints</u>

Any complaints by the CITY with regard to the ART
CENTER'S operation or maintenance of the Sculpture Park
shall be made by the CITY'S Park and Recreation Direc-
tor or such other person as the Director or City Coun-
cil may designate and shall identify the date that the
occurrence complained of occurred.  Any complaints by

E. Severance.

In the event any term or provision of this Agreement is declared unlawful by a court of competent jurisdiction, that provision shall be null and void and the remaining terms shall remain in force and effect and shall be the agreement between the parties while the parties negotiate in good faith to replace any such unlawful provision.  If the arrangement called for in this Agreement cannot be continued without the unlawful term or provision, and if the parties are unable for any reason to negotiate a mutually agreeable and lawful replacement provision within thirty days after the court decree becomes final, this Agreement shall terminate and the ART CENTER shall, as provided in Section XII.B. have the right to remove any or all sculptures from the Sculpture Park Area.

IX. ASSIGNMENT OR TRANSFER

A. The ART CENTER shall not assign or transfer any of its rights under this Agreement at any time to anyone without the prior approval of the CITY.

B. Mechanic's Lien

Neither the ART CENTER nor anyone claiming by, through, or under the ART CENTER, shall have the right to file or place any mechanic's lien or other lien of any kind or character whatsoever upon the property described in Exhibit "A," or upon any building or improvement thereon, or upon the interest of the ART CENTER therein, and notice is hereby given that no contractor, subcontractor, or anyone else who may furnish any material, service or labor for any sculpture, building, improvement, alteration, repair or any part thereof, shall at any time be or become entitled to any lien thereof, and for the further security of the CITY, the ART CENTER covenants and agrees to give actual notice thereof, in advance, to any and all contractors and subcontractors

BOOK 6316 PAGE 499

the ART CENTER directed to the CITY shall be in writing
to the CITY'S Park and Recreation Director under the
signature of an authorized representative of the ART
CENTER, and shall identify the date that the occurrence
complained of occurred.

VIII. RIGHTS, PROVISIONS, LANGUAGE

A. Successors

Each and every covenant and Agreement herein contained
shall extend to and be binding upon the successors and
assigns of the parties hereto.

B. Modification

No covenants, provisions, terms or conditions of this
Agreement to be observed or performed by the CITY or
the ART CENTER shall be in any manner modified, waived
or abandoned, except by a written instrument duly
signed by the parties and delivered to the CITY and the
ART CENTER.  This Operating Agreement contains the
whole agreement of the parties with respect to the
Sculpture Park Area.

C. Rights

The various rights, powers, options, elections and
remedies of either party provided in this Agreement
shall be construed as cumulative and no one of them is
exclusive of the others, or exclusive of any rights,
remedies or priorities allowed either party by law, and
shall in no way affect or impair the right of either
party to pursue any other equitable or legal remedy in
any way unremedied, unsatisfied or undischarged.

D. Language and Captions.

Words and phrases herein, including acknowledgement
hereof, shall be construed as in the singular or plural
number, and as masculine, feminine or neuter gender
according to the context.  The captions in this
Agreement are for convenience only and shall not
constitute a limitation on any terms therein.

BOOK 6316 PAGE 498

who may furnish any such material, service or labor.

X. RELATIONSHIP AND ADMINISTRATION

    A.   The parties are undertaking this operating arrange-
ment pursuant to Iowa Code (1989) Chapter 28E.  They are not
creating any separate legal or administrative entity, and
will not have a separate budget; each party being responsible,
as provided herein, for its own expenses.

    B.   It is expressly understood and agreed that the ART
CENTER in the maintenance, operation and use of the Sculpture
Park Area and improvements specified in this Agreement is and
shall be deemed an independent contractor and operator, and
the CITY shall in no way be responsible to any person, firm
or corporation for any injuries or damages occasioned by the
design, construction, installation, or maintenance of the
sculptures as specified in this Agreement.

    C.   For purposes of Iowa Code § 28E.6(1), the City Mana-
ger of the CITY shall be the administrator of this cooperative
undertaking.

XI. DISCRIMINATION

    The ART CENTER agrees that, during the term of this Agree-
ment it will not exclude any qualified person from parti-
cipation in any programs or activities operated by the ART
CENTER in the Sculpture Park Area and shall not separately
or together with anyone else deny anyone the benefits of
such programs or activities, or otherwise subject anyone
to discrimination on the grounds of age, race, religion,
creed, sex, color, national origin, ancestry or disability.

XII. TERMINATION

    A. In the event a party violates or fails to carry out any
of the provisions of this Agreement, the other party
shall give the violating party sixty (60) days' written
notice of said violation or failure; and in the event
the violating party does not correct such violation or
failure within sixty (60) days (or such longer period
if the same is not reasonably curable in sixty days),

-13-

or if a party habitually violates such provisions, then the other party may cancel this Agreement.

B. In the event of cancellation or termination of this Agreement, the ART CENTER may, within six months of the date of such cancellation or termination, or such longer period as the parties may agree upon, remove those sculptures which have been installed and restore the areas to a park-like condition. Title to and possession of sculptures still located in the Sculpture Park Area after such six-month period shall immediately vest in the CITY, and they may thereafter be removed or altered as the CITY deems appropriate.

XIII. MEMBERSHIP ON ART CENTER BOARD OF TRUSTEES:

During the term of this Agreement the Mayor, after consulting with the President of the Art Center Board of Trustees, shall nominate him- or herself, or another member of the City Council, to serve as the CITY representative on the ART CENTER Board of Trustees. In the same manner, the Mayor shall nominate another Council member to serve as an alternate representative when the named Council member is unavailable. The ART CENTER covenants and agrees that those persons shall be appointed to serve as a full member of its Board as an alternate, in accordance with ART CENTER By-laws relating to all Board members.

XIV. CONTRACTS WITH ARTISTS

Any contract entered into by the ART CENTER with any artist for a sculpture to be located in the Sculpture Park Area shall be subject to the terms of this agreement.

XV. TERM OF OPERATING AGREEMENT AND RENEWAL

This Operating Agreement shall be in force and effect for a period of forty-nine (49) years commencing on December 1, 1990 and ending on November 30, 2039, and shall be automatically renewed for periods of twenty-five (25) years per

renewal period without further action by either party.
Either party may provide written notice to the other party
within one hundred eighty (180) days but not less than
thirty (30) days of any renewal date that this Agreement
shall not be renewed.

IN WITNESS WHEREOF, the parties have caused this Agreement to be
executed by their duly-authorized officers as of the date first
above-written.

Attest:                           CITY OF DES MOINES, IOWA


Donna V. Boetel-Baker            By  John P. Dorrian, Mayor
City Clerk

APPROVED AS TO FORM:


Richard J. Boyle
City Solicitor


APPROVED AS TO FORM:             EDMUNDSON ART FOUNDATION, INC.
                                 DES MOINES ART CENTER


Jeffrey A. Krausman             By  Charles C. Edwards, Jr., President
Attorney, Des Moines Art
              Center

                                By  Thomas Urban, Secretary


                                By  Julia Brown Turrell, Director

STATE OF IOWA  )
              )  ss:
COUNTY OF POLK )

On this 20th day of _November_____, 1990, before me, the undersigned, a Notary Public, personally appeared JOHN P. DORRIAN and DONNA V. BOETEL-BAKER, to me personally known, who, being by me duly sworn, did state that they are the Mayor and City Clerk, respectively, of the City of Des Moines, Iowa; that the seal affixed to the foregoing instrument is the seal of the corporation, and that the instrument was signed and sealed on behalf of the corporation, by authority of its City Council, as contained in the Resolution adopted by the City Council under Roll Call No. _90-4882_ of the City Council on the _5th_ day of _November_____, 1990, and that John P. Dorrian and Donna V. Boetel-Baker acknowledged the execution of the instrument to be the voluntary act and deed of the municipal corporation, by it voluntarily executed.

STATE OF IOWA  )
              )  ss:
COUNTY OF POLK )

On this _5th_ day of _December___, 1990, before me, the undersigned, a Notary Public in and for the State of Iowa, personally appeared _Charles Edwards_ and _Thomas Urban_ , to me personally known, who being by me duly sworn, did say that they are the _President_ and _Secretary_, respectively, of _Edmundson Art Foundation_, the corporation executing the within and foregoing instrument; that the seal affixed thereto is the seal of the corporation; that the instrument was signed and sealed on behalf of the corporation by authority of its Board of Directors; and that _President_ and _Secretary_ as such officers, acknowledged the execution of the instrument to be the voluntary act and deed of the corporation, by it and by them voluntarily executed.



Notary Public in the State of Iowa

MAMIE A. MORLAN
MY COMMISSION EXPIRES
1-18-93

4-8-SCULPT1

renewal period without further action by either party.
Either party may provide written notice to the other party
within one hundred eighty (180) days but not less than
thirty (30) days of any renewal date that this Agreement
shall not be renewed.

IN WITNESS WHEREOF, the parties have caused this Agreement to be
executed by their duly-authorized officers as of the date first
above-written.

Attest:                          CITY OF DES MOINES, IOWA

_____          By _____
Donna V. Boetel-Baker               John P. Dorrian, Mayor
City Clerk

APPROVED AS TO FORM:

_____
Richard J. Boyle
City Solicitor


APPROVED AS TO FORM:         EDMUNDSON ART FOUNDATION, INC.
                             DES MOINES ART CENTER

_____          By _____
Jeffrey A. Krausman                 Charles C. Edwards, Jr., President
Attorney, Des Moines Art
                  Center
                                 By _____
                                    Thomas Urban, Secretary


                                 By _____
                                    Julia Brown Turrell, Director

-15-

STATE OF IOWA  )
               ) ss:
COUNTY OF POLK )

    On this _20th_ day of _NOVEMBER_____, 1990, before
me, the undersigned, a Notary Public, personally appeared JOHN P.
DORRIAN and DONNA V. BOETEL-BAKER, to me personally known, who,
being by me duly sworn, did state that they are the Mayor and
City Clerk, respectively, of the City of Des Moines, Iowa; that
the seal affixed to the foregoing instrument is the seal of the
corporation, and that the instrument was signed and sealed on
behalf of the corporation, by authority of its City Council, as
contained in the Resolution adopted by the City Council under
Roll Call No. _90-4882_ of the City Council on the _5th_
day of _NOVEMBER_____, 1990, and that John P. Dorrian and
Donna V. Boetel-Baker acknowledged the execution of the instru-
ment to be the voluntary act and deed of the municipal corpora-
tion, by it voluntarily executed.

                                            _Diane Vmotich_

STATE OF IOWA  )
               ) ss:
COUNTY OF POLK )

    On this _5th_ day of _December_____, 1990, before me, the
undersigned, a Notary Public in and for the State of Iowa, per-
sonally appeared _Charles Edwards_____ and _Thomas Urban_
_____, to me personally known, who being by me
duly sworn, did say that they are the _President_____
and _Secretary_____, respectively, of _Edmundson
Art Foundation_, the corporation executing the within and
foregoing instrument; that the seal affixed thereto is the seal
of the corporation; that the instrument was signed and sealed on
behalf of the corporation by authority of its Board of Directors;
and that _President_ and _Secretary_
_____ as such officers, acknowledged the execution of the
instrument to be the voluntary act and deed of the corporation,
by it and by them voluntarily executed.

                       _Mamie A Morlan_
                    Notary Public in the State of Iowa



MAMIE A. MORLAN
MY COMMISSION EXPIRES
1-18-93

## EXHIBIT A

The Sculpture Park Area shall be defined as the following property:

Commending at a point on the east entrance to Greenwood Park, otherwise designated as Forty-fifth Street which point is four hundred thirty (430) feet from the southwest corner of said entrance and Grand Avenue and parallel to Polk Boulevard extended, thence south and southwesterly along said Forty-fifth Street to a point fifty (50) feet south of the southernmost tip of the existing pond, thence northerly in an arc fifty (50) feet outside of the existing pond to the intersection of said arc with Park Drive, as if extended south from its current terminating point, thence northerly along the east line of Park Drive to the point on Park Drive which is the intersection of a line at right angles to a line drawn parallel to Polk Boulevard extended and which point is the current southwesterly point of the land granted to the Art Center by Ordinance 7374, thence east along said line to the point of beginning. It is the intention of this description to include all that land located south of Grand Avenue between Forty-fifth Street and Park Drive to a point fifty (50) feet south of the existing pond not previously granted for use by the Art Center in Ordinance 7374 on July 5, 1966.

SECRETARY OF STATE
STATEHOUSE
STATE OF IOWA
DES MOINES 50319

ELAINE BAXTER
SECRETARY OF STATE

515-281-5864

December 11, 1990


Donna V. Boetel-Baker, CMC
City Clerk
City Hall - 2nd Floor
400 East First Street
Des Moines, IA 50309-1891

RE:   Operating Agreement between the City of Des Moines and Edmundson
      Art Foundation, Inc. for development of the Greenwood Park
      Sculpture Park

Dear Ms. Boetel-Baker:

     We have received the above described agreement(s) which you
submitted to this office for filing, pursuant to the provisions of
Chapter 28E, 1989 Code of Iowa.

     You may consider the same filed as of December 11, 1990.


                                        Cordially,

                                        Elaine Baxter
                                        Elaine Baxter
                                        Secretary of State


EB/kl

<u>Addendum</u> (to Master Plan, see page 2)

### LAND USE CONTEMPLATED BY THE PROPOSED SCULPTURES

Certain individual sculptures are referred to as "environmental sculptures," that is, sculptures occupying sometimes large areas of physical space such that the dimensions are not always obvious to the observer.  These works incorporate as elements in the sculpture the topography and features of the site.

Neither access into Greenwood Park nor use of Greenwood Park will be altered by any of the proposed sculptures.  It is the intent of the "sculpture park" to extend and enhance the use of Greenwood Park as it now exists, and to provide ways for people in Des Moines to gain a greater appreciation of the natural landscape, plantings, and terrain of the park.

In the short term, there may be some temporary disruption of existing wildlife (i.e., skunk, rabbit, squirrel, raccoon, common snakes, etc.) populations in Greenwood Park as the construction of each sculpture is undertaken.  This may include noise, dust, and ground vibration associated with the normal site preparation, construction, and restoration activities at each individual site.

In the long term, after all sculpture pieces are in place and the area (turf, vegetation, etc.) has been allowed to restore itself to pre-construction conditions, no unusual or adverse impact on existing wildlife is anticipated.  These art works are designed to be sensitive to the environment and structurally and visually compatible with the natural features of the park setting.

A further mitigating factor is that the various sculpture pieces will be under construction at different times over a period of perhaps months or years.  This will likely insure that the sculpture park area has time to "rest and restore" itself in one area before construction activities are started in another area.

The Art Center will supervise the construction and installation of each sculpture in such a manner to insure that it will be installed in a workmanlike and prudent manner, and in accordance with any applicable city and state codes.  The Art Center does not anticipate any areas of the park to be impacted adversely. The Art Center will repair any damage to the grounds and/or plant materials resulting from the installation of the proposed sculptures.

GENERAL AREA TO BE OCCUPIED BY EACH SCULPTURE

1.   Proposed site is the lagoon area, south of the Art Center.
The use of the site would affirm the natural aspects and views
of the area and enhance its public use.  The proposed sculpture
would not prevent normal maintenance such as cleaning or
dredging for better storm water retention.

2.   Proposed site is a terraced area southeast of the Rose
Garden and northwest of Sylvan Theater.  The canopy of trees,
the three different levels, open space, and natural
characteristics of the site would be incorporated as elements of
the sculpture.

3.   Proposed site is a rolling hilly area southwest of the Rose
Garden and north of the lagoon.

4.   Proposed site is a rolling hilly area adjacent to the Rose
Garden and east of Park Avenue.

5.   Proposed site is a open slope south of the site #6 and
adjacent to the east side of the Rose Garden.

6.   Proposed site is a small grove of evergreen trees located
east of the Rose Garden adjacent to the "tea houses".

7.   Proposed site is a open flat area south of the Art Center
building designed by Saarinen.

8.   Proposed site is the Rose Garden area.  The site begins at
the (north position of garden) south side of the Art Center
building designed by I.M. Pei, and extends to the south portion
of garden.


*** The above proposed sites were approved by the City Council
     January 1991 with the Sculpture Park Master Plan of site
     locations, as outlined in II.a. of the Operating Agreement,
     11/5/90.



AGREEMENT FOR ARTISTIC SERVICES
FOR THE DESIGN DEVELOPMENT PHASE OF THE WORK



THIS AGREEMENT is made this *15th* day of *September*, 1992 by and between the Edmundson Art Foundation, Inc., Des Moines Art Center, hereinafter referred to as the "Art Center" and Mary Miss hereinafter referred to as the "Artist."

WHEREAS, the Art Center is commissioning artwork for its permanent collections and allocating funds for the establishment of site specific art in public spaces adjacent to the Art Center and making payments for the design, execution, and placement of art work; and

WHEREAS the Art Center has allocated funds for the design process to commission artwork; and

WHEREAS the Artist was selected by the Art Center to develop a concept plan designating in general, areas and elements to be developed for an environmental sculpture for the Art Center permanent collection (hereinafter referred to as the "Work"), and this concept has been approved through procedures duly adopted by the Board of Trustees; and

WHEREAS, the parties wish the Artist to provide Design Development services during a Design Development Phase; and

WHEREAS, the Art Center and the Artist have mutually agreed upon a site south of the Art Center, east of 45th Street, west of Park Drive and surrounding the lagoon area, as the site for the Work (hereafter the "Site"); and

WHEREAS, both parties wish the integrity and clarity of the Artist's ideas and statements in the Work to be maintained;

NOW THEREFORE, the parties mutually agree as follows:

1. During the Design Development Phase, the Artist shall:

(i) further define the form and placement of elements and landscaping, and provide site plan and elevations for the work of art to provide a practical review of the functional uses of spaces proposed.

(ii) provide material selections

(iii) prepare a preliminary budget

**EXHIBIT**

**B**

Page 2, Agreement, Design Development Phase, Mary Miss

(iv) develop such documentation as the Artist in her sole discretion considers necessary to fix and describe the character of the Work ("Design Development Documentation")

(v) present the Design Development Documentation to the Art Center for its approval. If the Design Development Documentation is disapproved, the Artist shall be afforded an opportunity to make revisions to the Design Development Documentation and resubmit it for approval. If disapproved, this agreement shall terminate.

2.      During the Design Development Phase, the Art Center shall:

(i) arrange for the landscape architect, and relevant other consultants to consult with the Artist and provide such technical information and support services as are necessary to permit the Artist to carry out Design Development including such information as is relevant to preparation of a budget. Specifically, the staff of the Art Center shall assist Artist in identifying budget elements devoted to the Work and budget elements devoted to the site and the costs of general upgrading of the area.

3.  Payment Schedule.  The Art Center shall pay to the Artist a Design Development fee of Twenty Thousand Dollars ($20,000.00) for the Design Development Phase. Such fee shall be payable in the following installments, each installment to represent full and final non refundable payment for all services provided prior to due date:

(i)  Ten Thousand ($10,000.00) on signing the Agreement,

(ii)  Ten Thousand ($10,000.00) on submission of the Design Development Documents.

In addition, the Art Center shall reimburse the Artist on submission of invoice for the following costs and expenses incurred in furtherance of the Work:

(a)  Travel costs, including, air fare to and from Iowa,

Page 3, Agreement, Design Development Phase, Mary Miss

          (b)    presentation models and other models and renderings requested by the Art Center,

          (c)  reproductions,

          (d)    postage and handling of Drawings and Specifications.

Such expenses shall be in addition to the Artist's Design fee and shall not exceed Six Thousand Dollars ($6,000.00) without the prior written approval of the Art Center.

4. <u>Artist Warranties</u>. The Artist warrants that the Work is unique and original and does not infringe upon any copyright; that the Work, or a duplicate thereof, has not been accepted for sale elsewhere; and the Work is free and clear of any liens from any source whatever.

5. <u>Reproduction Rights</u>. The Artist retains all rights under the Copyright Act of 1976, 17 U.S.C. Secs. 101 et seq., and all other rights in and to the Work except as such rights may be modified by further agreement. If the Design Development Documents are not approved, the Art Center agrees that it will not use the ideas proposed in the Design Development Documents.

6. <u>Ownership and Use of Documents</u>. Any and all sketches, drawings, tracings, computations, details, models/maquette and other materials prepared by the Artist shall be the property of the Artist whether or not the Work is approved or not. The Artist shall convey to the Art Center one drawing or maquette for archival and/or exhibition purposes. Possession of the maquette or model shall not convey to the Art Center any right to use the model other than for exhibition or archival purposes without the prior written approval of the Artist.

7. <u>Term</u>. The Artist shall commence the Design Development Phase upon the execution of this Agreement and shall present and submit the Design Development Documents within 90 days. This date may be changed by mutual agreement of the parties or if circumstances beyond the Artist's control prevent performance in a timely manner.

Page 4, Agreement, Design Development Phase, Mary Miss

8.   <u>Further Agreement</u>. If the Design Development Documents are approved, the Art Center shall enter into a further agreement with the Artist to provide for the Artist's services during construction and installation of the Work.

The Artist agrees that in the event the Art Center enters into a future agreement for the construction and installation of the Work, said construction and installation shall be subject to the terms and conditions of the Operating Agreement with the City of Des Moines, dated November 5, 1990, a copy of which agreement has been provided to the artist.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the date first above written.

Des Moines Art Center:                     Artist:

M. Jessica Rowe                            Mary Miss
Associate Director

9/92
9.29.92



## Agreement for Artistic Services
## For Further Design Development,
## Working Drawings and Implementation
## of the Artwork



EXHIBIT
C

**THIS AGREEMENT** is made this _4th_ day of _April_, 199 _4_ by and between the Edmundson Art Foundation, Inc., Des Moines Art Center, hereinafter referred to as the "Art Center" and Mary Miss hereinafter referred to as the "Artist."

**WHEREAS,** the Art Center is commissioning artwork for its permanent collections and allocating funds for the establishment of site specific art in public spaces adjacent to the Art Center and making payments for the design, execution, and placement of art work; and

**WHEREAS,** the Artist was selected by the Art Center to develop a concept plan designating in general, areas and elements to be developed for an environmental sculpture for the Art Center permanent collection (hereinafter referred to as the "Work"), and this concept has been approved through procedures duly adopted by the Board of Trustees; and

**WHEREAS,** the Art Center and the Artist have mutually agreed upon a site south of the Art Center, east of 45th Street, west of Park Drive and the surrounding lagoon area, as the site for the work (hereinafter the "Site") subject to approval procedures with Des Moines Art Center and City of Des Moines; and

**WHEREAS,** by further agreement the Artist has completed the Design Development Phase and the Art Center has approved Design Development Documentation;

**WHEREAS,** both parties wish the integrity and clarity of the Artist's ideas and statements in the Work to be maintained;

**WHEREAS,** both parties wish the Artist to proceed to preparation of working drawings, development of construction documents, and negotiation and bidding and as feasible to implementation of the Artwork;

**NOW THEREFORE,** the parties mutually agree as follows:

1. During the preparation of the working drawings, the Artist shall:

Page 2, Mary Miss Agreement

    1.1   General

        (i)    further define the form and placement of elements and landscaping,

        (ii)   refine material selections

        (iii)  prepare a final budget as set forth below.

        (iv)   develop such documentation as the Artist in her sole discretion considers necessary to fix and describe the final character of the Work. ("Artist's Working Drawings")

        (v)    prepare an updated project budget.

        (vi)   present the Artist Working Drawings and updated project Budget to the Art Center for its approval. If the Artist Working Drawings are disapproved, the Artist shall be afforded an opportunity to make revisions to the Artist Working Drawings and re-submit it for approval. If disapproved, this agreement shall terminate.

    1.2  Artist Working Drawings

        (i)    During the development of the Artist Working Drawings, the Artist shall work with engineering or architectural consultants to be hired by the Art Center to confirm structural and dimensional criteria and to permit said consultants to certify, to the consultants' knowledge, the work's compliance with applicable statutes and ordinances as well as structural requirements.

        (ii)   The Artist shall work cooperatively with the Art Center's consultants to permit said consultants to prepare Construction Documents based on the Artist's Working Drawings.

        (iii)  In order to ensure that the Project conforms to the Artist's aesthetic intent, no changes from the Artist's Working Drawings may be made in the Construction Documents without the Artist's prior written approval. The Artist shall review and approve all Construction Documents to ensure conformance with the approved Proposal and Artist Working Drawings.

    1.3  Construction Documents.

        After consultation with the Artist, the Park and Recreation Department or the appropriate official designated by the Art Center or the Park and Recreation Department shall prepare Construction documents for site elements and elements related to general upgrading of the area. The Artist shall have the right to

Page 3, Mary Miss Agreement

review and to approve the Construction Documents in order to ensure that the site elements and elements related to general upgrading of the area conform to her specific aesthetic intent as expressed in the Working Drawings and general aesthetic intent.

    1.4   Project Budgeting.

        (i)    The  Artist  together  with  the  Park  and Recreation  Department  and  the  Art  Center  shall prepare a final budget  for  the  work  based  on  estimates  solicited based on the Working Drawings and Construction Documents.

        (ii)   The  Budget  shall be presented for approval of the  Art  Center  with  the  submission  of the Working Drawings and Construction Documents.

        (iii)  The  Art Center may either approve the proposed Budget  and  the  Working  Drawings or alternatively in consultation with  the  Artist  determine which elements of the Work to implement if  the  implementation  of the entire Work would exceed the financial capabilities of the Art Center.

        (iv)   In  the  event  that  the  Art Center wishes to redesign  the  Work  to accommodate a revised budget, then the Artist shall  be  paid  an  additional  fee  based on the amount of time to redesign and the extent of the revision.

    1.5   Fabrication and Construction of the Project.

        (i)    Prior  to  bidding and construction, the Artist and  the  Art Center will mutually decide which elements if any will be  built  by  the General Contractor and which elements if any will be  fabricated  by  the  Artist's fabricator, and, the budget amount for  each  element.   The Artist shall arrange for and supervise the fabrication  of  the  elements  to  be  fabricated  by  the Artist's fabricator, if any.

        (ii)   The  Artist  shall  advise and consult with the Art  Center  and  the person or persons designated from time to time as  the  project  coordinator,  during  the  construction and installation phase.

        (iii)  Since  the  Artist does not have direct control over  construction  costs,  such  as  labor,  material, insurance and related  overhead  items, Artist cannot guarantee, or be responsible

Page 4, Mary Miss Agreement

for, the total cost of construction. Artist shall endeavor to provide accurate cost estimates and effective cost control to the best of Artist's ability, but payment of Artist's fee is not predicated upon the accuracy of the subject estimates. However, the Artist will redesign the Artwork, without any increase in the Artist's fee calculated under Article 3, after fabrication and installation bids are received, if necessary, to come within the approved budget.

(iv)   The Artist shall visit the Site at intervals approved by the Art Center and appropriate to the state of construction to become generally familiar with the process and quality of the Project completed and to determine in general if the Project is being performed in a manner indicating that the Project when completed will be in accordance with the Proposal and the Working Drawings.

2. **SCOPE OF ART CENTER'S RESPONSIBILITIES.**

(2.1)  The Art Center shall:

(i)   Contract with Architect, landscape Architect and other consultants to assist Artist in carrying out further design development and to prepare Construction Documents. Unless otherwise indicated, these services shall be performed by licensed professional consultants who shall affix their seals on the appropriate documentation. The Artist shall have no liability for the components of the Project, if any, designed by the Art Center's consultants. The Art Center's consultants will be responsible for securing all applicable permits, licenses and government approvals required in connection with the installation of the Project. The fees of such consultants shall be included in the Project budget.

(ii)   Advise on changes or modifications in design which may be required because of engineering or environmental considerations or because of health, safety, welfare or engineering codes and standards of the Art Center during the Design Proposal and Design Development Phases.

Page 5, Mary Miss Agreement

(iii)   Arrange   for   the   landscape architect,   and relevant   other   consultants   to consult with the Artist and provide such   technical information and support services as are necessary to permit   the Artist to carry out Further Design Development including such   information   as   is relevant to preparation of a final budget. Specifically,   Parks   Department   and   the   Staff   of the Art Center shall   assist   Artist   in identifying budget elements devoted to the Work   and   budget   elements   devoted   to   the   Site and the costs of general upgrading of the area.

(iv)   Designate   a   project   coordinator   (which designation   may   be   changed   from time to time) who will represent the   Art   Center   in   coordinating   all work with the Artist and the City   of   Des   Moines.   The costs of the project coordinator(s) are not a part of the project budget.

(v)   Pay   directly   on   submission   of   invoice, fabrication costs, if any, consistent with section 1.5 (i).

(vi)   Prepare   the   Site and construction and install the Project in accordance with the Working Drawings.

(vii)   Pay   all   costs and expenses in connection with the above responsibilities.

(viii)   Develop   in   consultation   with   Artist and The Science Center of Iowa signage and didactic material.

3.   **Payment   Schedule.**   The   Art   Center shall pay to the Artist   for   her   services   in connection with this agreement fee of the   hundred   twenty   five   thousand   ($125,000).   Such fee shall be payable   in   the   following   installments,   each   installment   to be provided prior to due date:

(i)   Twenty   Thousand   ($20,000)   on   signing   the agreement,

(ii)   Thirty   Thousand ($30,000) on submission of the Artist's Working Drawings,

(iii)   Ten   Thousand   ($10,000)   following   completion and approval of Construction Documents,

(iv)   Twenty   Thousand   ($20,000)   on   completion   of construction negotiation and bidding,

Page 6, Mary Miss Agreement

      (v)     Ten Thousand ($10,000) when Artist determines project is 25% complete,

      (vi)    Ten Thousand ($10,000) when Artist determines project is 50% complete,

      (vii)   Twenty-Five Thousand ($25,000) when the project is completed and accepted.

      In Addition, the Art Center shall reimburse the Artist on submission of invoice for the following costs and expenses incurred in furtherance of the Work:

      (viii)  Travel costs, including, air fare to and from Iowa,

      (ix)    presentation models and other models and renderings requested by the Art Center,

      (x)     reproductions,

      (xi)    postage and handling of Drawings and Specifications.

      Such expenses shall be in addition to the Artist's Design fee and shall not exceed Ten Thousand Dollars ($10,000) without the prior written approval of the Art Center.

    4.    **Artist Warranties.**  The Artist warrants that the Work is unique and original and does not infringe upon any copyright; that the Work, or a duplicate thereof, has not been accepted for sale elsewhere; and the Work is free and clear of any source whatever.

    5.    **Reproduction Rights.**  The Artist retains all rights under the Copyright Act of 1976, 17 U.S.C. §§ 101 et seq., and all other rights in and to the Work except as such rights may be modified by further agreement.  If the working drawings are not approved, the Art Center agrees that it will not use the original ideas proposed in the Design Development Documents.

    6.    **Term.**  The Artist shall commence the work contemplated by this agreement upon the execution of this Agreement and mutually agree upon a schedule for the work.  This date may be changed by mutual agreement of the parties or if circumstances beyond the Artist's control prevent performance in a timely manner.

Page   7, Mary Miss Agreement

The parties will mutually agree upon a time table for payments and amendments to agreement prior to commencement of the implementation phase of the project. Such further agreement will be provided in more detail at acceptance of the parties with respect to installation and provide for such installation and other requests.

8.    **Title and Ownership** — Upon completion of the Project and upon final payment to the Artist by the ART CENTER, title to the Project shall pass to the ART CENTER.

8.1    The Artist shall own all studies, drawings, designs, models and photographs produced by the Artist pursuant to this Agreement.

8.2   Alteration of the Work or of the Site.

(i)   Art Center agrees that it will not intentionally damage, alter, relocate, modify or change the Work without the prior written approval of the Artist.

(ii)   Art Center shall notify the Artist of any proposed alteration of the Site that would affect the intended character and appearance of the Work and shall consult with the Artist in the planning and execution of any such alteration and shall make a reasonable effort to maintain the integrity of the Work.

8.3    Moral Right. Art Center will not use the Work in any manner which would reflect discredit on the Artist's name of reputation as an Artist or which would violate the spirit of the Work.

8.4    Surviving Covenants. The covenants and obligations set forth in this Article shall be binding upon the parties, their heirs, legatees, executors, administrators, assigns, transferee and all their successors in interest, and Art Center's covenants do attach and run with the Work and shall be binding to and until twenty (20) years after the death of the Artist. However, the obligation imposed upon the Center by sections 9.3 (1) shall terminate on the death of the Artist. Art Center shall give any subsequent owner of the Work notice in writing and of the covenants herein, and shall cause each such owner to be bound thereby.

Page 8, Mary Miss Agreement

8.7    Additional Rights and Remedies.    Nothing contained in this Article 9 shall be construed as a limitation on such other rights and remedies available to the Artist under the Visual Arts Rights Act of 1990 or under any other law which may now or in the future be applicable.

9.    **ARTIST'S RIGHTS**

**9.1**    Signage.    ART CENTER agrees to use its best efforts to incorporate the Artist's rights in this Article as a condition of any transfer of the Project. The Artist retains the right to disapprove any transfer which fails to incorporate the Artist's rights of this Article.    The Artist's name, copyright notice, title, and date of the Project are to be displayed near or on the Project at all times in a mutually acceptable location.

9.2    Maintenance.    ART CENTER recognized that maintenance of the Project on a regular basis is essential to the integrity of the Project.    ART CENTER shall reasonably assure that the Project is properly maintained and protected; taking into account any instructions provided by the Artist, and shall reasonably protect and maintain the Project against the ravages of time, vandalism and the elements.

9.3    Repairs and Restoration.

(i)    ART CENTER shall have the right to determine, after consultation with a professional conservator, when and if repairs and restorations to the Project will be made. During the Artist's lifetime, the Artist shall have the right to approve all repairs and restorations, provided, however, that the Artist shall be paid a reasonable fee for any such services, provided that the ART CENTER and the Artist shall agree in writing, prior to the commencement of any significant repairs or restorations, upon the Artist's fee for such services.

Page 9, Mary Miss Agreement

### 10.   TERMINATION OF THE CONTRACT

If either party to this Agreement shall fail to fulfill in a timely and proper manner, or otherwise violate any of the covenants, agreements or stipulation material to this Agreement, the other party shall thereupon have the right to terminate this Agreement by giving written notice to the defaulting party of it's intent to terminate, specifying the grounds for termination. The defaulting party shall have thirty (30) days after receipt of the notice to cure the default. If it is not cured, then this Agreement shall terminate. In the event of default by ART CENTER, ART CENTER shall promptly compensate Artist for all services performed by the Artist prior to termination. In the event of a substantial and material default by the Artist, all finished and unfinished drawings, sketches, photographs, and other work products prepared and submitted or prepared for submission by the Artist under this Agreement shall at ART CENTER's option become it's property provided that no right to fabricate or execute Project shall pass to ART CENTER. Notwithstanding the foregoing, the Artist and ART CENTER shall not be relieved of liability to the other for damages sustained either by virtue of any breach of this agreement and ART CENTER may reasonably withhold payments to the Artist until such time as the exact amount of such damages due ART CENTER from the Artist is determined. Failure to fulfill contractual obligation due to conditions beyond either party's reasonable control should not be considered a breach of contract, provided that such obligations shall be suspended only during the duration of such conditions.

### 11.   INDEMNITY

Upon transfer of title of the Project, ART CENTER shall indemnify and hold harmless the Artist against any and all claims or liabilities then existing or arising thereafter in connection with the Site, the Project of this Agreement, except claims by ART CENTER against the Artist and claims which may occur as a result of the Artist's breach of the warranties provided in Article 6.

Page 10, Mary Miss Agreement

12. **ENTIRE AGREEMENT**

Except as otherwise provided herein, this writing embodies the entire agreement and understanding between the parties hereto, and there are no agreements and understandings oral or written, with reference to the subject matter hereof that are not merged herein and superseded hereby.

13. **NO COPARTNERSHIP, JOINT VENTURE OR AGENCY** – It is understood and agreed that nothing herein contained is intended or shall be construed to in any respect create or establish the relationship of copartners, joint venturers, or agents between ART CENTER and Artist or in any of Artist's assignees, delegates, subcontractors, or Project Directors, or as constituting any of them the general representative of ART CENTER for any purpose except as specifically authorized by separate prior written approval of ART CENTER.

14. **WAIVER** – waiver of performance by either party shall be construed as or operate as a waiver of any subsequent default of any terms, covenants, and conditions of this Agreement. The payment or acceptance of fees for any period after a default shall not be deemed a waiver of any right or acceptance of defective performance.

15. **COOPERATION OF CITY** – The parties acknowledge that the performance of certain aspects of this agreement requires the cooperation of the Parks and Recreation Department or other units of the government of the City of Des Moines. The failure of the City of Des Moines to perform as contemplated by this agreement shall not be deemed a breach of either party of this contract but may constitute an event causing a failure to fulfill the contractual obligations beyond either party's control. The Artist acknowledges this agreement is subject to the terms of the 28E agreement between the City and the Art Center, a copy of which agreement has been supplied to the Artist prior to the execution of this agreement. The terms of this agreement are subject to the terms of the 28E agreement which shall take precedence over conflicting terms, if any, in this agreement.

Page 11, Mary Miss Agreement

     16.     **HEIRS AND ASSIGNS** — This Agreement shall be binding upon and shall inure to the benefit of ART CENTER and the Artist and their respective heirs, personal representatives, successors, and permitted assigns.

     17.  The members of the Board of Directors of the ART CENTER FOUNDATION shall have no personal liability for the performance of the terms of this agreement.

     18.     **MODIFICATION** — No alteration, change or modification of the terms of the Agreement shall be valid unless made in writing and signed by both parties hereto and approved by appropriate action of ART CENTER,

     IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the date first above written.

Des Moines Art Center          Artist

_____     _____

12/93





EXHIBIT

D



Greenwood Park
Artist's Working Drawings
PRELIMINARY SUBMISSION
October 21, 1994

Mary Miss
340 Greenwich Street
New York, New York 10013

Was Cardillo Architect
410 Bergich Avenue
Brooklyn, New York 55523

| DRAWING LIST | | LAST SUBMISSION DATE |
|---|---|---|
| | COVER SHEET | 10/21/94 |
| GN - | NOTES AND DRAWING LIST | 10/21/94 |
| | | |
| SP1 - | SITE PLAN | 10/21/94 |
| | | |
| A1 - | PART PLAN PAVILLION (A), FREESTANDING ELEMENTS (B), EARTH MOUND (R) | 9/26/94 |
| A2 - | PAVILLION PLAN AND REFLECTED CEILING | 10/21/94 |
| A3 - | PAVILLION ROOF PLAN, ELEVATION AND SECTION | 10/21/94 |
| A4 - | PAVILLION SECTIONS | 10/21/94 |
| A5 - | PAVILLION ENCLOSURE PANELS | 10/21/94 |
| A6 - | PAVILLION ENCLOSURE PANELS DETAILS | 10/21/94 |
| A7 - | PAVILLION ROOF DETAILS | 10/21/94 |
| | | |
| B1 - | FREESTANDING ELEMENT PLANS, ELEVATIONS AND SECTIONS | 9/26/94 |
| B2 - | FREESTANDING ELEMENT PLANS AND ELEVATIONS | 9/26/94 |
| B3 - | FREESTANDING ELEMENT PLANS AND ELEVATIONS | 9/26/94 |
| | | |
| C1 - | BRIDGE AND RAMP RECESS INTO WATER PLAN | 10/21/94 |
| C2 - | BRIDGE PLAN | 10/21/94 |
| C3 - | BRIDGE ELEVATIONS | 10/21/94 |
| C4 - | BRIDGE SECTION | 10/21/94 |
| C5 - | BRIDGE DETAIL SECTIONS | 9/26/94 |
| | | |
| D1 - | WOOD WALKWAY (D), RAMP WALKWAY (E) PLAN AND DETAILS | 10/21/94 |
| D2 - | RAMP WALKWAY DETAILS, SECTIONS AND ELEVATIONS | 9/26/94 |
| D3 - | RAMP WALKWAY DETAILS | 10/21/94 |
| D4 - | WOOD WALKWAY DETAILS | 9/26/94 |
| | | |
| F1 - | WALKWAY RECESS INTO WATER (F) DETAILS | 10/21/94 |
| F2 - | WALKWAY RECESS INTO WATER (F) DETAILS | 10/21/94 |
| | | |
| G1 - | TERRACES PLAN | 10/21/94 |
| G2 - | TERRACES DETAILS | 10/21/94 |
| | | |
| I1 - | OVERHANGING WALKWAY (I) PLANS | 10/21/94 |
| I2 - | OVERHANGING WALKWAY ISONOMETRIC AND DETAILS | 10/21/94 |
| I3 - | OVERHANGING WALKWAY DETAIL SECTIONS | 10/21/94 |
| I4 - | OVERHANGING WALKWAY DETAILS | 10/21/94 |
| | | |
| J1 - | VIEWING PAVILLION, ELEVATIONS AND SECTIONS | 9/26/94 |
| J2 - | VIEWING PAVILLION, PLANS AND DETAILS | 9/26/94 |
| | | |
| L1 - | ELEVATED WALKWAY AND VIEWING PLATFORM PLAN | 10/21/94 |
| L2 - | ELEVATED WALKWAY AND VIEWING PLATFORM, DETAILS | 9/26/94 |
| L3 - | RETAINING WALLS, DETAILS | 10/21/94 |
| | | |
| M1 - | VIEWING PAVILLION AND STEEL GRATE WALKWAY PLAN AND DETAILS | 10/21/94 |

PRELIMINARY SUBMISSION #2  10/21/94

Artist: **Mary Miss**
349 Greenwich Street
New York, New York 10013

Architectural Consultant:   **Max Cardillo Architect**
203 Seventh Avenue
Brooklyn, New York 11215

NOTE
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT.
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.

Date: 10/24/94
Artist's Working Drawings

GN



① PART PLAN 1/16"=1'-0
PAVILLION WITH METAL ROOF (A),
FREESTANDING ELEMENTS (B), EARTH MOUND (R)

Mary Miss
349 Greenwich Street
New York, New York 10013

Architectural Consultant:

Max Cardillo Architect
205 Seventh Avenue
Brooklyn, New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT.
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.

PRELIMINARY SUBMISSION 8/26/94

Date: 8/26/94
Artist's Working Drawings.

A1





1 PLAN    1/4"=1'-0
  AT PAVILLION (A)

1 REFL.CLNG. PLAN    1/4"=1'-0
  AT PAVILLION (A)

PRELIMINARY SUBMISSION #2 10/21/94
PRELIMINARY SUBMISSION #1 9/26/94

Date: 9/26/94
Artist's Working Drawings

A2

Artist: Mary Miss
349 Greenwich Street
New York, New York 10013

Architectural Consultants:   Max Cardillo Architect
205 Seventh Avenue
Brooklyn,New York 11215



NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT.
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.







2 FRONT ELEVATION   1/4"=1'-0
  AT PAVILLION (A)

3 SECTION   1/4"=1'-0
  AT PAVILLION (A)

1 ROOF PLAN   1/4"=1''-0
  AT PAVILLION (A)

18'

12'-6"

18'

PRELIMINARY SUBMISSION #2 10/21/94
PRELIMINARY SUBMISSION #1 8/26/94

Date: 9/26/94
Artist's Working Drawings

A3

Artist
Mary Miss
349 Greenwich Street
New York, New York 10013

Architectural Consultants
Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.



① UNFOLDED SECTION     3/8"=1'-0
  AT PAVILLION (A)



LIGHT FIXTURES
ELECTRIC HEATERS

CRUSHED STONE
WOOD DECK

16'-6"

② SECTION     3/8"=1'-0"
  AT PAVILLION (A)



15'

③ SECTION     3/8"=1'-0"
  AT PAVILLION (A)

PRELIMINARY SUBMISSION  10/21/94
                                       1/26/94

Date: 9/26/94
Artist's Working Drawings

A4

Mary Miss
349 Greenwich Street
New York, New York 10013

Architectural Consultant:

Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215



NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.



1 ELEVATION    1/2"=1'-0
AT PAVILLION ENCLOSURE PANELS

2 SECTION    1/2"=1'-0
AT PAVILLION ENCLOSURE PANELS

3 ELEVATION    1/2"=1'-0
AT PAVILLION ENCLOSURE PANELS



4 PART PLAN    1/2"=1'-0
AT PAVILLION ENCLOSURE PANELS

PRELIMINARY SUBMISSION #2 10/21/94

Mary Miss
349 Greenwich Street
New York, New York 10013

Architectural Consultant:

Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215


NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.

Date: 10/21/94
Artist's Working Drawings

A5





(1) PLAN DETAILS    3"=1'-0
    AT PAVILLION ENCLOSURE PANELS

(2) PART PLAN    3"=1'-0
    AT PAVILLION ENCLOSURE PANELS

PRELIMINARY SUBMISSION  #2  10/21/

Date  10/21/94
Artist's Working Drawings

Mary Miss

340 Greenwich Street
New York, New York 10013

Architectural Consultants    Max Cardillo Architect

203 Seventh Avenue
Brooklyn, New York 11215



NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT.
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.

A6



③ SECTION DTL .1"=2"
AT PAVILLION ROOF TRUSS

GALV.SCREW W/GASKET
SEALANT
20 GA.GALV. STEEL SHEET
3/4" MARINE GRADE PLYWOOD
RAFTER 4X4 PRESSURE TREATED LUMBER

DRIP

② SECTION DTL .3"=1'-0
AT ROOF EAVE

③ SECTION DTL .1"=2"
AT POST BEAM CONNECTION

PRELIMINARY SUBMISSION #2 10/21/94
PRELIMINARY SUBMISSION #1 9/28/94

Date: 10/21/94
Artist's Working Drawings

Mary Miss
349 Greenwich Street
New York, New York 10013

Architectural Consultant:

Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.

A7



4x4 WOOD TYP.

① ELEVATION   1/4"=1'-0
   AT FREE STANDING ELEMENT

② SIDE ELEVATION   1/4"=1'-0
   AT FREE STANDING ELEMENT

③ PLAN   1/4"=1'-0
   AT FREE STANDING ELEMENT



4x4 WOOD TYP.

④ TYPICAL SECTION 1/4"=1'-0
   AT FREE STANDING ELEMENT

PRELIMINARY SUBMISSION 9/28/94

Date: 9/28/94
Artist's Working Drawings

Artist:  Mary  Miss
349 Greenwich Street
New York, New York 10013

Architectural Consultant:   Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11216



NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT.
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.

B1



① ELEVATION  1/4"=1'-0
  AT FREESTANDING ELEMENT

② SIDE ELEVATION  1/4"=1'-0
  AT FREESTANDING ELEMENT

③ PLAN  1/4"=1'-0
  AT FREESTANDING ELEMENT

④ ELEVATION  1/4"=1'-0
  AT FREESTANDING ELEMENT

⑤ SIDE ELEVATION  1/4"=1'-0
  AT FREESTANDING ELEMENT

⑥ PLAN  1/4"=1'-0
  AT FREESTANDING ELEMENT

PRELIMINARY SUBMISSION 9/26/94

Artist:  Mary Miss
349 Greenwich Street
New York, New York 10013

Architect and Consultant:   Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.

Date: 9/26/94
Artist's Working Drawings

B2



4×4 WOOD TYP.

1  ELEVATION  1/4"=1'-0
   AT FREESTANDING ELEMENT

2  ELEVATION  1/4"=1'-0
   AT FREESTANDING ELEMENT

3  PLAN  1/4"=1'-0
   AT FREESTANDING ELEMENT

4×4 WOOD TYP.

4  ELEVATION  1/4"=1'-0
   AT FREESTANDING ELEMENT

5  ELEVATION  1/4"=1'-0
   AT FREESTANDING ELEMENT

6  PLAN  1/4"=1'-0
   AT FREESTANDING ELEMENT

PRELIMINARY SUBMISSION 9/26/94

Date: 9/26/94
Artist's Working Drawings

Mary Miss
349 Greenwich Street
New York, New York 10013

Architectural Consultant:   Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.

B3



① PLAN    1/8"=1'-0
   AT BRIDGE (C) & RAMP RECESSED INTO WATER (F)

Mary Miss
349 Greenwich Street
New York, New York 10013

Architectural Consultant:
Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT.
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.

PRELIMINARY SUBMISSION #2  10/2/94
PRELIMINARY SUBMISSION #1  9/28/94

Date: 9/26/94
Artist's Working Drawings

C1



STEEL HANDRAIL
NEW WOOD OUTRIGGERS
NEW PAINTED STL. GRATE

EXISTING BRIDGE STRUCTURE TO REMAIN

STEEL STEP
WOOD DECK

STEP UP

CONCRETE PAD
EXISTING CONCRETE BRIDGE SUPPORT

EXISTING CONCRETE SUPPORT
NEW DIAMOND PLATE
NEW WOOD DECK TREADS

① PLAN   1/4"=1'-0
  AT BRIDGE

Mary Miss
Architectural Consultant
349 Greenwich Street
New York, New York 10013

Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT.
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.

PRELIMINARY SUBMISSION #2 10/21/94
PRELIMINARY SUBMISSION #1 8/26/94

Date: 9/28/94
Artist's Working Drawings

C2



EXISTING STL. RAILING TO BE REMOVED
NEW RAILING IN PAINTED STL. TUBING
RISER FACE 1/4" STL. PLATE
¾ IN 1/4" STL. PLT.
STL. DIAMOND PLATE
WATERLINE
EXISTING CONCRETE END SUPPORT FOR BRIDGE TO REMAIN
NEW INTERMEDIARY SUPPORT COLUMN IN STL. TUBING WITH CONCRETE FOUNDATIONS

① ELEVATION (SOUTH)
AT BRIDGE
1/4"=1'-0



NEW PAINTED STEEL GUARDRAIL
NEW WOOD OUTRIGGERS
EXISTING CONCRETE BRIDGE
NEW INTERMEDIATE SUPPORT IN CONCRETE AND STEEL

② ELEVATION (NORTH)
AT BRIDGE
1/4"=1'-0

Mary Miss
549 Greenwich Street
New York, New York 10013

Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215



NOTE:
THE ONLY FUNCTION OF THIS DRAWING IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT. THIS DRAWING IS NOT FOR CONSTRUCTION OR FILING AT THE BUILDING DEPARTMENT.

PRELIMINARY SUBMISSION #1 10/25/94
PRELIMINARY SUBMISSION #2 1/26/94
Date: 9/26/94
Artist's Working Drawings

C3



NEW PAINTED GALV. STL. GUARDRAIL

NEW WOOD DECK

NEW GALV. STL. GRATING

NEW GALV. STL. RISER

WOOD DECK

1/4" STL. DIAMOND PLATE

NEW WOOD OUTRIGER 4×6

NEW STEEL CHANNEL BEAM

NEW COLUMN IN STEEL TUBING

NEW STEEL BEAM EXTENCITON

EXISTING STL. STRUCTURE TO REMAIN

NEW CONCRETE FOOTING

WATER LINE

RISER IN IN 1/4"
DIAMOND STL. PLATE

TREAD IN WOOD DECK

NEW STEEL FRAME
SUPPORTING STEPS

① SECTION    1"=1'-0
   AT BRIDGE

Mary Miss
349 Greenwich Street
New York, New York 10013

Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.

PRELIMINARY SUBMISSION #2 10/21/94
PRELIMINARY SUBMISSION #1  9/28/94

Date: 9/28/94
Artist's Working Drawings

C4





① SECTION DTL. 1-1/2"=1'-0
AT BRIDGE

② SECTION DTL. 1-1/2"=1'-0
AT BRIDGE







③ SECTION DTL. 1-1/2"=1'-0
AT BRIDGE

④ SECTION DTL. 1-1/2"=1'-0
AT BRIDGE

PRELIMINARY SUBMISSION 9/26/94

ARTIST: Mary Miss          ARCHITECTURAL CONSULTANT: Max Cardillo Architect

349 Greenwich Street          803 Seventh Avenue
New York, New York 10013      Brooklyn,New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.

Date: 9/26/94
Artist's Working Drawings

C5



6X6 WOOD POST
2X6 WOOD VERTICAL PLANKS
BASE RAILS STAGGERED
2X8 WOOD CAP PIECE
HOT DIP GALV. CARRIAGE BOLTS
T.O. WALL
VAR. EL. 94.00 MIN.
WATER LINE
EL. 92.25

EARTH



② ELEVATION   3/8" – 1' 0"



4X4 LUMBER
DEADMAN
2X8 WOOD CAP        7-1/2"        T.O. WALL
EARTH                             VAR. EL. 94.00 MIN.
                                  WATER LINE
                                  EL. 92.25
                    6X6 POST
                    2X8 VERT. PLANKS
HOT DIP GALV.
STEEL TIEROD
4X4 WOOD BASE RAIL
BOLTED TO POSTS

GRAVEL

WOOD RETAINING WALL
MADE ALL IN PRESSURE TREATED LUMBER
AND HOT DIP GALV. BOLTS, NAILS & SCREWS



EL. 95'-7"

EL. 95'-0"
EL. 93'-10"

BENCH ABOVE WATER

POSTS ABOVE WATER
PLANKING BELOW WATER

EL. 92.25'

WOOD RAMP ABOVE WATER

FOLLOW GEOMETRY
OF THIS CURVE AS
INDICATED ON DWG. S-1

EL. 95'

1/4" STEEL DIAMOND PLATE

③ SECTION        3/8" – 1' 0"
WOOD RETAINING WALL

① PLAN   3/32" – 1' 0"
WOOD WALKWAY (D)
RAMPED WALKWAY (E)

PRELIMINARY SUBMISSION #2  10/21/84
PRELIMINARY SUBMISSION #1  9/26/84

Date: 9/25/84
ARTIST WORKING DRAWING

D 1

Mary Miss
849 Greenwich Street
New York, New York 10013

Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.



1 ELEVATION (UNFOLDED) 1/8"=1'-0
AT RAMPED WALKAY

— EL 92.25
— EL 88.00

WOOD BENCH
2- 2X8
BENCH SUPT.

GALV.OR SS.
BOLTS TYP.

WATER LINE

1'-7 1/4"

5'

WOOD POST
6X6
WOOD DECK
2X8
WOOD BEAM
2X8
DIAG. BRACES
IN WO. 2X8

AS REQ.

6'-7 1/4"

2 SECTION   1/2"=1'-0
AT RAMPED WALKAY

WOOD DECK 2X8
WOOD BENCH 2- 2X8
WOOD CURB 6X8

WATER LINE

BENCH SUPT.
BRACKET

WOOD BEAM 2X8
DIAG. BRACES
IN WO. 2X8

WOOD BLANKS 2X8
BELOW WATER
23-1/4" O.C.

WOOD POST 6X6

GALV.OR SS.
BOLTS TYP.

AS REQ.

VAR.

3 SECTION   1/2"=1'-0
AT RAMPED WALKAY

PRELIMINARY SUBMISSION 9/25/94

Mary Miss
349 Greenwich Street
New York, New York 10013

Architectural Consultant:

Max Cardillo Architect
203 Seventh Avenue
Brooklyn,New York 11215



NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.

Date: 9/25/94
Artist's Working Drawings

D2







① ELEVATION  1/2"=1'-0
AT RAMPED WALKWAY



② PART DTL.  3/8"=1'-0
AT RAMPED WALKWAY

Mary Miss
349 Greenwich Street
New York, New York 10013

Architectural Consultant:  Max Cardillo Architect
203 Seventh Avenue
Brooklyn,New York 11215



NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT

PRELIMINARY SUBMISSION ② 10/21/94
PRELIMINARY SUBMISSION ① 6/14/94

Date: 9/26/94
Artist's Working Drawings

D3



WOOD CAP

5X5 WD. POSTS
2x6 WD. PLANKS

WOOD DECK 2X6 PLANKS
WOOD BEAM 4X4

**1 PART PLAN** 1/4""=1'-0
AT WALKWAY (D)



T.O. WALL
EL. 95.00

LOW WOOD
WALKWAY

WATER LINE
EL. 92.25

WOOD RETAINING WALL
WITH LOW WOOD WALKWAY
IN FRONT

**3 SECTION** 3/8"=1'-0
AT WALKWAY (D)



5X8 WOOD POST
2X6 WOOD VERTICAL PLANKS
BASE RAILS STAGGERED
2X8 WOOD CAP PIECE

T.O. WALL
VAR. EL. 94.00 MIN.

WATER LINE
EL. 92.25

EARTH

**4 ELEVATION** 3/8"=1'-0
AT WALKWAY (D)

PRELIMINARY SUBMISSION 9/26/94

Date: 9/26/94
Artist's Working Drawings

# Mary Miss

Architectural Consultant

349 Greenwich Street
New York, New York 10013

Max Cardillo Architect

203 Seventh Avenue
Brooklyn, New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT

**D4**



① SECTION   1/4"=1'-0
AT WALKWAY RECESSED INTO WATER (F)



② PART PLAN   1/4"=1'-0
AT WALKWAY RECESSED INTO WATER (F)



③ SECTION   1/4"=1'-0
AT WALKWAY RECESSED INTO WATER (F)

PRELIMINARY SUBMISSION  10/27/84
PRELIMINARY SUBMISSION  9/28/84

Date: 9/28/84
Artist's Working Drawings

Mary Miss
549 Greenwich Street
New York, New York 10013

Architectural Consultant:

Max Cardillo Architect
209 Seventh Avenue
Brooklyn, New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.

F1



1/8" PAINTED STL. CAP
WATER LINE

① SECTION DTL.   3"=1'-0
AT WALKWAY RECESSED INTO WATER

WATER LINE

LAMINATED GLASS
AS REQUIRED

② PLAN DETAIL   3"=1'-0
AT WALKWAY RECESSED INTO WATER

③ SECTION DTL.   1-1/2"=1'-0
AT WALKWAY RECESSED INTO WATER

1"=1'-0"

④ SECTION DTL.   1-1/2"=1'-0
AT WALKWAY RECESSED INTO WATER

Artist  Mary Miss
349 Greenwich Street
New York, New York 10013

Architectural Consultant:

Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT

PRELIMINARY SUBMISSION #2 10/17/94
PRELIMINARY SUBMISSION #1 8/26/94

Date: 9/29/94
Artist's Working Drawings

F2





PLAN   3/32"=1'-0
AT TERRACES (H),& (G)

STEEL EDGED STEPS

LIGHT POST

WOOD RETAINING WALLS

NEW CONTOURS
EXISTING CONTOURS TO REMAIN

Mary Miss
549 Greenwich Street
New York, New York 10013

Max Cardillo Architect
203 Seventh Avenue
Brooklyn,New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.

PRELIMINARY SUBMISSION #2  12/21/94
PRELIMINARY SUBMISSION #1   8/25/94

Date 9/29/94
Artist's Working Drawings

G1

1/8" STEEL PLATE



12" max.

6 7/8"

WELDED BRACKET WITH EYELID
FOR SPIKE

1/2"X 24" STEEL SPIKE TOP BELLOW
GROUND SURFACE

① SECTION DTL.                    1-1/2"-1'-0
   AT METAL STEP EDGE



STEEL TIEROD
HOT DIP GALV.

DEADMAN
4X4 LUMBER

2X6 WOOD VERTICAL PLANKS

BASE RAILS STAGGERED

2X8 WOOD CAP PIECE

6X6 WOOD POST
HOT DIP GALV. CARRIAGE BOLTS

EARTH

WOOD RETAINING WALL
MADE ALL IN PRESSURE TREATED LUMBER
AND HOT DIP GALV. OR S.S. BOLTS,
NAILS & SCREWS

BASE RAILS STAGGERED

2X6 WOOD VERTICAL PLANKS

2X8 WOOD CAP PIECE

6X6 WOOD POST

EARTH

③ SECTION              1/2"-1'-0
   AT WOOD RETAINING WALL

④ ELEVATION            1/2"-1'-0
   AT WOOD RETAINING WALL

PRELIMINARY SUBMISSION #2  10/21/94
PRELIMINARY SUBMISSION #1  9/26/94

Date: 9/26/94
Artist's Working Drawings

G2

Mary Miss
349 Greenwich Street
New York, New York 10013

Architectural Consultant:

Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.



① PLAN          1"=20'
   OVERHANGING WALKWAY (D)

② PART PLAN     1/8"=1'-0
   EXISTING CONCRETE DAM

Mary Miss
349 Greenwich Street
New York, New York 10013

Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.

PRELIMINARY SUBMISSION #2 10/21/94
PRELIMINARY SUBMISSION #1 9/26/94

Date: 9/26/1994
ARTIST WORKING DRAWING

I 1



CRUSHED STONE
WALKWAY

ELEVATED
WOOD
WALKWAY

WOOD RETAINING WALL



1 ISONOMETRIC
AT OVERHANGING WALKWAY



2 PLAN DTL.   1/2'=1'-0
AT OVERHANGING WALKWAY END SECTION



2 OUTRIGERS 2X8
GUARDRAIL

WOOD DECK IN 2X8
BEAM 4X4
BENCH 2X12

4 PLAN DTL.   1/4'=1'-0
AT OVERHANGING WALKWAY WITH BENCH

Artists
## Mary Miss
349 Greenwich Street
New York, New York 10013

Architectural Consultant:
Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.

PRELIMINARY SUBMISSION #2 10/21/84
PRELIMINARY SUBMISSION #1 9/28/84

Date 9/28/84
Artist's Working Drawings

I 2



OVERHANGIN WOOD WALKWAY

T.O. COMCRETE DAM
EL. 95.60

EXISTING CONCR. DAM

WATER LINE
EL. 92.25

(1) SECTION DTL.    3/8"=1'-0
OVERHANGING WLK. AT DAM



T.O. WALL
EL. 94.00

CONC. BLOCK
RETAINING WALL

WATER LINE
EL. 92.25

(2) SECTION DTL.    3/8"=1'-0
AT BLOCK RETAINING WL.



WOOD DECK IN 2X6

T.O. WALL
EL. 94.00

WOOD RETAINING WALL
SEE DTL. 3/D1

WATER LINE
EL. 92.25

(3) SECTION DTL.    3/8"=1'-0
OVERHANGING WLK. AT WOOD RETAINING WL.



OVERHANGIN WOOD WALKWAY

T.O. WALL
EL. 94.00

CONC. BLOCK
RETAINING WALL

WATER LINE
EL. 92.25

(4) SECTION DTL.    3/8"=1'-0
OVERHANGING WLK. AT BLOCK RETAINING WL.

PRELIMINARY SUBMISSION
PRELIMINARY SUBMISSION

ARTIST WORK DRAWING
Date 9/28/1994

I 3

Mary Miss
349 Greenwich Street
New York, New York 10013

Architectural Consultant:
Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215



NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT.
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.



WOOD POST 4X4
TOP & BOTTOM RAILS 3X4
SPINDELS 2X2

+— 6'-0

3'-6"

—2'—

OUTRIGERS 2X6

① ELEVATION    3/4"=1'-0
  OVERHANGING WALK



② SECTION    3/4"=1'-0
  OVERHANGING WALK



③ SECTION    3/4"=1'-0
  OVERHANGING WALK





BENCH
DECK
EARTH

④ SECTION DTL 3/4"=1'-0
  OVERHANGING WALKWAY

⑤ ELEVATION DTL.    3/4"=1'-0
  OVERHANGING WALKWAY

artist.   **Mary Miss**
349 Greenwich Street
New York, New York 10013

Architectural Consultant:   Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215


NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR ITEMS AT THE BUILDING DEPARTMENT.

PRELIMINARY SUBMISSION #1 10/27/84
PRELIMINARY SUBMISSION #2 3/26/85
Date: 29/9/1984
ARTIST WORKING DRAWING

I 4



①  FRONT ELEV. 1/4"=1'-0
    AT VIEWING PAVILLION

②  SIDE ELEV. 1/4"=1'-0
    AT VIEWING PAVILLION

③  SECTION  1/4"=1'-0
    AT VIEWING PAVILLION

PRELIMINARY SUBMISSION 8/26/94

Date: 9/26/94
Artist's Working Drawings

**Mary Miss**
349 Greenwich Street
New York, New York 10013

Architectural Consultant

Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215



J1





$\overset{2}{\bigodot}$ REFLEC. CLNG. PLAN   1/4"=1'-0
AT VIEWING PAVILLION



$\overset{1}{\bigodot}$ PLAN DTL.   1"=2'
METAL MESH FRAME



$\overset{3}{\bigodot}$ PLAN   1/4"=1'-0
AT VIEWING PAVILLION



Mary Miss
349 Greenwich Street
New York, New York 10013

Architectural Consultant

Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.

PRELIMINARY SUBMISSION 9/26/84

Date: 9/26/84
Artist's Working Drawings

J2



WOOD DECK 2X8

EL. 95'-0

EL. 98'-3"

EL. 95'-7"

STEEL GANGWAY

EL. 95'

WOOD VIEWING PLATFORM

EL. 98'-0

PLAN    1/8'=1'-0
AT ELEVATED WALKWAY

Mary Miss
349 Greenwich Street
New York, New York 10013

Architectural Consultant:    Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.

PRELIMINARY SUBMISSION #2 10/21/94
PRELIMINARY SUBMISSION #1 9/26/94

Date: 9/26/94
Artist's Working Drawings

L1

CUT EDGE OF DECK ALONG CURVE OF WALKWAY

WOOD DECK 2X8 LAYED
IN RADIAL PATERN
WIDEST GAPS BETWEEN
BOARDS TO BE 3/8" & MIN 3/16"
WHERE NECESSARY SPLAY ABOARD
TO TO KEEP GAPS WITH IN
INDICATED DIMENSIONS







WOOD DECK 2X8

① PLAN DTL   1/4"=1'-0
   AT ELEVATED WALKWAY

③ PLAN   1/4"=1'-0
   AT VIEWING PLATFORM

④ FRAMING PLAN 1/4"=1'-0
   AT VIEWING PLATFORM

BEAMS & CROSS BRACES  IN WOOD 3X6
BOLTED TO 6X6 WOOD POSTS



BEAMS & CROSS BRACES  IN WOOD 3X6
BOLTED TO 6X6 WOOD POSTS

② FRAMING PLAN   1/4"=1'-0
   AT ELEVATED WALKWAY



⑥ ELEVATION   1/2=1'-0"
   AT VIEWING PLATFORM

WOOD DECK 2X8

STEEL GANGWAY

BEAMS & CROSS BEAMS
IN WOOD 3X6

POSTS WOOD 6X6



AS REQ

2X8 WOOD DECK
3X6 WOOD BEAMS
6X6 WOOD POST



AS REQUIRED

⑤ SECTION   1/2"=1'-0
   AT ELEVATED WALKWAY

⑦ SECTION   1/2=1'-0"
   AT VIEWING PLATFORM

PRELIMINARY SUBMISSION 9/26/94

# Mary Miss

349 Greenwich Street
New York, New York 10013

Architectural Consultants

Max Cardillo Architect

203 Seventh Avenue
Brooklyn, New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.

Date: 9/26/94
Artist's Working Drawings

L2





**2** SETION DTL.   3/8"=1'-0
AT RETAINING WALL



**3** SETION DTL.   3/8"=1'-0
AT RETAINING WALL

**1** PLAN   3/32"=1'-0
AT RETAINING WALL

PRELIMINARY SUBMISSION #1 10/21/94
PRELIMINARY SUBMISSION #1 8/26/94

Date: 9/28/94
Artist's Working Drawings

L3

## Mary Miss
349 Greenwich Street
New York, New York 10013

Arch/Sectional Consultant:   Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT.
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.



ELEVATED WOOD WALKWAY (L)

VIEWING PLATFORM (K)

STEEL GRATE WALKWAY (M)
IN 6'-6" SEGMENTS

VIEWING PAVILLION (J)

HANDRAIL IN 1.5" #1.5" STL. TUBING
INTALL ONLY ALONG SECTION WHERE
WATER IS DEEPER THAN 12"

② ELEV. DTL. 3/8"=1'-0"
    AT STL. GANGWAY

③ SECT. DTL. 3/8"=1'-0"
    AT STL. GANGWAY

3" CALV. STL SUPPORT
POST UNDER BRACKET

AS REQ.

CALV STEEL PRESS LOCKED
BAR GRATING TYPE GAA-150

CALV. STL. SUPPORT BRACKET
IN 3/16" DIAMOND PLATE

① SITE PLAN 1/16"=1'-0
    AT VIEWING PAVILLION

④ PLAN DTL. 3/8"=1'-0"
    AT STL. GANGWAY

⑤ SECT. DTL. 3/8"=1'-0"
    AT STL. GANGWAY

Mary Miss
349 Greenwich Street
New York, New York 10013

Architectural Consultant:

Max Cardillo Architect
203 Seventh Avenue
Brooklyn, New York 11215

NOTE:
THE ONLY FUNCTION OF THIS DRAWING
IS TO DESCRIBE THE ARTIST'S DESIGN CONCEPT.
THIS DRAWING IS NOT FOR CONSTRUCTION
OR FILING AT THE BUILDING DEPARTMENT.

PRELIMINARY SUBMISSION #2 10/21/94
PRELIMINARY SUBMISSION #1 3/11/94

Date: 3/28/94
Artist's Working Drawings

M1

EXHIBIT

# E

# CITY OF DES MOINES, IOWA
### COMMUNITY DEVELOPMENT DEPARTMENT
### BUILDING SAFETY DIVISION

# * NON-STRUCTURAL PLAN REVIEW *

| | | | |
|---|---|---|---|
| | PRELIMINARY PROJECT REVIEW | PROJECT: | **Greenwood Park - Mary Miss Sculpture and Wetland Project.** |
| | | ADDRESS: | |
| | JOINT PROJECT REVIEW | DATE: | **March 24, 1995** |
| | | REVIEWER: | **J.W. JOHNSON** |
| X | PLAN REVIEW | REVIEWED WITH: | |

## DESCRIPTION:

This project includes a variety of improvements intended around and in the existing pond at Greenwood Park. Such improvements include: A small enclosed pavilion building, a pedestrian bridge, a series of walkways around and in the pond, retaining walls, an elevated viewing pavilion, a small wood viewing platform, plantings in and around the pond, earth mounds and stepped terracing, and parking and roadway improvements, all intended to create a sculptural wetland environment.

## GENERAL COMMENTS:

- This review is to determine compliance with the 1991 edition of the Uniform Building Code and applicable local building code provisions found in Chapter Eight of the Des Moines Municipal Code.
- This review is intended to consider the scope and definitions of the building code and determine which of the elements in this project are regulated by such code and if these elements appear to comply applicable code provisions
- This review is to determine if the proposed project appears to be planned to comply exclusively with the Des Moines Building Code. It should be noted that there may or may not be other codes that also apply to this project that are not considered in this review. Specifically, accessibility for persons with physical disabilities and compliance with applicable Iowa State Code requirements are not included in this review. Due to the unique use and application of this project, Des Moines Permit and Development Center staff will not review this project for compliance with accessibility standards. We suggest the designer submit the design to the Iowa State Building Code Commissioner's office for review for compliance with these specific standards.

| OCCUPANCY CLASSIFICATION | Appears to most resemble an A-4 reviewing stand. | SPRINKLERS: | Not Applicable |
|---|---|---|---|
| TYPE OF CONSTRUCTION | Type V-N | STORIES: | One |
| AREAS | | | |

## OCCUPANT LOADS

| DESCRIPTION | AREA | FACTOR | = | OCC.LD. | NOTES |
|---|---|---|---|---|---|
| A - Enclosed Pavilion | 520 | 15 | = | 35 | |
| J - Viewing Pavilion | 160 | 15 | = | 11 | |
| I - Overhanging Walkway | 2880 | 15 | = | 192 | |
| F - Recessed Walkway | 250 | 15 | = | 17 | |
| E - Ramped Walkway | 500 | 15 | = | 33 | |
| D - Elevated Walkway | 405 | | | Not Applicable | |
| K - Viewing Platform | 100 | 15 | = | 7 | |
| 01 & 02 - Surface Walkways | | | | Not Applicable | |
| C - Pedestrian Bridge | | | | Not Applicable | |

| M - Steel Grate Walkway | | | | Not Applicable | |

## CODE COMMENTS

| CODE SECTION: | CODE TEXT: | COMMENTS AND STATUS: |
|---|---|---|
| 102 | PURPOSE: The purpose of this code is to provide minimum standards to safeguard life, limb, health, property and public welfare by regulating and controlling the design, construction, quality of materials, use and occupancy, location and maintenance of all **buildings and structures** within this jurisdiction and certain equipment ................. | Refer to definition of structure. |
| 103 | SCOPE: The provisions of this code shall apply to the construction, alteration, moving, demolition, repair and use of any **building or structure** within this jurisdiction, except work located primarily in a public way, public utility towers and poles, mechanical equipment not specifically regulated in this code, and hydraulic flood control structures........ | No Comment. |
| 403 | DEFINITION OF "BUILDING": Is **any structure used or intended for supporting or sheltering any use** or occupancy. | Refer to definition of structure. |

| | | |
|---|---|---|
| 8-2.02 | DEFINITION OF "STRUCTURE": **Anything constructed or erected with a fixed location on the ground**, or attached to something having a fixed location on the ground. **Structures include, but are not limited to, buildings, walls, fences, gates, towers, factory built homes, signs, utility poles, flag poles, yard lights and storage tanks.** For purposes of this chapter, streets, sidewalks, alleys, hard-surface parking areas and underground utilities are excluded are excluded from the definition of "structure". | Based on this definition and sections 102 and 103, it appears the following elements of this project fall under the definition of structure and are required to comply with applicable sections of the Building Code. <br> • A - Enclosed Pavilion. <br> • I - Overhanging wood walkway. This element most nearly resembles a wood balcony as it projects beyond the retaining wall over the water surface and appears to be intended for purposes other than just a walking surface from one location to another. <br> • J - Elevated viewing pavilion. This element most nearly resembles a reviewing stand or elevated press box, which is and has been regulated by the Building Code. <br> • K - Wooden Platform. <br> • F - The recessed concrete bunker. This element resembles a recessed structure in the ground, although in this case it is recessed in the pond. It does appear to be intended to accommodate a specific use. <br> • E - Ramped Walkway. This walkway descends into the water and is provided with a bench on one side. It appears to serve a use other than just a walking surface such as sidewalk. <br> Elements that do not appear to be covered by the Building Code and the definition of structure are as follows: <br> • D - Low Wood Walkway above water. This element appears to resemble a sidewalk, which is excluded in the definition. <br> • Pedestrian Bridge. Bridges have not been typically regulated by Building Code provision , pedestrian, vehicle or otherwise.. <br> • Steel Grate Walkway to elevated pavilion. This element appears to resemble a sidewalk, which is excluded in the definition. |
| 408 | DEFINITION OF "GRADE": is the lowest point of elevation of the finish surface of the ground, paving or sidewalk within the area of the building and the property line or, when the property line is more than 5 feet from the building, between the building and a line 5 feet from the building. | Based on this definition and the definition of "ground" in Webster's Dictionary, the bottom of the pond will be considered grade for purposes of applying the provisions of the Code. |

| 408 | DEFINITION OF "GUARDRAIL": Is a system of building components located near the open sides of elevated walking surfaces for the purposes of minimizing the possibility of an accidental fall from the walking surface to the lower level. | Refer to guardrail requirements. |
|---|---|---|
| **Occupancy Requirements:** | | |
| 601 | GROUP A OCCUPANCIES: | The general occupancy classification of this project appears to most nearly resembles is a Group A, Division 4. |
| 602 | CONSTRUCTION, HEIGHT AND ALLOWABLE AREA: SUBSECTION (e): 1.   Division 4 structures other than Type III-N and Type V-N grandstands, bleachers, reviewing stands and folding telescoping seating of open skeleton-frame type without roof, cover or enclosed usable space are not limited in area or height. 2.   Seating and exiting requirements for reviewing stands, grandstands, bleachers and folding and telescoping seating are provided under Section 3322. | No Comment. |
| 603 | LOCATION ON PROPERTY: | Not Applicable. |
| 604 | ACCESS AND EXIT FACILITIES: (b)  Exits and exit signs for Division 4, Amusement Structures, shall be approved by the building official and, where practicable, shall comply with the requirements of specified in Chapter 33. | The steps serving the elevated viewing pavilions, the enclosed pavilion and the recessed concrete bunker will be required to comply with applicable code provisions. |
| 605 | LIGHT, VENTILATION AND SANITATION: | Not Applicable. |
| 606 | SHAFT AND EXIT ENCLOSURES: | Not Applicable. |
| 607 | SPRINKLER AND STANDPIPE SYSTEMS: | Not Applicable. |
| 608 | SPECIAL HAZARDS: | Not Applicable. |
| 609 | FIRE ALARM SYSTEMS: | Not Applicable. |
| 610 | AMUSEMENT BUILDING ALARM SYSTEM: | Not Applicable. |
| **Construction Requirements:** | | |
| 1701 | CONSTRUCTION CLASSIFICATION: | Based on the presence of unprotected wood the construction classification for this project appears to resemble a Type V-N construction type. |
| 1702 | STRUCTURAL FRAME: | No Comment. |
| 1703 | USABLE SPACE UNDER FLOORS: | Not Applicable. |
| 1704 | VERTICAL FIRE SPREAD AT EXTERIOR WALLS: | Not Applicable. |
| 1705 | EXCEPTIONS TO TABLE 17-A: | Not Applicable. |
| 1706 | SHAFT ENCLOSURES: | Not Applicable. |
| 1707 | CONSTRUCTION JOINTS: | Not Applicable. |
| 1708 | WEATHER PROTECTION: | Not Applicable. |
| 1709 | MEMBERS CARRYING MASONRY OR CONCRETE: | Not Applicable. |
| 1710 | PARAPETS: | Not Applicable. |
| 1711 | PROJECTIONS: | Not Applicable. |

| 1712 | GUARDRAILS AND VEHICLE BARRIERS: <br> (a) Unenclosed floor and roof openings, open and glazed sides of stairways, landings and ramps, balconies or porches, which are more than 30 inches above grade or floor below, and roofs used for other than services of the building shall be protected by a guardrail. <br>     EXCEPTIONS: <br>     A............ <br>     B............ <br>     C........... <br> The top of guardrails shall be not less than 42 inches in height. <br>     EXCEPTIONS: <br>     1............ <br>     2............ <br>     3........... <br> Open guardrails shall have intermediate rails or an ornamental pattern such that a sphere 4 inches in diameter cannot pass through. <br>     EXCEPTIONS: <br>     1............ <br>     2............ | Based on the definition of grade, any of the listed structures that are 30 inches or more above a ground surface, the bottom of the pond, or any other hard surface will be required to comply with the provisions of this section. It may be conceivable to interpret specific areas of this project such that lower guardrails are allowed, similar to what is allowed in the exception to section 3322 (e) 7. <br><br> • The overhanging wood walkway does appear to be provided with 42" high guardrails designed to resist the appropriate loading at the top rail. <br> • The elevation of the bottom of the pond is not provided such that it can be determined if guardrails are required for the ramped walkway. <br><br><br><br> • The intermediate rails for the overhanging walkway are specified to be spaced at 6 inches on center with 2"x 2" railings. This design would not restrict a 4" sphere and the spacing must be reduced or the dimension of the railing enlarged. |
| 1713 | FOAM PLASTIC INSULATION: | Not Applicable. |
| 1714 | INSULATION: | Not Applicable. |
| 1715 | SOLAR ENERGY COLLECTORS: | Not Applicable. |
| 1716 | ATRIA: | Not Applicable. |
| 1717 | MEZZANINES: | Not Applicable. |
| CHAPTER 22 | | No Comments. |

| 2516 | GENERAL CONSTRUCTION REQUIREMENTS: | |
|------|-----------------------------------|---|
| | (c)  Protection Against Decay and Termites: | |
| |     1.  Wood support embedded in ground: Wood embedded in the ground or in direct contact with the earth and used for the support of permanent structures shall be treated wood unless continuously below the groundwater line or continuously submerged in fresh water. Round or rectangular posts, poles and sawn timber columns supporting permanent structures which are embedded in concrete or masonry in direct contact with the earth or embedded in concrete or masonry exposed to the weather shall be treated wood. The wood shall be treated for ground contact. | All of the wood specified for this project appear to be cedar. Wood in direct contact with the earth is required to be ground contact treated wood. Cedar does not appear to be an acceptable type for this area. Wood not in direct contact with the earth and not embedded in concrete or masonry may be cedar. |
| |     2..Under floor clearance.   When wood joists or the bottom of wood structural floors are located closer than 18 inches or wood girders are located closer than 12 inches to exposed ground in crawl spaces or unexcavated area located within the periphery of the building foundation, the floor assembly, including posts, girders, joists and subfloors, shall be shall be approved wood of natural resistance to decay as listed in Section 2516 (c) 3 or treated wood. | |
| |     3......... | |
| |     4. Columns and Posts.  Columns or post located on concrete or masonry floors exposed to the weather or to water splash or in basements and which support permanent structures shall be supported by concrete piers or metal pedestals projecting above floors unless approved wood of natural resistance to decay or treated wood is used............... | |
| |       5......... | |
| |       6......... | |
| |       7......... | |
| |       8......... | |
| |       9......... | |
| |       10........ | |
| |       11........ | |
| | **Exiting Requirements** | |

| 3306 | STAIRWAYS:<br>(a) General. Every stairway having two or more risers serving any building or portion thereof shall conform to the requirements of this section. .......<br>(b) Width. The minimum stairway width shall be determined as specified in Section 3303 (b), but shall be not less than 44 inches except as specified herein. Stairways serving an occupant load of 49 or less shall not be less than 36 inches in width.<br>(c) Rise and Run. The rise of ever step in a stairway shall be not less than 4 inches or greater than 7 inches. Except as permitted in subsections (d) and (f), the rune shall be not less than 11 inches as measured horizontally between the vertical planes of the furthermost projection of adjacent treads. Except as permitted in subsections (d), (e) and (f), the largest tread run within any flight of stairs shall not exceed the smallest by more than 3/8 inch. The greatest riser height shall not exceed the smallest by more than 3/8 inch.<br>(d).......<br>(e).......<br>(f).......<br>(g) Landings. Every landing shall have a dimension measured in the direction of travel not less than the width of the stairway. Such dimension need not exceed 44 inches when the stair is a straight run. There shall be not more than 12 feet vertical between landings. ......<br>(h) .......<br>(I) Handrails. Stairways shall have handrails on each side, and every stairway required to be more than 88 inches in width shall be provided with not less than one intermediate handrail for each 88 inches of required width..........<br>    EXCEPTIONS:<br>      1........<br>      2........<br>      3........<br>    The top of handrails and handrails extensions shall be placed not less than 34 inches or more than 38 inches above the nosing of the treads and landings. Handrails shall be continuous the full length of the stairs and, except for private stairways, at least one handrail shall extend in the direction of the stair run not less than 12 inched beyond the top riser or less than 12 inches beyond the bottom riser. Ends shall be returned or terminate in newel posts or safety terminals.<br>    The handgrip portion of handrails shall not be less than 1 1/2 inches or more than 2 inches in cross-sectional dimension or the shape shall provide an equivalent gripping surface. The handgrip portion of handrails shall have a smooth surface with no sharp corners.......<br>(j)......<br>(k).....<br>(l)...... | The stairs serving the recessed concrete bunker are provided with code complying riser and tread dimensions, although handrails are not specified. Handrails are required and will be required that serve this stair.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>The landing between the two flights of stairs serving the elevated viewing pavilion is dimensioned at 3'-4" in length. This landing should measure 3'-8" in dimension.<br><br><br><br><br>Handrails are not specified for the stairs serving the steps down into the recessed view bunker. Handrails are required on both sides of these stairs, These handrails are required to comply with section 3306 (I) of the Building Code.<br><br>One handrail is indicated for the stairs serving the elevated viewing pavilion. Handrails are required on both sides, serving both flights of stairs, and complying with section 3306(I). |

| 3322 | REVIEWING STANDS, GRANDSTANDS, BLEACHERS AND FOLDING AND TELESCOPING SEATING. | |
|------|------|------|
| | (b) Definitions. Reviewing Stands. Are elevated platforms accommodating not more than 50 persons...... | The elevated viewing pavilion appears to be similar to a reviewing platform. |
| | (c)........ | |
| | (d)........ | |
| | (e) General Requirements: | |
| |     1....... | |
| |     2....... | |
| |     3....... | |
| |     4....... | |
| |     5....... | |
| |     6. Stairways and Ramps.   Except as otherwise provided in this item, grandstands, bleachers and folding and telescoping seating shall comply with other applicable section of this chapter. Stairways and ramps shall have a maximum rise and run as provided in Section 3306 (c) and Section 3307, except those within the seating facility which serves as aisles at right angles to the rows of seats where the rise shall not exceed 8 inches................... | The stairs serving the elevated viewing pavilion is required to comply with Section 3306 of the Building Code. The stairs specified for this structure have 10" risers and 10" treads with not handrails and a substandard landing dimension. Modifications will be required to comply with the provisions of the Building Code in this area. |
| |     7....... | |
| |     8....... | |
| |     9....... | |

## CONCLUSION

Based on a review of the submitted plans for compliance with non-structural requirements of the Building Code, this project was found to have a series of deficiencies that should be corrected prior to approval of this project.

These comments represent only issues discovered during a review of the plans submitted and should not be considered a list of all code related questions or deficiencies for this project. The designers and contractors are presumed to be knowledgeable of code requirements, whether or not included herein.

# GREENWOOD PARK LAGOON - MARY MISS PROJECT

July 24, 1995

### REPORT TO THE PARK AND RECREATION BOARD
### Prepared by:     Don Tripp
###                     Park and Recreation Director

The Greenwood Park Discovery Wetlands Project began in the Fall of 1990 as a community service proposal from the Des Moines Founders Garden Club. Their goal was to raise funds and provide volunteer labor and plant materials to help restore the park lagoon into a native Iowa wetland that would also serve as an outdoor classroom and environmental education resource for the central Iowa area. Primary users were envisioned to be the Science Center of Iowa, Des Moines public and private schools, local colleges and universities, and the general public.

At that time, the City's Park and Recreation Department was approached about possibly being involved in the project, and how it might be coordinated with the planned dredging and cleanup of the lagoon area scheduled for 1992. The City's response was very positive and supportive, although public funds were stated to be limited to pond dredging, silt basin construction, and outlet structure reconstruction. With that in mind, follow-up contacts involving the Founders Garden Club, the Science Center of Iowa, the Iowa Natural Heritage Foundation, and the Polk County Conservation Board were equally as positive. Shortly thereafter, the Greenwood Park Discovery Wetlands Coalition was formed with the goal of funding and operating the Discovery Wetlands area as an environmental education facility in Greenwood Park open to the public. The City was a "charter member" of that coalition. Subsequent conversations with the Des Moines Public School's Science Department also showed great potential for their future involvement, as well as local Scouting organizations.

Shortly thereafter (Fall 1991), the Des Moines Art Center publically announced plans to contract the services of well-known New York artist, Mary Miss, to design and construct the first of several site-related, environmental sculptures planned for Greenwood Park. This decision was based on a Sculpture Park 28E Agreement between the Art Center and the City approved in November, 1990, and a Sculpture Park Master Plan approved by the City in January, 1991. In August, 1991, it was announced that Mary Miss had selected the area in and around the Greenwood Park Lagoon as the preferred site for her environmental sculpture project. In an effort to better coordinate, plan and implement both projects, the Des Moines Art Center and the Mary Miss Project were added to the Discovery Wetlands Coalition, and the two projects were combined into one for the betterment of all concerned.

In September 1992, after a year of research, study, and on-site meetings, Mary Miss and the Art Center publically presented a conceptual sketch plan and study model of her intended work at the lagoon. On this plan, various pedestrian structures and features placed around the edge of the pond by the artist were combined with proposed wetland plantings and other landscape enhancements as suggested by the wetlands coalition members. Shelters, decks, walkways around and into the water, viewing platforms, and various shoreline treatments were all envisioned by the artist to complement and enhance the environmental education goals expressed earlier by the Founders Garden Club and its wetlands project team.

GREENWOOD PARK LAGOON - MARY MISS PROJECT
Page Two

In 1992 and 1993, the coalition continued to meet and discuss the project almost monthly. Also during this time, the conceptual plans and ideas for Mary Miss's work became more specific, eventually being refined into a second scale model that was presented to the coalition and the City for approval. At the same time, other components of the project, i.e. fund-raising, educational programming, interpretive signs, botanical selections, and park user interface (safety issues) were being considered and worked on by various team members. In June 1993, the Des Moines Park and Recreation Board was asked to review and approve the scale model which had been updated and revised to include the artist's latest thinking on the project structures and elements she was proposing. The Park and Recreation Board approved the concept of the project, subject to receipt of further information, and resolving issues related to: 1) funding sources and total estimated costs; 2) maintenance responsibilities on the finished project; and 3) Building Code compliance and user safety as called for in the 28E Agreement. As of this writing, these issues are still not resolved to the staff's satisfaction.

Between June 1993 and the Fall of 1994, Mary Miss worked in conjunction with architects in New York and Des Moines to develop detailed plans and specifications for construction of the various site structures included in her project. During this time, also, staff of the Park and Recreation Department continued to attend regular monthly meetings of the coalition, and tried unsuccessfully to voice concerns and objections about user safety related to some of the walkways and water-oriented structures shown on the 1992 drawings and on the scale models. These included concerns about the "Overhanging Wood Walkway", the "Wood Walkway Descending Into Water", the "Walkway Recessed Into Water", the "Steel Grate Walkway", and the "Viewing Platform".

Also during this time (Spring 1994), staff began to have concerns that some of the structures and site features first proposed by Mary Miss on her September 1992 sketches were quietly being shifted away from Art Center funding as agreed, and over to additional City funding. On their preliminary cost estimates, project planners working for the Art Center began identifying some of the artist-proposed structures as "site improvements" to be paid for by the City in addition to the pond dredging and silt basin construction already completed. Staff expressed concern then and now that the City should not be asked to fund the cost of items first proposed by the artist, Mary Miss. To date, the City has or will invest a total of $432,000 in the project, including: outlet structure replacement, pond dredging, silt basin construction, and shoreline stabilization. Pond dredging and cleanup was completed solely at City expense during the period Fall 1991 to Fall 1993. Staff continues to resist adding any additional costs to the City for the Art Center's project, particularly costs for items or improvements first proposed and designed by Mary Miss.

Detailed drawings for the Mary Miss structures and elements were not available to City staff until October 21, 1994 when a draft "Preliminary Submission" was sent to the City's Engineering and Risk Management Offices for review. At subsequent coalition meetings, and in one-on-one meetings with the artist, staff again expressed the same concerns about user safety, Building Code compliance, additional costs to the City, liability insurance coverage, structural integrity of certain

# GREENWOOD PARK LAGOON - MARY MISS PROJECT
Page Three

materials, and long-term maintenance issues. At no time did staff question or comment on artistic design, structure placement, or intent of the artist. During this time, also, Park and Recreation Department staff recognized the need for full Building Code review by the City's Permit and Development Center. This would formalize the review/permit process for the various structures, and allow a more balanced review of the project plans by all appropriate City departments (Engineering, Risk Management, Building, and Parks and Recreation). Issues related to each department's area of responsibility could then be taken up and evaluated by experts in respective areas, with comments feeding back to the Director of the Permit and Development Center. This is standard procedure for most private developments in the City which require a Building Permit.

On March 6, 1995, a revised and more detailed set of review drawings for the Mary Miss project was delivered to the City for formal Building Permit review. After several meetings and discussions, all departments submitted review comments and a twelve (12) page response was sent by the Permit and Development Center Director to the project architects. Most issues highlighted as unsatisfactory in that letter related to Building Code compliance, user safety, liability, choice of materials, long-term maintenance, engineering design and structural stability, vandalism potential, and requirements for completing the City approval process. Comments from the Park and Recreation Department staff included in that letter covered: user safety, long-term maintenance, vandalism potential, and choice of materials in walking surfaces.

In response, the architectural team submitted a second set of plans and drawings on May 18, 1995. These plans, from our point of view, are relatively unchanged from the first submittal, and many of our comments still apply. Input received from the local architects suggest they do not agree with the City's comments and concerns about how these structures are designed, and what inherent dangers may exist if and when they are open to the public. Our information is that the design team believes the structures are inherently safe, durable, and properly engineered for long-term stability and low maintenance. They point to the Art Center's commitment to do all necessary structural repair and upkeep on the "art elements" (but not the "site improvements") as reason for us not to question long-term maintenance. Further, they believe the City is unduly concerned with user safety because of the "hold-harmless" clause in the 28E Agreement and their willingness to provide up to $3 Million in commercial liability insurance on the finished project.

With all of this, the three (3) issues raised by the Park and Recreation Board in June, 1993 are still not resolved to staff's satisfaction. We have user safety concerns involving a few specific structures as designed (see above); we have no long-term maintenance agreement between the City and the Art Center; and we still do not have a detailed revenue/cost breakdown that shows how the project is to be funded and what the estimated costs are for the individual structures and/or elements. In addition, to date we still have no official recognition from the Art Center that the City has invested $432,000 in this project, which is, in fact, more than the Art Center is contributing to the Mary Miss structures.

wrong

**GREENWOOD PARK LAGOON - MARY MISS PROJECT**
Page Four

<u>Greenwood Ice Skate Shelter</u>

Amidst all of this discussion and unresolved plan review issues, the Art Center design team recently announced its intentions to put their portion of Mary Miss's project out to private bid for construction in August. As a part of that process, the City has been asked to demolish and remove the old ice skating shelter at Greenwood Lagoon to make way for the proposed new shelter. In view of the aged and unsightly condition of this building, the Park and Recreation Department would probably be recommending removal of the structure anyway in the next two to three years, with or without the Mary Miss project. Therefore, we wish to inform the Park and Recreation Board of our intentions to demolish and remove the ice skate shelter in the next few months. Depending on the future of the Mary Miss project, we will assess the warming shelter needs at Greenwood Park prior to the 1995-96 ice skating season. If necessary, temporary warming facilities may have to be installed until permanent facilities can be developed at this site.

This report is forwarded for your general information and review. If you have any questions or need additional information, please contact me or Steve Drake of my staff at your convenience.

DrakeAS:MISSDRFT.sd

*Mary Miss # 2*

Agenda Item No. _____

Meeting Date: __August 8, 1995__

Submitted By: __Donald M. Tripp__

## DES MOINES PARK & RECREATION BOARD

## ACTION FORM

**Subject:** Greenwood Park Discovery Wetlands. Request from Des Moines Art Center and HLKB Architecture for final approval of Mary Miss Environmental Sculpture Project, and authorization to proceed with construction.

**Background:** The Park and Recreation Board has reviewed and discussed the proposed Mary Miss Project on several occasions, including a meeting involving the artist, Art Center staff, Science Center of Iowa, and Des Moines Founders Garden Club on November 8, 1994. Prior to that, on June 3, 1993, by Resolution No. 11250, the Park and Recreation Board voted to approve the "conceptual plans and scale model of the project", subject to final resolution of three (3) items:

1. "The role of the City and other coalition members in financing the project",
2. "Identification as to who has long-term maintenance and operations responsibilities for various structures and facilities within the expanded project",
3. "The exact nature of materials, design, construction techniques, and Uniform Building Code requirements as they apply to this project".

In addition, Paragraph II.C. of the 1990 City/Art Center Agreement for Sculpture Park states that the Park and Recreation Board will examine the impact of the project on the practical and functional uses of the park, and that "...no sculpture shall be placed in the Sculpture Park Area which ... the Park Board reasonably finds unduly interferes with existing uses or safe use of the Sculpture Park Area of facilities located there".

The Art Center has previously provided this information to the Park and Recreation Board in the form of scale models, public presentations, joint meetings, and on-site inspections. They have now presented final plans to the City's Permit and Development Center for review and approval, and have given all appropriate City departments an opportunity to review and comment on their submittal. Their presentation to the Board today is a final summation of the project status, and is considered a follow-up submittal of information needed to satisfy the Park and Recreation Board's requirements and stipulations as itemized in Resolution #11250 from June 3, 1995.

**BOARD ACTION FORM - Mary Miss Project**
**August, 1995**
**Page Two**

**Alternatives:**

1.  Approve the final plans subject to:

    a.  The Art Center and City staff resolving final language of a Long-Term
        Maintenance Agreement for care and maintenance of the Mary Miss
        Sculpture Project and associated wetland plantings, and submission of
        that Maintenance Agreement to this Board at such time as it is finalized
        and agreed-to by all parties concerned.

    b.  The Art Center resolving all outstanding building code, safety, liability,
        and construction materials issues with the City's Building Department;
        and subsequent issuance of a Building Permit for the project by that
        department.

    c.  The Art Center submitting a detailed cost estimate and financial
        summary of all anticipated construction costs associated with this
        project to date, and anticipated sources and amounts of revenue needed
        to pay for the project, as currently contemplated. Summary to reflect
        City's costs for all improvements, including dredging, silt basin
        construction, and outlet structure repair.

    *Very important - you must bring this with you to the Park Board Mtg.*

2.  Deny the request for plan approval.

3.  Defer action on the request pending final resolution of the above-listed items.

**Recommendation:**          Staff recommends Alternative No. 1.

**Staff Comments:**          Staff has spent considerable time and effort on this project for
the past five years. More recently, we have focused on user safety and maintenance
issues relative to the final construction plans as prepared by the Art Center's
consultants. It is our belief that the Art Center shares our concerns for user safety and
long term durability of the structures, and both parties want the project to succeed.

With regard to the items above, if the Art Center will present a detailed cost estimate
showing all costs and revenues for all improvements at the site, including the proposed
Mary Miss project, and including all improvements made by the City in the last five
years, and including anticipated contributions from the Science Center and Founders
Garden Club, then this issue from previous Park and Recreation Board meetings can
be considered resolved.

**BOARD ACTION FORM - Mary Miss Project**
**August, 1995**
**Page Three**

Likewise, on several occasions, staff of the Park and Recreation Board has provided input and comment about potential user safety concerns and long term durability of some of the structures. This information has been passed to the Permit and Development Center, and subsequently to the Art Center. We believe the matter of user safety and longevity of construction materials has been made known to the appropriate people, and should now be a matter for resolution by the Building Department. As they become satisfied that provisions for adequate safety of users and long term durability of materials are taken care of in project documents, we recommend approval subject to a final Building Permit being issued by that department, as legally provided for in the City Code.

Likewise, good progress is being made between staff and the Art Center on the wording of the long term Maintenance Agreement. That is not finalized, but we believe substantial agreement exists, and the only remaining issues are minor ones that can and will be resolved in accordance with the 1990 Operating Agreement. Staff recommends this issue from previous Park and Recreation Board meetings be considered substantially complete and taken care of.

**Board Action:**

DrakeA5:ACTONFM4.sd

# *SilentRivers*

2340 Des Moines St. • Des Moines, IA • 515/266-6702 • srivers@radiks.net



February 7, 2002

Des Moines Art Center - Jessica Rowe, Assoc. Director
4700 Grand Ave
Des Moines,    IA   50112

Dear Jessica:

I have reviewed the drawings, and looked at the structure for the cantilevered walkway - Mary Miss Double Site. I describe my observations, including the expected costs for repairs, under the following four sections: 1) railing; 2) decking surface; 3) substructure for walkway; and 4) freestanding walkway. I hope this helps you understand the scope of work. A discussion on these four points would further help clarify current aesthetic concerns and construction failures plus define solutions to remedy current problems. I will look forward to talking with you to create a plan for making necessary repairs and alterations to restore the Mary Miss Sculpture.

**EXHIBIT**

**F**

Scope of Work:

1) **Railing -**   Obviously, the railing continues to be vandalized, and repairs have proven unsuccessful in creating a permanent fix. Also, the termination posts need to be secured in  such a way as to maintain the integrity of artist's vision. The rise and fall of the rail is distracting visually as well, but its cause is not railing-specific (see Substructure for Walkway). We can repair the railing by replacing the posts and rails with a cedar structure that includes the following changes from the original design: a) rails will remain close to the 4" x 3"  dimension, but will be mortised to hold the new pickets in a stronger way; b) while the bottom rail will be fully mortised to allow water to drain, the top rail will be mortised part way through to protect rail strength; c) pickets will increase in size by 1/2" (maybe 3/4") to be a true 2"x2" , thus alleviating the possibility of being snapped; and d) steel hardware will be created to hang each railing on, to allow future repairs if necessary. Item (d) would change the aesthetics the most, as the hardware would create a slight joint between the post and the rail, plus it would expose a bolt on the end of each rail. Most of the bracket itself will be hidden. However, we can place the bracket on the water side of the railing, which would make it easier to install and remove, but it would create a detail somewhat visible across the water. I would expect to secure the end posts for the railing with a 1/2" bolt that is run through the center of the post and bolted to the cantilevered beam. The beam could be notched to create a stronger connection.

# *SilentRivers*

2340 Des Moines St. • Des Moines, IA  50317• 515/266-6702 • srivers@radiks.net

February 7, 2002

Des Moines Art Center - Jessica Rowe, Assoc. Director
4700 Grand Ave
Des Moines,   IA   50112

Costs include the  removal of the old railing, and installation of new railing made of cedar as described above. Drawings will be done to further illustrate the details of the project. Removal of debris is included. Expected cost is: $61,470.00

**2) Decking Surface** - The surface, while still solid structurally, is visually mediocre. This is due in part to the nature of CCA Pine lumber, as the lumber warps and twists, creating an uneven surface. Most concerning are the screw fasteners popping from changes in the boards. I don't expect that your surface will fail to function any time soon, but there are cosmetic details that could have been avoided in the beginning. We can remove the treated lumber and replace it with cedar, which will give a more finished edge, and have less twisting. I would also use stainless steel fasteners that will resist failure from exposure to the water.  Either wood will need to be maintained with sealant regularly to avoid prominent checking of the lumber. Another option would be to install composite decking, which is made of wood and plastic. Many docks are constructed of this material. Visually speaking, I prefer the integrity of wood, but the composite surface does have its benefits. I have used wood to arrive at the cost figure below. Because I switched the lumber to cedar, in order to maintain a cleaner looking character to the constructed surface, I chose to add two joists between each railing post in the deck structure in order to strengthen this new surface.

Costs include the removal of the old decking, hauling it away, and replacing it with cedar 2x6 planks, secured with stainless steel screws. They also includes the construction of integration of additional stiffening boards into the sub structure. Expected cost is: $108,343.00

**3) Substructure of the Walkway** - This is my biggest area of concern. In addition to the fact

# *SilentRivers*

2340 Des Moines St. • Des Moines, IA • 515/266-6702 • srivers@radiks.net

February 7, 2002

Des Moines Art Center - Jessica Rowe, Assoc. Director
4700 Grand Ave
Des Moines,   IA   50112

that the structure is not built as specified, there are inherent problems under the structure: a) the 'shims' that 'control' the height of the deck are missing in some cases, and are feeble attempts to shore up the structure; b) the concrete piers are not consistently installed at heights relevant to changing slope of the deck surface; and c) in many areas the drawings called for no piers, and the structure is supported on an existing retaining system, which may not be supported below the frost line; d) there are other substructural construction techniques that were quickly and sloppily executed (see photos), and the work reminds me of a cheap deck tacked onto a speculative home. Despite these concerns, I have yet to discern why the walk way is rising and falling. My initial suspicion was that the freezing and thawing of different areas of the walkway caused parts of it to rise. I had hoped to find answers in the structure beneath.  In many of the areas where support shims were missing, the deck appeared consistently stable. Other parts of the walkway seem to be rising and falling, regardless of the wooden structure. The majority of the deck movement seems to be in areas where the old shoreline had eroded. I wonder if the piers in these locations might not have been drilled deep enough to overcome freeze/thaw pressures. The most visually consistent areas are over the release drain, which is housed in a solid concrete wall, and over the steel pylons. Both were installed at depths greater than the poured piers. I speculate that the problems might lie in the piers - their depths and the level of accuracy with which they were constructed.

Bearing this in mind, I cannot put a specific figure on the repairs. I would expect to remove the structure, test several of the footings, establish a more consistent height for the piers, build the platform more proficiently. Until we can uncover the piers and see what exactly is causing the uplift, I cannot give an accurate price for construction. For this section I would expect to

## *SilentRivers*

2340 Des Moines St. • Des Moines, IA  50317• 515/266-6702 • srivers@radiks.net

work on a time and material basis, and bill regularly to keep all parties updated on the cost status.
I estimate that the costs might range $115,000 - $145,000.

**4) Freestanding Walkway** - I looked at the area where the freestanding platform deck that slopes into the water connects to the landscape. There is currently a 1" gap created from shifting in the platform (assumption).  I do not know what is causing this shift, or how to fix it. I think that all components are shifting, including the wall. The platform and the landscape wall are autonomous, only connected with a few screws. The 6x6 posts on which the platform is supported can fluctuate with the freeze and thaw, and may have twisted somewhat, as well as shifted as the pond bottom moves. Perhaps they are not set deep enough below the surface of the pond floor. Regardless of the specific cause ( I imagine it is a combination of issues) I am not sure if anything can be done, aside from monitoring it over the next few years. As the platform stabilizes, if it does, then perhaps we could recreate a plate to connect the walkway to the landscape, or rethink the detail between the gravel walk and the steel transition of the platform walk.

————

I hope the above descriptions have helped to illuminate the breadth of the necessary repairs and their components.  I do look forward to working with you to realize these solutions, and to delving further to discover the roots of the few remaining mysteries involved in the project!

Sincerely,

Chaden Halfhill

**Des Moines Art Center**

Des Moines Art Center
4700 Grand Avenue
Des Moines, Iowa 50312

# Condition Report   August 2004

## Mary Miss Sculpture - Greenwood Park

EXHIBIT
G

Draft

# CONTENTS

# GENERAL OBSERVATIONS ..................................................PAGE 1-2

## PRESENT ........................................................................ PAGE 3

## FUTURE………………………………………………….....PAGE 4

## NEXT STEPS………………………………………………...PAGE 4

## BUDGET PROJECTIONS…………………………………..PAGE 4-5

## SUMMARY……………………………………………….....PAGE 5-6

## PICTURES…………………………………………………..PAGE 6-11



# General Observations

The sculpture has been in existence for approximately 8 years, this is based on field visit observations letter by Stephan Knowles of Herbert Lewis Kruse Blunck in response to the contractor Christensen Corporation. The photographic evidence of the structure date to October of 1997, the majority of the pictures document the vandalism that has occurred to the structure. Due to its secluded location, vandalism is one of three forces behind its steady decline; the other two are "mother nature", the weather and some structural challenges of the material and its association with the water. Some items of troubling interest are:

- The manner and frequency the walk way was fastened to the sub-structure. There aren't enough fastenings to adequately hold the natural warp of the treated yellow pine lumber.

- The obvious settling of structural elements within the sculpture itself, recessed walkway, peers at both the east and west ends of the boardwalk, the elevated bridge walkway adjoining the viewing pavilion and the ramp leading to and coming off of the metal bridge to the northwest.

- The runoff of rain water into the pond when there is an event causing flooding to the recessed walkway.

- The vegetation and its continual movement within the pond exacerbate the flooding of the recessed walkway.

- The growth, in mid-summer, of algae and green slime that block the spillway and cause flooding to the recessed walkway.

- The cantilever elements of the walkway, anchored into concrete and held by a wooden beam at one end, which is continually exposed to the elements and in time will fail.

- No protective finish has been applied to the wood structure on an annual basis to extend its limited life.

- The one way entry to the park makes an easy escape path for vandals.

- Insufficient light during night time hours.

- Park should have gated and closed access after sundown.

These items are apparent to the author and may be addressed some time in the future, however it should be recognized that this sculpture was may not designed to stand the test of time or nature.  Due to the materials, structure and continuous exposure to water its life is limited.   There are alternatives to its continual demise, to reconstruct and modify (with the artists input) the materials that are presently used.  It should be noted that the artists intent was to take a dilapidated urban blight and make a beautiful connection with nature, she has and it is, however to insure its survival in a like new condition, time and money are needed.

This habitual practice extends beyond exterior sculpture, but in all elements of construction throughout the industry.   An idea is conceived, an issue is raised, parties are rallied and money is raised and the idea is brought to physical fruition. Congratulations are extended, participants are praised, and the ribbon is cut but there may not be a plan in place to provide for its care.  Mary Miss does have an agreement between the Art Center and the City of Des Moines for the upkeep and maintenance of the area, but money has not been specifically designated for the repairs needed.  This is a much larger issue which pervades all business and industry today, the unattractive work of "maintenance".  A lesson can be learned from this, going forward and presumably by the artist requests, endowments should be required for all exterior sculpture to be maintained and preserved, by implementing this step provides a means to maintaining the works.

## Present

The week of August 2, 2004 there were heavy rains within the Des Moines Area (1"-2"); the impact of the runoff left the pond 8" above its normal level.  This was evidenced by the debris trail left on the steps of the observation tower.  That week, due to normal staff vacations I drew duty to monitor and maintain the spillway, perform any repairs and clean out the bench in the below water seating area, this upkeep took a great deal of time.  Twice each day I made trips to the pond to review water levels, clean out the spillway from debris and make any repairs.  It was not until Friday of that week that the water level was low enough to thoroughly clean the underwater seating area enough to allow people to use it.  All week even though the spillway was running, water continued to seep over the south end of the concrete seating area. The north end of the bay was up out of the water, indicating a definite settling of the structure, by up to 2".  Unless the pond remains calm, and the runoff is ceased, this area will flood.  When the water levels rise, pond scum and debris float into the structure and remain on the floor until it is removed.

I discovered after such an event a minimum of 10 hours are required to put the structure back into operation.  This is if no damage has occurred.

In addition, the rain event removed an aesthetic element that covered the pilings on the west side of the pond.  This structure was found floating and it required 4 adult males to maneuver it to the lower dock and lift it out of the water.  Because of its size (12'-0") and the absorption of water it was all the men could do to remove it from the site.  Its replacement is now being scheduled and will occur in the near future.  This repair will require a boat to be used, as the repair must be made from the water.  In addition a special fastening device to hold the wood blocking to the steel piles (which was not used in the original installation) will be used to secure the structure to the piles.  Previous installation was completed with intermittent blocking (one per 10'-0" panel), to hold the panel in place.  This has proven insufficient, with the rest of the panels needing to be modified in the near future.

## Future

What are the solutions to our commitment to the sculpture, the park and the public?  How do we adequately maintain this structure with our limited budget and balance its needs with 90,000 square foot of structure (museum)?  What are the real needs of the sculpture; at what level should it be maintained?  Did or does Mary Miss have any suggestions, would she like the wood treated, do any and all maintenance modifications need to be approved in writing by her?  Do we develop a sinking fund to build annually to care for the upkeep and eventual replacement of large pieces of the work?

## Next Steps

At this point I believe it is time to form a committee / task force to make some decisions concerning the on-going maintenance, up keep and preventative methods we use to preserve the sculpture. I am comfortable with making these decisions, but feel due to the sensitivity of the project it would be a good idea to have partners in this process.

**Budget Projections (Annually)**

1.  Human Resources

    a.  .5 FTE (full time equivalent) to commit to the continual care for 7 months out of the year – $15,000

2.  Construction and materials

    a.  Material to begin to annually replace a portion of the upper decking and any rotten substructure that may exist-  $18,000

    b.  Planned Projects such as raising and realignment of the north walkway, leveling of deck to lower seating area, etc - $5,000

**4**

c. Annual Preventative Maintenance- cleaning and waterproofing of the walkway and handrails, this must occur either in late fall or early spring as the chemicals may inhibit foliage growth- $2,500

d. Redesign of spillway to enable the un-obstructive flow of debris down the drain.   May require a hydrologist design to remedy- $2,200

e. Modification of spillway from redesign- $1,000

f. Reapplication of additional gravel around pond walkway  $800

g. Structural investigation of sinking of below water seating bench – long range planning.

Sub Total of Items

| | |
|---|---|
| Human Resources | $15,000 |
| Material and Construction | $24,800 |
| Design and Engineering Fees | $2,200 |
| Preventative Maintenance | $2,500 |
| Total for annual costs | $44,500 |

One solution to the economic dilemma of Mary Miss may be to look for a corporate sponsor to provide an endowment for the sculpture.  These funds would be used for some immediate need, but the bulk would be left to grow and support the sculpture long into the future.  In consideration of their gift the pond would be named for them, such as "The Wells Fargo Double Site".  Granted this may be a bit commercial, but may be the best alternative to liberate this challenge from our cash flow.

## Pictures



Missing horizontal wooden skirting was found floating in the pond was retrieved and will be attached the week of 8/16/04. This was held on by a limited number of nails, a few on each side. This structure weighs in excess of 300#, the manner and number of fasteners was insufficient to support its own weight. This is indicative of the type of workmanship and quality control that was employed in the building of this project.





Buildup of scum and loose floating plant life (see lower left of picture), plug the spillway and cause the flooding of the lower seating area (see below).

Also in the picture below, note the water level in the foreground and the level of the water to the back of the seating area. The concrete structure is settling at the south end (farthest away from this picture) which causes the area to flood and take on a great deal of moss and debris. This requires numerous hours to clean and maintain.



Note the water is running over the south end of the seating area in the picture below and is 3" above the water in the picture above (north end of seating area).



View the walkway in the center of the picture with the picket hand railing attached to it, note after the 4th vertical post the dock is settling.  This condition exists in numerous locations around the structure.



## Midwest Art Conservation Center

2400 Third Ave. South, Minneapolis, MN 55404  Tel: 612-870-3120  Fax: 612-870-3118

## Objects Condition Survey

09.1301.8

| | |
|---|---|
| **Object Number:** | **1996.20** |
| **Artist/Maker:** | Mary Miss |
| **Object Name/Title:** | Greenwood Pond: Double Site, 1989-1996 |
| **Medium:** | mixed media: wood, galvanized steel, cement, and granite |
| **Dimensions:** | Overall: 6 1/2 in. (16.5 cm.) |
| **Credit Line:** | Commissioned by the Des Moines Art Center with funds from the National Endowment for the Arts, Melva and Martin Bucksbaum, Carolyn and Matthew Bucksbaum, City of Des Moines, Des Moines Founders Garden Club, Herbert Lewis Kruse Blunck Architecture, George Milligan Memorial, Judy Milligan McCarthy, The Nathan Cummings Foundation, Norwest Banks N.A, Louise Noun, The Andy Warhol Foundation for the Visual Arts, The Science Center of Iowa, and McAninch Corporation, 1996.20 |

**Surface/Finish:**

- ✓ Dust, grime, accretions, bloom, soot
- ✓ Stains, fading, discoloration,
- ✓ Abrasions, wear, scratches, dents
- ✓ Coating? *on some elements*
- ✓ Crazing, cleaving, flaking, losses to coating

**Structural/Physical:**

- ✓ Loss of structural integrity
- ✓ Loose parts, insecurities, missing elements
- ✓ Tears, breaks, cracks, losses
- ✓ Dents, gouges
- ✓ Brittleness, dehydration, stiffening, shrinkage
- ✓ Warping, planar distortions, stretching
- ✓ Previous treatment/repair

**Metal Components:**

- ✓ Corrosion - Active / Stable
- ✓ Loose corrosion products
- ✓ Tarnish
- ✓ Loose to : patina, plating, gliding

**Condition Summary:** _____ Stable  ✓ Unstable
**Conservator's Priority:** ① 2 3 4

**Conservation Treatment Required:** _____ No Treatment
_____ Minor Treatment _____ Moderate Treatment ✓ Major Treatment

✓ **Requires In-House Treatment:  (Type)**

✓ **Requires Frequent Inspections:**
**Curator's Priority:** 1 2 3 4

**Storage/ Display:**
✓ Inadequate support or protection
✓ Inappropriate materials

**EXHIBIT**
**H**

**Comments:**

Poor condition - safety concerns
Structural prob. include inherent
prob. in design / construction, +
materials (for long term outdoor public use)
Too much overhang of SE walkway. Pins
are pulling out of the ground + walkway railing
slanted in different directions.
Some posts are no longer sitting in the metal
bracket on foundation. Water may have gotten
too high, caused some elements to float, move
and then settle in a new location. Walkway that
goes into water is afloat at present. Many
SE walkway has been altered to avoid a
visitor walk into the water instead of onto
the path on the W side of the pond. Numerous boards
have been replaced due to rot or vandalism. Scratches,
paint, etc. esp. on the enclosure on stilts at the N side.
The below water level enclosure is filled w/ water at this time.
Beavers building dam under one bridge at NW side. Much bird guano
in covered area on the W side. Pond scum/growth. Active rust on uncoated
or plated metals.

| | | | |
|---|---|---|---|
| **Print Date:** | 12-Mar-2008 05:05 PM | **Conservator:** Donna Haberman | **Date:** 6-8-8 |

**Midwest Art Conservation Center**

2400 Third Ave. South, Minneapolis, MN 55404  Tel: 612-870-3120  Fax: 612-870-3118

## Objects Condition Survey

**Biological Activity:**

X  Insect                    _____  Active

X  Rodent  *beaver*          _____  Abandoned

X  Biological Growth  *pond scum?*

X  Guano

*graffiti*















floating
above
brace

plunger cistern under here    cannot pump out of water level is too



**Midwest Art Conservation Center**
2400 Third Avenue S.  Minneapolis, Minnesota  55404 (612) 870-3120

| | |
|---|---|
| Owner: | Des Moines Art Center |
| Address: | 4700 Grand Ave |
| | Des Moines, IA  50312 |
| Contact: | Rose Wood |
| Phone: | 515-271-0323 |
| Project No.: | 09.1301.8 |
| Accession No.: | 1996.20 |
| Artist: | Mary Miss |
| Title: | Greenwood Pond: Double Site |
| Medium: | Mixed: wood, galvanize steel, concrete, granite. |


EXHIBIT

I

**Condition Report/Treatment Proposal**

DESCRIPTION
This art work is a large outdoor environment including walkways, steps, rails, small bridge, benches, pavilion, raised observation area, landscaping and below water level sitting area in and around a pond. Part of the walkway around the pond is cantilevered over the water's edge; one fork leads one down to the water; other walkways continue around the pond.  Posts, like those on the walkway, continue across the pond and make it appear the walkway continues under water and out of the below water level structure. There is a covered pavilion near the water on the west side constructed of wooden uprights and beams and metal braces and curved roof.  An adjacent series of uprights, continuing the structure, were never covered.  There is a raised observation area at the north edge of the water and raised walkways to it over the water.  Elements include an electrical system, a pump, cistern, drainage pipes, etc.  Walkways are made of  wood, galvanized steel or gravel; rails are both wood and galvanized steel.

CONDITION
The art work is in poor condition, is unstable and is becoming a safety hazard.  There are inherent problems with the design, construction and materials for an outdoor and under water environment used, long term, by the public.  Flooding and vandalism have also contributed to the downfall of the art environment.  Smooth lines of the walkways and gradually changing rail heights have been replaced with zig zag lines at different heights.

The overhanging walkway is pitched towards the water in some areas and back towards the ground in others.  Some pins on the land side of the walkway are pulled up.  There are also areas of washed out soil where the walkway has dropped.  In some areas the pin has been pulled out but the walkway has dropped down.  Some alterations to the overhanging walkway have already been made for safety concerns (east side where the overhang ended at the water, rather than at the path).  Other walkway boards, over water, on the

north side of the pond have been removed from the posts. The remaining posts have heaved up out of the ground. They are at different heights and angles and some are broken. The level between the top of these posts and the adjacent metal mesh path is over a foot different. The remaining walkway, leaving the gravel path, drops slightly where it leaves the ground. The gravel path leaving the turnaround on the west side is badly eroded.

Wooden elements overall are rotted, checked, cracked, broken, warped and some have been repaired or replaced due to vandalism and natural causes. The spindles of the railing seem especially vulnerable to damage. Many have been broken by vandals. Many are no longer securely attached to the rail or walkway due to warping, shrinkage, mechanical damage or other reasons. Some rails are not securely attached to the posts with similar causes. There is severe warping in some of the walkway boards, the rails and the spindles. Nails, screws, "L" brackets and other repair additions have been made. The wood is split in some areas due to the addition of a nail. Numerous wood boards and spindles have been replaced. At least one corner of a walkway section is not sitting on the foundation. The ground level of the pavilion posts are "chewed up", possibly from lawn equipment or animals.

The top edge of the underwater concrete seating area is not level, is now full of water due to recent rains and cannot be pumped out until the water level goes down. When this water is pumped out, debris will be left in the area and elements may be damaged. An underwater section of the walkway on the opposite side of the pond has been detached from its underwater anchor and floats. It could drop down if someone steps onto it and when the water goes down it can settle in a different location. I believe this has been repaired in the past.

There is rust on some of the metal elements, especially where a coating or plating material has been lost or where non-plated or non-stainless steel was used. Material added to the top of the rails on the north west side of the pond is cracked with losses, leaving a rough and uneven rail with future loss assured. At least one of the vertical diamond plates, on the stepped area on the west side of the pond, is detached at one corner. Much of the mesh and diamond plate surfaces and the metal rails and spindles are in good condition. Vertical wooden elements below the section of walkway that is between the cantilevered and the forked sections in the walk are missing.

Beavers are building a dam under the small bridge on the north west side. Debris is found on the pond and edges, especially at the north end. There is much growth under the overhanging walk. "Pond scum" covers the pond. Algae or other biological growth is found on some of the wooden elements. The pavilion and raised observation areas are roosting areas for birds. Nests are found and much guano has been deposited.

The interior of the raised observation area and steps up to it are marred with graffiti in the form of finger, brush and sprayed applied paint, felt tipped pens, incised marks, pencils and ink pens. This is applied to both wood and metal surfaces. The spindles of the railings have been kicked out by vandals. Other damage such as broken walkway

boards, graffiti on other surfaces (such as railing on west side) and broken material over the metal railing can probably also be attributed to vandalism.

## RECOMMENDATIONS

This project is well beyond the range of my expertise and requires the input of other specialists, possibly including construction personnel, engineers, a landscape architect and the artist. There are, to my opinion, a few very important issues that need to be addressed.

A more thorough examination of the cantilevered walkway is necessary to determine what design and/or landscape changes should be made to prevent movement (less of an overhang, a better method of anchoring, better preparation of the area before construction?,etc.).

A change of design or repair of elements that are not anchored well enough to keep them in place. This refers to the walkway sections that are not on their foundation piers, posts that heave up out of the ground,
Damaged wooden elements should be replaced. This might involve replacing some of the wooden elements with galvanized steel (with artist's approval) or another material or to replace with the same materials, understanding that a regular schedule of wood replacement will be necessary over time.

Plans for regular replacement of degraded or damaged materials, repairing washed out soil, graffiti removal and regular maintenance to keep the area clean and in good shape should be implemented.

Improve drainage in the area, as possible, to prevent some flood damage. Possibly remove beaver dam.

Increased security is needed. Ideally, this area would be locked up at night but doing that would require fencing a large area. Additional cameras and the physical presence of security personnel may be called for. Graffiti building up makes the site appear un-cared for and encourages further graffiti. Repairing damage and removing graffiti should be a regular task.

To keep the site beautiful and in good condition at all times will come with a large price tag. Therefore, another important issue is fund raising.


Conservator:       Donna Haberman
Report Date:       October 16, 2008
Client:            Des Moines Art Center
Project No.:       09.1301.8

July 14, 2010



Rose Wood, Chief Registrar
Des Moines Art Center
4700 Grand Avenue
Des Moines, Iowa 50312

Re:   Mary Miss Project, Greenwood Wetlands
      Des Moines, Iowa



**EXHIBIT**
**J**

Dear Rose:

This letter documents structural observations made during several walks through *this* project.  The letter also reports conclusions based on these observations and on subsequent analysis of information gathered during the walkthrough.

The project was designed and constructed in 1994.  The budget for the project was limited but a significant amount of construction was desired.   To accommodate the desire to maximize the amount of work that could be done within the limited budget, residential deck construction materials and techniques were used.  These materials and techniques provided the extent of construction desired, but with a limited life expectancy unless significant maintenance is undertaken.   The Art Center has performed maintenance over the years, but deterioration of portions of the project have exceeded their budget and ability to maintain this functional work of art.  A significant amount of work is now required to make the project safe and return it to its desired appearance.

At the East concrete drilled piers were installed with a significantly enlarged top portion.  This enlarged area of concrete has made the piers susceptible to uplift caused by freezing soil and the actions of ice in the pond.  The vertical movement of these piers has caused this portion of the walk surface and railing to become very irregular with a significant slope to the adjacent ground and a significant cross slope at the walk.  This portion of the walkway would be best repaired by removal and replacement of the piers, walkway, and railing.

The handrail has undergone numerous repairs due to vandalism and age. Replacement of limited portions of the railing and additional maintenance in other is now required.

A beam that cantilevers over a section of a steel sheet pile retaining wall near the Northwest end of the main walkway (the fourth beam from the end) has dropped significantly at the sheet piling making the walkway very uneven.  The reason for this movement must be verified by removing decking and the wood covering the sheet pile before a method of repair can be developed.  The repair may require replacement of the beam, beam tie down adjacent decking and railing.

4308 UNIVERSITY AVENUE
DES MOINES IOWA 50311-3424

p  515.279.3900
f  515.279.5233
w  csengr.com

A number of internal joists or stringers supporting the floor planks are missing at a section of the West walkway that extends down to the pond surface.  The loss of these framing members has reduced the capacity of this section of to significantly below code required levels.   Contact with the water has caused more rapid deterioration of the framing and deck in this area.  These stringers and some of the deck must be replaced.

Connection of the lower level walkway at the West of the pond to the steel sheet pile retaining wall has failed.  No support is provided for a section of the walkway in this area.   This has caused a very uneven and unsafe section of the walk. Deteriorated framing and deck in this area should be replaced and a new connection made to the sheet pile.   Other joist/beam connections should be checked to verify that they have not similarly deteriorated.

The below water level viewing area at the North of the pond has been overtopped by the water and has been capped with a section of deck to prevent access.  This section of deck is in contact with the water and is in poor condition.  A section of walkway connecting to this area has failed.  These areas will require significant reconstruction/replacement.

Throughout the project planks and seating are "scalloped" due to creep of the treated lumber.  It is my recollection that the Artist wanted the project to show signs of age and wear but, of course, did not want unsafe conditions to be present.  Rotten portions of the deck and framing are present in various areas of the project.  There are also a number of fasteners that have failed for various reasons.   Uneven, rotten, poorly supported and inadequately fastened framing and decking should be addressed to provide a safe surface for the public.

A steel fascia plate at the seating area at the North of the pond is missing and should be replaced.

This project has served the public for nearly 16 years.  Deterioration has made portions of project unsafe and has reduced its aesthetic appeal and functionality. A concentrated effort to repair the areas of major damage along with continued maintenance will allow this work of art to continue to perform its aesthetic and practical functions.

This structural review was based on limited, non-destructive observations on the site.  The information provided herein represents opinions and recommendations based on sound engineering judgment using the available information.  Conditions may exist that are hidden by construction, covered or otherwise obscured that might change opinions stated in this letter.   No warranty or guarantee of the condition of the structures is expressed or implied by this letter.

Mary Miss Project, Greenwood Wetlands
Structural Walkthrough
Page 3

I hope this letter has answered questions and concerns regarding this structure.  If there are any additional questions or concerns, please feel free to contact me.

Sincerely,

Charles E. Saul, P.E.

Mary Miss Project, Greenwood Wetlands
Structural Walkthrough
Page 4

# PHOTOS



1.   Tilting walkway at East.



2.   Heaved drilled piers at East.



3.      Slope to walkway and non-uniform railing at East.



4.      General view of East walkway from the West.

Mary Miss Project, Greenwood Wetlands
Structural Walkthrough
Page 6



5.      Repaired railings.



6.      Repaired railings.



7.    Deflected beam at West.



8.    Missing joists/stringers at lower walkway at West



9.     General view of lower walkway at West.



10.     Missing plate at seating area to the North of the pond.



11. Deteriorated cover over water level viewing area.



12.    Rotting deck board and poor fastener condition.



**Midwest Art Conservation Center**
2400 Third Avenue South Minneapolis, MN 55404

| | |
|---|---|
| **Owner:** | Des Moines Art Center (DMAC) |
| **Address:** | 4700 Grand Avenue |
| | Des Moines, IA 50312 |



EXHIBIT

**K**

| | |
|---|---|
| **Contact:** | Mickey  Ryan, Registrar |
| **Phone:** | 515-271-0314 |
| **Project No.:** | 22.1301.4 |
| **Artist:** | |
| **Title:** | Outdoor Sculpture Survey |
| **Medium:** | |
| **Dimensions:** | |
| **Marks:** | |

**Project Report**

In late July 2022, 41 outdoor artworks in the collection of the Des Moines Art Center were surveyed by MACC Conservators Courtney Murray and Megan Randall. Though proposed as a survey of artworks installed at the Pappajohn Sculpture Park, extra time (grouping with a second project) enabled the conservators to examine sculptures on the grounds of the Des Moines Art Center and other locations.

The goal of the survey was to provide DMAC with current information about the condition of the sculptures and their treatment needs. MACC conservators completed a survey form for each artwork including condition notes and treatment recommendations; in some cases the recommended treatment is routine maintenance that may be performed by Des Moines Art Center staff who have previously undergone training in paste waxing, hot waxing and basic inpainting (see project 21.1301.1). In other cases, the recommendations address damage or degradation, and in a few instances where the artwork and its condition are particularly complex the recommendation is for further correspondence and research to inform treatment proposal development. Individual survey forms and extra photographs are submitted separately.

Summary of Observations
The 41 artworks surveyed here are made from a variety of material types. Since material often dictates the condition issues and treatment needs, these are summarized briefly here. The largest group of artworks are made of cast bronze (15), with large groups of painted metal (11), stone (6), and unpainted metal (5). In addition there are mixed media (2), painted fiberglass (1), and coal (1) sculptures in the group. Bronze artworks are most susceptible to corrosion and patina loss. They require regular washing and (in nearly all cases) waxing. Painted metals require regular washing and maintenance of the paint layer. Infrequently, these artworks must be fully stripped and repainted. The needs of stone artworks vary based on the type of stone, but generally they are susceptible to biological growth/staining, damage from migrating salts, and cracking or loss due to freeze/thaw cycling. Unpainted metal sculptures must be monitored for active corrosion, washed regularly, and may require larger treatment if

1

their surfaces become unstable.

Each artwork was assigned a conservation priority number between 1 and 4, defined as follows:

1. Urgent Treatment: The object requires immediate treatment or intervention in order to stabilize or arrest ongoing deterioration. The artwork may be structurally unsound, at risk for further significant damage, or represent a potential hazard to visitors/staff.

2. Requires Treatment: The object requires treatment to insure its stability; the treatment may be either major or minor. Sculptures with active corrosion, missing hardware, actively observed flaking, etc. are listed in this category. In addition, sculptures with deteriorated wax coatings are listed in this group.

3. Cosmetic/Aesthetic Treatment: The appearance of the object could be improved through cosmetic or aesthetic treatment. Poor appearance may make an object inappropriate for exhibition, or make interpretation difficult. Note that routine maintenance (e.g. washing, waxing) may be included in this category.

4. No Treatment: The object is in stable condition and no interventive treatment is required at this time. Included in this category is an artwork that is currently in storage.

This is the distribution of priorities within DMAC's collection. Note that this is a snapshot in time and that priorities are constantly changing based on condition.

| Conservation Priority 1 | 7 |
| Conservation Priority 2 | 12 |
| Conservation Priority 3 | 18 |
| Conservation Priority 4 | 4 |

Additionally, each artwork was giving a rank by the conservators of 1 - 41, with number one being the highest priority for treatment. Within a conservation priority category however, one sculpture may have a higher ranking than a sculpture with more significant condition concerns when the treatment is seen to be particularly timely or beneficial. The rankings are based entirely on condition and give no weight to the significance or value of the sculpture. *Greenwood Pond: Double Site* is ranked number one overall due to vandalism, structural hazards, and loose parts. *Nomade* by Jaume Plensa is ranked second. While repainting of the entire sculpture could wait a few years, replacement of the corroded hardware should be pursued immediately.

Conservation priority does not signify the length of the treatment. For example, Three Cairns is a conservation priority 1 because there are two loose stones that should be tucked in before they disappear. In general, artworks categorized as 1's have loose parts, missing parts, corroded hardware, or - in the case of the Rondinone MOONRISE sculptures- a paint surface that is washing off every time it rains. There are a group of bronzes in conservation priority 2 that need to be paste waxed as soon as possible; their wax coatings are heavily worn, and additional corrosion or patina loss may occur if they are not addressed.

Maintenance steps or short treatments that can be undertaken by trained DMAC staff are outlined in the Site Notes and Maintenance Recommendations section of each survey record. Conservator treatment steps are outlined in Treatment Recommendations, and -where relevant- cost estimates are provided. It is hoped that the Conservation History section of each survey record can be used as a jumping off point for DMAC Registration to develop a clear tracking system for short maintenance treatments that are being undertaken by DMAC Installations staff. This data can be helpful to build support for larger intervention, should it be necessary.

A regular maintenance schedule may be developed by grouping artworks by material type and frequency of required maintenance. MACC conservators are available to review proposed schedules.

The next four sculptures that require major repainting (barring unforseen condition changes):
-Willy (Tony Smith)
-Nomade (Jaume Plensa)
-MOONRISE east. january 2005 (Ugo Rondinone)
-MOONRISE . east. august 2005 (Ugo Rondinone)

Two major treatments that should occur in the next five years:
-Untitled, 1994 (Ellsworth Kelly)
-Panoramic awareness pavilion (Olafur Eliasson)- consider relocation

Each survey form includes four small thumbnail images. Additional images taken during the survey will be provided along with this report.

Concurrent with the survey, two short treatments were carried out by MACC in the Pappajohn Sculpture Park. *Reclining Figure* was washed and hot waxed, and *Gymnast III* was washed and paste waxed, with a localized spot of corrosion reduced. In addition, MACC initiated treatment on a detached limb from *air gets into everything even nothing;* a separate treatment proposal will be developed for that artwork. MACC conservators will work to develop large proposals for the Kelly and the Moore in 2022.

| | |
|---|---|
| **Conservator:** | Courtney Murray |
| **Date Completed:** | 8/4/2022 |
| **Client:** | Des Moines Art Center (DMAC) |
| **Project No.:** | 22.1301.4 |

3

DMAC Outdoor Sculpture Survey 2022
Midwest Art Conservation Center

**COLLECTIONS OR PUBLIC RISK:** [x] Vandalism
[ ] Hazardous Materials
[x] Structural Hazard

**Conservation Priority:**   1    **Rank:**   1

**Title:**        Greenwood Pond: Double Site

**Artist:**       Mary Miss

**Dimensions:**   6.5 acres

**Location:**     Greenwood Pond

**Materials:**    Mixed media: wood, galvanized steel, granite, concrete



**Description:**  A mixed media artwork that is installed over a section of approximately 6.5 acres surrounding Greenwood Pond behind the Des Moines Art Center. The artwork consists of railings, walkways, structures, and built stone walls.

**Surface:**

[x] Abrasion/Scratches
[x] Accretions
[ ] Bloom
[ ] Coating
[ ] Coating Loss
[x] Corrosion ACTIVE
[ ] Corrosion STABLE
[ ] Crazing/Blanching
[x] Dirt/Dust/Grime
[ ] Discoloration
[ ] Fading
[ ] Flaking
[x] Graffiti
[ ] Pitting
[x] Staining
[x] Wear

**Structure:**

[x] Brittleness/Stiffening
[x] Breaks
[ ] Crack
[ ] Deformation
[ ] Delamination
[x] Dents/Gouges
[x] Loose Parts
[x] Loss of Structural Integrity
[x] Losses
[x] Missing Elements
[x] Previous Repair
[ ] Spalling/Sugaring
[ ] Tears

**Notes on Conservation History**

*Numerous repairs have been undertaken by DMAC and the Parks department. This extensive site history should be documented clearly in the object record.*

delivered to
KB by Jay
on 12/14

**Previous Restoration:**

[x] Stable
[ ] UNSTABLE
[ ] Unsightly
[ ] Historic Repair
[ ] Artist Repair

**Biological Activity:**

[x] Guano
[x] Insects
[ ] Pests
[ ] Mold
[x] Lichen
[x] Other Organic Growth

**Site Notes and Maintenance Recommendations:**

See treatment recommendations. Develop a comprehensive maintenance plan that includes regular graffiti removal, hardware checks, pump maintenance, repair or replacement of broken elements, etc.

**Condition:**

The artwork is in fair condition overall, with some elements in poor condition due to structural instability. A galvanized steel panel on the stepped platform adjacent to the pond is actively falling off. Stone blocks built into the hillside are missing, broken, and displaced. Hardware on the built structures is loose and/or displaced, potentially resulting in some level of structural instability. Graffiti is present, as are losses in an epoxy (est.) coating on the top surface of the galvanized railing. The sunken viewing area is flooded. Spot rusting is noted on galvanized steel elements.

  

**Treatment Recommendations:**

Treatment is required and may be undertaken by DMAC staff and/or parks staff in consultation with a conservator. It is recommended that the artwork be clearly defined and documented, with critical discussion regarding the maintenance with site stakeholders. Cost estimate below is for conservator consultation and review of protocols for long-term care of each material type.

**Treatment or Maintenance Required:**

☐ None            ☐ Moderate (10-25 hours)
☒ Minor (<10 hours)    ☐ Major  (>25 hours)

**Cost Estimate:**

$1600-1800

**Conservator:**    Courtney Murray            **Date:**    7/27/2022

1996.20conrpt

EXHIBIT

**L**

DE/
MOINE/
ART
CENTER

# CONDITION REPORT

Mary Miss (American, born 1944)
*Greenwood Pond: Double Site*, 1989−1996
Mixed media: wood, galvanized steel, cement, and granite 6.5 acres
Commissioned by the Des Moines Art Center with funds from the National Endowment for the Arts, Melva and Martin Bucksbaum, Carolyn and Matthew Bucksbaum, City of Des Moines, Des Moines Founders Garden Club, Herbert Lewis Kruse Blunck Architecture, George Milligan Memorial, Judy Milligan McCarthy, The Nathan Cummings Foundation, Norwest Banks N.A, Louise Noun, The Andy Warhol Foundation for the Visual Arts, The Science Center of Iowa, and McAninch Corporation, 1996.20



This report documents the condition of *Greenwood Pond: Double Site*, 1989−1996 in February 2024. All photos are provided by the DMAC's Registration Department between October 2023− February 2024.

After several in-depth physical examinations, I have come to the conclusion that *Greenwood Pond: Double Site* is no longer viable without a complete reconstruction utilizing weather-appropriate materials, as well as increased funding and specialized staff. This report documents the decaying and weather-worn condition of the wood structures of each artist-designed element, as well as the need for reworked pump systems (Recessed Walkway).

Examiner: Mickey Ryan, Director of Registration and Collections Management
Date: 02.26.2024

1996.20conrpt



Elements addressed in this report:

    A.  Pavilion with Metal Roof
    B.  Free Standing Wood Elements
    C.  Bridge
    D.  Low Wood Walkway Above Water
    E.  Wood Walkway Descending into Water
    F.  Walkway Recessed into Water
    F1. Post Markers in Water
    G.  Retaining Wall for Earth Terraces
    H.  Steps
    I.   Overhanging Wood Walkway
    J.  Viewing Pavilion
    K.  Wooden Platform
    L.  Elevated Wood Walkway
    M.  Steel Grate Walkway

1996.20conrpt

## A. Pavilion with Metal Roof



On October 2023, this element was determined to be structurally unsafe by John Rhodes, a structural engineer hired by the DMAC. On the same day a temporary fence was constructed. The current fencing was constructed the following week.

Several hardware elements of the Pavilion are missing, there are large gaps where the wood once joined, and the wood is cracking and unstable, often with dry rot. The wood posts are in direct contact with the soil, which has exacerbated the dry rot and structural integrity of the pavilion. None of the lights in the structure work. Details on following pages.

1996.20conrpt

## A. Pavilion with Metal Roof



## A. Pavilion with Metal Roof





1996.20conrpt

## A. Pavilion with Metal Roof

separating
hardware/joints



examples of
separating hardware
and joints, as well as
splitting wood



## A. Pavilion with Metal Roof






Dry rot (fungal decay) of Pavilion posts

1996.20conrpt

## B. Free Standing Wood Elements



Missing hardware, separating joints, wood loss and cracking, and extreme dry rot (fungal decay), especially at the bottom of support beams. The posts were in direct contact with soil, which exacerbated the condition. Per the report provided by John Rhodes, Structural Engineer, on February 26, 2024, "The wood arches were leaning noticeably, and the arches could be moved approximately 12" laterally with minimal effort from one person from the ground level." Details of damage below and on following page.

On October 2023, this element was determined to be structurally unsafe by John Rhodes, a structural engineer hired by the DMAC. On the same day a temporary fence was constructed. The week of October 23, the elements were deinstalled. The wood was disposed of, but the hardware was kept and stored at the DMAC.

## B. Free Standing Wood Elements

 

**B. Free Standing Wood Elements**



Loose hardware, separating joints, general wood losses, cracking, and dry rot. The images on this and the following page show the condition of the bottom of the support beams. Some of the structures were leaning and could easily be pushed over.

## B. Free Standing Wood Elements




1996.20conrpt

**B. Free Standing Wood Elements**



DMAC Director of Facilities and Lead Facilities Manager deinstalling the freestanding
structures, October 2023.

1996.20conrpt

## C. Bridge



Wear, decay, and loss of wood elements on the bridge. Metal components rusting.

1996.20conrpt

## C. Bridge



missing element

1996.20conrpt

## C. Bridge



loss of wood
plank

1996.20conrpt

## C. Bridge



Wear, decay, and loss of wood elements on the bridge. Metal components rusting.

1996.20conrpt

## C. Bridge



Visible warping, wear and decay, cracking, and losses of wood approaching the bridge.

1996.20conrpt

**D. Low Wood Walkway Above Water**



Inherent wear, warping, and decay of wood on walkway.

1996.20conrpt

## D. Low Wood Walkway Above Water



loss of
wood
plank

1996.20conrpt

## D. Low Wood Walkway Above Water



1996.20conrpt

## D. Low Wood Walkway Above Water



Inherent wear, warping, and decay of wood on walkway.

1996.20conrpt

## D. Wood Walkway Descending into Water



Inherent wear, decay, wear, and discoloration of wood.

## E. Wood Walkway Descending into Water





missing element

## E. Wood Walkway Descending into Water



Missing elements, inherent wear, decay, wear, and discoloration of wood.

### E. Wood Walkway Descending into Water





Inherent wear, decay, wear, and discoloration of wood.

## F. Walkway Recessed into Water



missing plank

The recessed walkway is persistently underwater. As a result, the DMAC fenced off this element October 20, 2023, as a safety measure. The presence of pond water has caused a layer of pond growth (algae) to grow and collect on the surface. There is also a plank missing from the bench.

1996.20conrpt

## F1. Post Markers in Water





Inherent wear, decay, wear, and discoloration of wood.

## F1. Post Markers in Water





Inherent decay of wood markers in water.

1996.20conrpt

## F1. Post Markers in Water



missing element

1996.20conrpt

## F1. Post Markers in Water



Missing element, inherent decay of post markers in water.

1996.20conrpt

### G. Retaining Wall for Earth Terraces





Retaining wall has many loose stones, stones that are out of place, as well as missing stones.

1996.20conrpt

## G. Retaining Wall for Earth Terraces

two missing stones



## G. Retaining Wall for Earth Terraces





Retaining wall has many loose stones, stones that are out of place, as well as missing stones.

## H. Steps



1996.20conrpt

## I. Overhanging Wood Walkway



On October 20, 2023, the Overhanging Wood Walkway was also closed due to safety concerns. The cantilevered bridge is warping and sagging due to dry rot and general wood decay. There are also missing wood elements.

According to John Rhodes, Structural Engineer, in his February 26, 2024, report to the DMAC, "Portions of the boardwalk have moved vertically over 4" resulting in an uneven walking surface. This appears to be the result of deterioration at the tension ties connections on the south side of the boardwalk."

1996.20conrpt

**I. Overhanging Wood Walkway**



Inherent wear, warping, decay, and discoloration of wood.

**I. Overhanging Wood Walkway**





1996.20conrpt

**I. Overhanging Wood Walkway**





Inherent wear, warping, decay, and discoloration of wood.

1996.20conrpt

## I. Overhanging Wood Walkway



1996.20conrpt

## J. Viewing Pavilion





**J. Viewing Pavilion**



## J. Viewing Pavilion



Detail of loss on first landing.

1996.20conrpt

## J. Viewing Pavilion



Detail of wood condition.

### J. Viewing Pavilion



Presence of graffiti over all the interior of pavilion.

1996.20conrpt

## K. Wooden Platform



The original wood platform was removed at some point and not returned or replaced. The current location is unknown. This photo represents the location of the platform.

1996.20conrpt

## L. Elevated Wood Walkway



## L. Elevated Wood Walkway



**M. Steel Grate Walkway**



## M. Steel Grate Walkway



# MARY MISS

349 Greenwich Street 5th floor New York, NY 10013
telephone 212.966.4287 website www.marymiss.com

July 10, 2012

Jeff Fleming
Director
Edmundson Art Foundation, Inc.
4700 Grand Avenue
Des Moines, Iowa 50312-2099
P. 515-277-4405
F. 515-255-1006



**EXHIBIT M**

Dear Jeff,

I am glad I was able to come out to see the pond project and discuss how we might proceed.   As I mentioned since it is one of the few large scale permanent public project I have and the only large outdoor work I have at a museum space (the Indy Art and Nature Park project has a limited installation period) I am particularly interested in seeing it restored.  I do recognize the obstacles in doing this I would like to outline some thoughts I have had.

After our meeting I spoke with a scientist I have worked closely with in Indianapolis to see if he was aware of any grants that he thought might be appropriate. He suggested that grants distributed through the Clean Water Act would be worth checking out.  State 319 funds are allocated for 'best management practices' and are intended to address the maintenance of clean water and education on the subject.  The way they are distributed varies from state to state but in Indiana they are for substantial amounts of money, up to a couple of million dollars for projects addressing the improvement of the water system and education.  I am paraphrasing what I was told and may not have all this right.

I think it would be worth checking into this to see how they are handled in Iowa.  My friend thought it may be hard to ask for funds to restore the derelict walkways around the pond but it might be possible to get funds to clean and upgrade the basins leading from Grand Ave to the pond.  We might be able to add a content layer to the pond to address the educational component the grant offers. You can check out the website we did for the project in Indy (http://flowcanyouseetheriver.org) to see how content was handled there.  I would presume that we would need to apply for such funds with the city and a science person or organization. Is there someone in the city, Department of Natural Resources or the US Geological Survey (USGS) who could help check this out? It may be worth mentioning my work in Indy to any 'water' people and that we received a NOAA grant to do the project as well as an award from the Association of State Floodplain Managers for it (just to give this suggestion some credibility).

If we were able to get funds to address part of the upgrade of the pond perhaps it would be possible to piece together funding from different sources. Also, if funds were received from a

grant it might inspire the city or others to want to see the work repaired.

There are priorities I have in the restoration of the project. For one thing I feel that it is imperative that a notice be put up that the project is in a state of restoration with an image of the original work so that people won't be misled by what they see on site. It is my preference that all damaged elements and walkways be removed. I would rather see a section of walkway removed with appropriate guard rails installed than a buckling walkway.

The 'heart' of the project and the greatest priority for replacement for me is the recessed walkway in the pond. Without that element I have always felt the work was totally incomplete.

I think there should be investigation of the use of ipe or some other certified sustainable hard wood for the walkways to give a longer life span for the wood portions of the project as they are replaced.

If it is possible to restore the project it needs to be recognized that a maintenance program (which of course implies funding) needs to be in place. A bridge, a house--any built outdoor structure, particularly in a place like Iowa, will need ongoing maintenance.

Finally I think there should be a time limit for this all to happen and that we would agree to remove the entire work if the funding for repairs is not forthcoming. It would be unacceptable for portions of the work to remain on the site.

I hope this provides a road map for moving forward with the restoration work. I really appreciate your interest in having the work whole again and I am happy to work with you to explore possible solutions.

Best wishes,

Mary

**R**<span>E</span> **RAKER RHODES**
Engineering

EXHIBIT
N

Mike Gard
Des Moines Art Center
4700 Grand Ave
Des Moines, IA 50312

November 8, 2023

Raker Rhodes Engineering was asked to review the condition of the structural framing of the Mary Miss Art Installation at Greenwood Pond. A small group walked through the site on October 20, 2023. The group consisted of Mike Gard (Art Center), Mickey Ryan (Art Center), and myself (RRE). The art piece consists of several treated wood structures that was completed between 1989-1996 near the south and west side of the pond.

There are significant structural concerns with the boardwalk, pavilion, and wood pieces north of the pavilion. Dry rot in the wood members and connections have resulted in number of unsafe/unstable conditions. In my professional opinion, the wood has deteriorated to a point it is not feasible to replace just a few members. Total replacement with new treated wood or a more durable wood species (Ipe is one option) is the best route forward. If the decision is made to rebuild the art pieces, there are a number of connection details that could be improved to prolong the life of the structure. For example, most wood columns were originally direct buried in soil resulting in accelerated decay. Raker Rhodes Engineering can help revise the original connection details to extend the life of the art pieces.

Please let us know how you would like to proceed.

Regards,

John Rhodes, PE, SE

JOHN D. RHODES 18297 LICENSED PROFESSIONAL ENGINEER IOWA



**RAKER RHODES**
Engineering



EXHIBIT

**O**

Mike Gard
Des Moines Art Center
4700 Grand Ave
Des Moines, IA 50312

February 26, 2024 (Updated)

Raker Rhodes Engineering was asked to review the condition of the structural framing of the Mary Miss Art Installation at Greenwood Pond. A small group walked through the site on October 20, 2023. The group consisted of Mike Gard (Art Center), Mickey Ryan (Art Center), and myself (RRE). The art piece consists of several wood structures that was completed between 1989-1996 near the south and west side of the pond.

There are significant structural concerns with the boardwalk, pavilion, and wood arch pieces north of the pavilion. Dry rot in the wood members and connections have resulted in number of unsafe/unstable conditions. The wood posts for the pavilion and the arches appeared to be direct contact with the soil which is not ideal even for treated wood. A number of these posts for the arches have completely rotted away. The wood arches were leaning noticeably, and the arches could be moved approximately 12" laterally with minimal effort from one person from the ground level. The post bases for the pavilion show significant deterioration at the soil level on the west side.

The boardwalk on the south side of the pond is also in extremely poor condition (See Figure 2). The structure consists of wood beams that cantilever over a pond wall and are held down with hold down rods buried in the soil. Portions of the boardwalk have moved vertically over 4" resulting in an uneven walking surface. This appears to be the result of deterioration at the tension ties connections on the south side of the boardwalk (See Figure 3). The original detail allowed for water to be trapped in the recessed hole for the tension rod and washer accelerating delay. It is unlikely the structure would support the required 100 psf assembly live loading. The wood guardrail above the pond also not meet Code driven load requirements and moves laterally with minimal effort.

In my professional opinion, the wood has deteriorated to a point it is not feasible to replace just a few members for the wood arches and the boardwalk. Further investigation is required for the columns of the pavilion. The recommendation was to close off access to these structures to the public due to life safety/liability issues. It is unclear what type of wood was originally used but it has reached the end of its useful life. A life span of roughly 30 years for wood fully exposed to the elements is not unreasonable. If the decision is made to rebuild these structures there are a number of material and connection details that could be improved to extend the useful life. We would be happy to help with these details if necessary.

Let us know how you would like to proceed.

Regards,

John Rhodes, PE, SE

LICENSED PROFESSIONAL ENGINEER
JOHN D. RHODES
18297
IOWA

**R**AKER RHODES
Engineering



*Figure 1. Wood arches north of the pavilion.*



*Figure 2.  Condition of the boardwalk.*



**RAKER RHODES**
Engineering



*Figure 3.  Condition of a boardwalk hold down.*

November 10, 2023



Mike Gard
Des Moines Art Center
4700 Grand Avenue
Des Moines, IA 50312



**Mary Miss Boardwalk Repair and Reconstruction Budget**

As requested, we have budgeted the Work, as described above and shown on the attached scope of work document, which includes the furnishing of all labor, material, equipment, insurance, and taxes necessary to perform the work, for a **BUDGET AMOUNT** of:

**Section #1: Clean/Repair at Southeast Boardwalk Section Built in 2015**
NINETEEN THOUSAND THREE HUNDRED FIFTY
AND NO/100DOLLARS...................................................................................................... $19,350.00

**Section #2: New Structure, Boardwalk, Rail & Benches at South Cantilevered Boardwalk**
ONE MILLION ONE HUNDRED THIRTY THOUSAND FOUR HUNDRED
AND NO/100DOLLARS.................................................................................................. $1,130,400.00

**Section #3: New Structure with Salvaged Cumaru Boardwalk & Bench at Walk into Water**
FOUR HUNDRED THIRTY-THREE THOUSAND SEVEN HUNDRED TWENTY-FIVE
AND NO/100DOLLARS.................................................................................................... $433,725.00

**Section #4: Demo and Rebuild the Pavilion**
FOUR HUNDRED FORTY-SEVEN THOUSAND ONE HUNDRED
AND NO/100DOLLARS.................................................................................................... $447,100.00

**Section #5: Rebuild Five Freestanding Wood Elements**
TWO HUNDRED EIGHTY THOUSAND SEVEN HUNDRED
AND NO/100DOLLARS.................................................................................................... $280,700.00

**Section #6: New Boardwalk at North Bridge. Clean/Repair Boardwalk and Bench at Recessed Viewing Area**
ONE HUNDRED FIFTY-SIX THOUSAND TWO HUNDRED
AND NO/100DOLLARS.................................................................................................... $156,200.00

**Section #7: Demo and Rebuild Bird Cage Pavilion**
ONE HUNDRED SIXTY-SEVEN THOUSAND TWO HUNDRED FIFTY
AND NO/100DOLLARS.................................................................................................... $167,250.00

**Section #8: Clean/Minor Repair of 2015 Elevated Northeast Boardwalk Bridge**
SEVENTEEN THOUSAND NINE HUNDRED FIFTY
AND NO/100DOLLARS...................................................................................................... $17,950.00

**TOTAL FOR ALL SCOPES OF WORK**
**TWO MILLION SIX HUNDRED FIFTY-TWO THOUSAND SIX HUNDRED SEVENTY-FIVE**
**AND NO/100DOLLARS.................................................................................................. $2,652,675.00**

**The Standard of Excellence**

 515.243.0156      1435 Ohio Street, Des Moines, IA 50314      NeumannBros.com

November 10, 2023



Mary Miss Boardwalk Repair & Reconstruction

Project Scope Description:

**Section #1:** Overall condition of structure and Cumaru installed in 2015 appears to be in excellent condition. Clean all existing boardwalk and rail areas. Tighten and readjust any loose boards.

**Section #2:** Demo the existing cantilevered boardwalk. Install new helical anchors along the south edge of the boardwalk and encapsulate with a concrete grade beam that is to be buried below finish grade. The concrete piers at the midpoint of the boardwalk will remain in place and be reused for a new Cumaru structure. Replace the boardwalk, rail assembly and benches with Cumaru.

**Section #3:** Remove and salvage the existing stone cap and all existing Cumaru boards from the boardwalk, benches, and face of retaining wall for reinstallation. Demo all existing green treat lumber structures down to the existing concrete pier foundations. Demo all 6x6 green treat free standing post markers in the water. Rebuild the structure and post markers with Cumaru. Reinstall all salvaged Cumaru boards for the boardwalk, benches, and face of retaining wall. Reinstall salvaged stone cap at retaining wall.

**Section #4:** Demo the existing pavilion and salvage all existing hardware. Rebuild the west pavilion, benches, and floor decking with Cumaru. Install new lighting at the underside of the roof deck. Install new tin roofing over Cumaru deck boards. Cumaru does not come in a sheathing material, so all roof decking will be made up of T&G 1x6 deck boards. We did not figure glass wall assemblies or heaters as the assumption is these would be easily damaged by the public and become a continual maintenance issue after installation. If you want the glass, doors, and heaters to be installed to match the original design exactly, please <u>**ADD: $90,000.00**</u>

**Section #5:** Reconstruct five (5) new freestanding wood structures to match the original design documents. Each wood structure will be fully constructed out of Cumaru. New 12" x 48" concrete foundations will be installed at the base of each wood post per the original drawings. Please note it is assumed the original hardware will be provided by the Art Center for reuse to build each freestanding wood structure. No new hardware has been included.

**Section #6:** Replace all green treat material at the north bridge with Cumaru. Clean all existing Cumaru, repair any loose boards, and replace any missing boards in the existing Cumaru boardwalk and bench areas at the walkway to the recessed viewing area. Galvanize the existing steel plates at the bridge. The existing steel structure and guardrail will be cleaned but left in place as they are in good condition.

**Section #7:** Demo the existing Bird Cage Viewing Pavilion. Salvage all existing screen wall material to be reinstalled. Rebuild the structure, viewing platform and stairs out of Cumaru. Cumaru does not come in a sheathing material so the roof decking will be made up of T&G 1x6 deck boards. Install new tin roofing material and reinstall the salvaged screen walls.

**Section #8:** Overall condition of structure and Cumaru installed in 2015 appears to be in excellent condition. Clean all existing boardwalk and rail areas. Tighten and readjust any loose boards.


Project Specific Inclusions:

01.  General supervision.
02.  All new wood will be Cumaru with stainless steel fasteners.
03.  Daily clean-up of all construction debris.
04.  Daily supervision.

**The Standard of Excellence**

 515.243.0156       1435 Ohio Street, Des Moines, IA 50314       NeumannBros.com

November 10, 2023



Mary Miss Boardwalk Repair & Reconstruction

Project Specific Exclusions:

    01.  Builders risk insurance.
    02.  Premium time.
    03.  Building permit (no permit required).
    04.  Soil stabilization of any kind.
    05.  Foundation removal, existing concrete pier foundations in the pond are assumed to be in good stable condition and will be reused.
    06.  Draining of the water in the pond. This will need to be done to complete the scope of work for areas #2 and #3 on the attached scope drawing.
    07.  New hardware at section #4, #5 & #7. Existing hardware is to be salvaged and reused with the new Cumaru wood structures.
    08.  Staining of any new or reused Cumaru wood. Note the new wood will be at its natural brown finish and will grey rapidly if not sealed. This was the original intent previously and is why sealing is excluded from the budget.
    09.  Soil Testing / Special Inspections.
    10.  Design Fees.
    11.  Landscaping.

This budget is based on prices of materials and equipment in effect as of the date of this letter.

**Please note this is only a "budget" and if you would like to proceed, we would move to refine scope / pricing and put a contract in place.**

Please call if we can be of any additional service or provide any additional information.

**Neumann Brothers, Inc.**

_____

Josh Braby
Project Manager / Shareholder

jmb/dsw

**The Standard of Excellence**



515.243.0156    1435 Ohio Street, Des Moines, IA 50314    NeumannBros.com



SCOPE OF WORK ATTACHMENT

Date: 11/10/2023

neumann

SECTION #08

SECTION #07

SECTION #06

SECTION #05

SECTION #03

SECTION #01

SECTION #02

SECTION #04





# Recommendation to Deaccession Mary Miss, *Greenwood Pond: Double Site* (1989–1996)



# Recommendation to Deaccession Mary Miss, *Greenwood Pond: Double Site* (1989–1996)

February 27, 2024

The Des Moines Art Center's Executive Director, Senior Curator, and Director of Registration and Collections Management regretfully recommend the de-accessioning Mary Miss's *Greenwood Pond: Double Site* (1989–1996). Multiple issues have prompted this recommendation, all of them outlined in the following justification, which is guided by three documents: the Art Center's 1990 agreement with the City of Des Moines; our Collections Management Policy; and the Association of Art Museum Directors' (AAMD's) rigorous deaccessioning protocols, found in "Professional Practices in Art Museums." Based on these three documents, we believe we are justified in endorsing the deaccessioning of *Greenwood Pond: Double Site* given the hazard it poses to public safety; the expense involved in rebuilding it, which is far in excess of its value; its need for constant special care; and its state of extreme disrepair, which has frustrated attempts at reasonable maintenance. According to AAMD's "Professional Practices in Art Museums," "deaccessioning is a legitimate part of the formation and care of collections and, if practiced, should be done in order to refine and improve the quality and appropriateness of the collections, the better to serve the museum's mission."

I. In 1990, the Art Center entered into an agreement with the City of Des Moines to place sculptures in Greenwood Park. That agreement, to which all of our other agreements, including the one with Mary Miss, are subject, contains numerous stipulations around public safety. More specifically, it requires the Art Center to correct any unsafe conditions within a work of art sited inside Greenwood Park. In October 2023, safety concerns noted by the Art Center staff prompted the hiring of a licensed structural, industrial, and civil engineering firm to conduct a complete structural review of *Greenwood Pond: Double Site*. Three of the work's most important elements—its cantilevered boardwalk, warming hut, and arched structures—were deemed both dangerous and unsalvageable: dry rot had developed in the original wood timbers, compromising structural integrity. It was recommended we close off access to all three sections, which we did immediately upon notifying the City, the Board President, and Mary Miss. One section had deteriorated to such an extent it had to be deinstalled immediately. Other areas of *Greenwood Pond: Double Site* are visibly and structurally compromised. It is our belief that our agreement with the City compels us to remove the work from the Park, to protect the public from harm.

II. According to the deaccessioning guidelines contained in the Art Center's Collections Management Policy, we are justified in deaccessioning a work of art if it "is in poor condition and unworthy of conservation even for study purposes or requires conservation in excess of its value." It is challenging to assign a value to a work like *Greenwood Pond: Double Site.* Christie's was unable to provide a value when asked on January 5, 2024. As a result, we rely on the work's original cost—$1,200,000--to establish its current value. Even

if this value has increased since 1996, it is far less than an estimate secured from Neumann Brothers on November 10, 2023 to rebuild the compromised sections with the hard wood Cumaru, a far more appropriate choice for an outdoor location in Iowa: $2,652,675.00. If Neumann were also to address the heaters and glass panels in the warming hut, which broke long ago, that price would increase to $2,742,675. Note that this is only the cost to rebuild. When other costs are taken into account, such as those associated with re-engineering the work to make it more durable and hiring extra staff to oversee such an ambitious capital project, the final cost would spike much higher. Our fine arts insurer, Huntington T. Block, informed us they will not accept a claim for the work due to inherent vice (see below for more detail), leaving the Art Center responsible for all of these costs. As a result, it is clear that *Greenwood Pond: Double Site* requires conservation far in excess of its value, justifying its deaccessioning.

III.  According to "Professional Practices in Art Museums," de-accessioning is justified in eight cases. Two are relevant to *Greenwood Pond: Double Site*. 1) "The physical condition of the work is so poor that restoration is not practicable or would compromise the work's integrity or the artist's intent. Works damaged beyond reasonable repair that are not of use for study or teaching purposes may be destroyed." 2) "The museum is unable to care adequately for the work because of the work's particular requirements for storage or display or its continuing need for special treatment." When *Greenwood Pond: Double Site* was constructed in 1996, the unfortunate decision was made to use materials—predominantly treated cedar—with a life expectancy of 10-15 years. All of the conservation and engineering reports commissioned since 1996, seven total, have pointed to the use of subpar wood, as well as subpar construction and engineering techniques, as the source of the work's ongoing problems. Essentially, the work is plagued by what is referred to as "inherent vice."

Although described as "permanent," *Greenwood Pond: Double Site* was made with ephemeral materials using techniques inappropriate to an outdoor environment—specifically a busy public park—in Iowa. In the nearly 30 years since initial construction, *Greenwood Pond: Double Site* has been battered by Iowa's dramatic weather cycles, floods, rampant vandalism (destruction enabled by the choice of materials, inadequate nighttime lighting, and the work's distance from the Art Center), and the wear and tear of everyday use. Even with ongoing, regular upkeep and repairs, these forces have rendered the installation unsightly and, more importantly, unsafe. Three sections were condemned in October 2023, with more areas in need of significant investment, including the recessed walkway, whose wood has been eroded by its immersion in water and which is currently inaccessible and dangerous. The same holds true for the sunken trough, which has almost never functioned as intended, despite intervention over the years: meant to provide an eye-level view of the water, it is instead frequently filled with dark, brackish water, its pumping system no match for silt build-up and the natural ebb and flow of water levels. The artist's intention of guests using pathways, structures, and alcoves to enjoy the natural beauty of the pond is no longer possible in much of the work.

Allowing *Greenwood Pond: Double Site* to exist in this manner not only goes against the aesthetic intention of the artist; it also threatens the integrity and reputation of the Art Center. We would not exhibit an artwork inside the museum that was damaged and/or a potential health hazard to the public. We must hold works installed outdoors to the same standards.

Bringing *Greenwood Pond: Double Site* back to life—rebuilding it and re-engineering it so that it would be durable, safe, and in accordance with current construction codes—would require a major capital investment of many millions of dollars. This goes far beyond the sort of reasonable maintenance the Art Center agreed to perform in its 1996 agreement with the artist. It would likely result, moreover, in significant modifications to the original design as well, fundamentally changing the artist's intent. Such an investment, devoted to a single artwork, would hinder the Art Center's ability to sustain multiple other elements of its operations, including the care and conservation of our facilities and the growth and maintenance of the rest of our collection. Realistically, a reconstruction of *Greenwood Pond: Double Site* carried out with the best possible materials and vigorous maintenance would still only have a life expectancy of 40 years, placing future museum operations under the burden of ongoing and ever more costly cycles of replacement just as environmental conditions in the state and the world become increasingly unpredictable. This is an unsustainable pattern to pursue, both for the artwork and the institution.

In the decades since its construction, the Art Center has devoted major staff and financial resources—approximately $1,000,000—to *Greenwood Pond: Double Site*, only to be faced with its continual erosion. As recently as summer 2022, the Art Center invested $17,000 to repair the cantilevered boardwalk, which was condemned about 10 months later. In 2011, the work suffered catastrophic damage due to floods. A partially successful fundraising campaign was initiated, netting a little over $300,000 over three years. Operating revenue had to be used to make up the difference, and even then, only a very small percentage of the overall work was rebuilt. Those sections—mostly walkways—are in good condition due to the use of a hard wood more appropriate to the outdoors, while the rest of the work has continued to erode.

Mary Miss has been involved in conversations around the structural, material, and financial challenges involved in maintaining *Greenwood Pond: Double Site* since 1996. Records indicate her awareness of the work's precariousness from the beginning. In 2012, Mary Miss visited the Art Center, the last time she would do so, to discuss the flood-related damage. During those meetings with then-director Jeff Fleming, the artist and the Art Center acknowledged a moment would likely come when the work would have to be removed from Greenwood Park. Indeed, Mary Miss herself recommended in a letter from July 2012 to then-director Jeff Fleming that they agree to deinstall the work in its entirely if it was not feasible to fundraise to repair it.

For these reasons, we believe AAMD's "Professional Practices in Art Museums" justify our recommendation to deaccession *Greenwood Pond: Double Site* and, subsequently, to dispose or destroy it.

The Art Center staff fully acknowledges the gravity of recommending the deaccessioning and destruction of *Greenwood Pond: Double Site*. This outdoor environment is not only a historic commission by the Art Center; it is also an important, ambitious work of land art by a major woman artist. A series of very unfortunate circumstances have brought us to this moment, and we would not have adopted the position we have if there was a feasible way forward and if the work was not a literal threat to public safety.

All of the original living and/or active funders of the initial project, some of them important collaborators, were contacted by the Executive Director in December and January, as were those associated with the 2014-2015 partial rebuild. No objections to deaccessioning have been lodged. The Des Moines Founders Garden Club, whose members continue to care for the landscape around *Greenwood Pond: Double Site*, have voiced concern about the removal of the work, in part because of potential impact on the surrounding environment, but they have not taken an official position against deaccessioning.

The Art Center will derive no income from the deaccessioning of *Greenwood Pond: Double Site*; in fact, it will incur costs to deinstall it. These costs will be considerable, but they are many times less than the cost to re-build.

We have considered the impact deaccessioning will have on the Art Center, the community, and the artist, and we have actively considered a variety of ways to honor both the project and the Mary Miss. We will also be working closely with both the City and the Des Moines Founders Garden Club on the deinstallation, beginning with a group tour of the site in March.

It is important to note that Mary Miss is not in agreement with the museum about our recommendation to deinstall and deaccession. However, the position voiced here still stands as a matter of public safety and a realistic assessment of the artwork's compromised state.

Attached are documents that will further help the committee and board understand the complicated history of *Greenwood Pond: Double Site*.

**EXHIBIT**

**R**

Prepared by:   Kerry Enger, City of Des Moines, 400 Robert D. Ray Drive, Des Moines, IA 50309-1891, (515) 283-4548
Return to:      City of Des Moines, Real Estate Division, 400 Robert D. Ray Drive, Des Moines, IA 50309-1891

| | |
|---|---|
| Project: Disposition – Non-Project Related | Activity ID 341111000 |
| Project Location: Greenwood-Ashworth Park | Parcel No.: 001 |

## TEMPORARY RIGHT-OF-ENTRY

City of Des Moines, Iowa, a municipal corporation (hereinafter referred to as the "City") for and in consideration of One and No/100 Dollars **($1.00)** by the Edmundson Art Foundation, Inc. d/b/a Des Moines Art Center, an Iowa non-profit corporation (hereinafter referred to as the "Grantee"), does hereby grant to Des Moines Art Center, 4700 Grand Avenue, Des Moines, Iowa, a Temporary Right-of-Entry under, over, through and across the following described property:

THE AREA OF THE GREENWOOD POND: DOUBLE SITE ART INSTALLATION BY MARY MISS WITHIN GREENWOOD PARK.

(hereinafter referred to as the "Property") for the limited purpose of allowing Grantee, its agents, contractors and employees access thereto for the purpose of the removal, demolition and restoration of the Greenwood Pond: Double Site Artwork by artists Mary Miss at Greenwood Park (hereinafter referred to as the "Project). The said Right-of-Entry shall be for the limited purpose of allowing personnel and equipment thereon to perform all work required for the Project.

1.  **PROJECT PLANS**. All work required for the Project shall be subject to all permitting requirements of the City and shall be completed in accordance with current Iowa Statewide Urban Design and Specifications (SUDAS) Standard Specifications. Grantee shall submit plans for the work to be completed for the Project to the City's Park and Recreation Director for review and approval, prior to commencing work on the Project. The Project plans shall include anticipated start and end dates, ingress and egress to the Property, staging, contractor parking, construction fencing, tree protection, erosion control, location of onsite signage which lists Des Moines Art Center project contact information, any other requirements of the City codes and ordinances, along with a detailed exhibit of said work to be completed, the exhibit is attached herein as Exhibit A.

2.  **NOTICE TO PROCEED**. Grantee shall not commence work on the Project until a written Notice to Proceed is issued from the City's Permit and Development Services Department and the Parks and Recreation Director.

3.  **FINAL ACCEPTANCE**. Grantee shall meet with the City for a final walkthrough of the work completed for the Project and shall address all of the City's concerns to the satisfaction of the City's Park and Recreation Director.

4.  **TREE PROTECTION**. Grantee's work for the Project shall not include any cutting, recutting, trimming and removal of trees, branches, brush or other vegetation or plantings located on or adjacent to the Property, unless written pre-approval is granted by the City's Park and Recreation Director.

5.  **DURATION**. It is understood and agreed that this grant allowing entry in, upon and onto the Property shall be in effect beginning on the date that the City signs this document until completion of the Project as above described and outline in the project plans.

6. **COMPENSATION**. It is a condition of this grant that the consideration paid by the Grantee for this Right-of-Entry shall constitute compensation only for the temporary rights herein granted. As further consideration, Grantee agrees to provide the following at Grantee's sole cost and expense:

   a. Keep the Property free from nuisances and debris; and
   b. Honor current Greenwood Park rentals and events occurring in the project limits and the adjacent Sylvan Amphitheater.
   c. Maintain the Property in a safe condition.

7. **SECURITY**. The Grantee agrees that it will provide any and all security measures necessary for the Property. Grantee agrees that the City shall not be responsible, or be in any way liable, for any damages sustained as a result of the Grantee's use of the Property or the use thereof by Grantee's agents, contractors, employees, invitees, guests, or any other party.

8. **ACCESS AND EASEMENTS**. Grantee shall not interfere with or in any way prohibit the City or its authorized agents from use of the Property. The City and its authorized agents shall have the right to reasonably enter upon and inspect the Property, including ingress and egress and surrounding area. This Right of Entry is granted subject to any and all easements for existing utilities, restrictions and covenants on the Property.

9. **RESTORATION/REMOVAL OF EQUIPMENT**. Upon completion of the Project, Grantee shall restore the Property to its original condition or better as reasonably possible, including but not limited to restoration of grading, drainage, trees, landscaping and turf by sodding or seeding, replacement of concrete or asphalt driveways, trails, and walks removed for grading or access purposes, and replacement of fences or other structures that may be removed or damaged by Grantee during the course of the Project. It is further understood and agreed that Grantee will remove all of its equipment from the Property prior to the expiration of this Agreement, or within 10 days after the Project has been completed, whichever date comes first.

10. **NOTICES**. Notices to City pursuant to this Agreement shall be in writing and may be given by either party to the other by personal delivery, e-mail, regular mail, or overnight mail as follows:

CITY:
Daniel Calvert                                **AND**              Kerry Enger
DJCalvert@dmgov.org                                               klenger@dmgov.org
Park and Recreation Department                                    Real Estate Division
City of Des Moines                                                City of Des Moines
1551 E. Martin Luther King, Jr. PKWY                              400 Robert D. Ray Drive
Des Moines, IA 50317                                              Des Moines, Iowa 50309-1891

GRANTEE:
Kelly Baum
John and Mary Pappajohn Director
kbaum@desmoinesartcenter.org
Des Moines Art Center
4700 Grand Avenue
Des Moines, Iowa 50312

11. **TERMINATION**. This Agreement shall be continued for the fixed term herein provided, except that if Grantee shall fail to meet any of the terms included in this Agreement, as determined by City,

then this Agreement shall at the election of the City be terminated prior to the end of the fixed term upon providing written notice by City to Grantee in the manner provided above for notice to Grantee. In addition, either party may terminate this Agreement prior to the end of the fixed term, with or without cause, upon ten (10) days written notice to the other party in the manner provided above for notice to said party.

12. **INSURANCE/RELEASE OF LIABILITY**.  Grantee agrees to purchase and maintain insurance in accordance with the insurance requirements set forth in Exhibit "A" to protect the Grantee and the City of Des Moines, Iowa throughout the duration of this Temporary Right-of-Entry.  Grantee shall not commit any act which shall invalidate any policy of insurance.  Grantee shall defend, indemnify and hold harmless the CITY in accordance with the indemnification requirements set forth in Exhibit "A".  Grantee shall be subject to all terms and provisions set forth in Exhibit "A" and the exhibits thereto.

**ACCEPTANCE BY GRANTEE:**

Des Moines Art Center

By: _Kelly B_____

Please Print: _Kelly Baum_____

Date _April 2, 2024_____

**ACCEPTANCE BY CITY:**

Executed on behalf of the City of Des Moines by authority of the City Council as defined in Ordinance No.15,639

_____

Dwayne Myers, Real Estate Division Manager

Date _4-2-24_____

Approved as to Form:

_____

Glenna K. Frank, Assistant City Attorney

**ATTACHMENT 1**

**CITY STANDARD ACCESS AGREEMENT – MAJOR**

**INSURANCE & INDEMNIFICATION REQUIREMENTS**

For the purposes of this Attachment and all provisions included herein, the term "CITY" shall mean the City of Des Moines, Iowa, including its elected and appointed officials, employees, agents, volunteers, boards, commissions and others working on its behalf.

1. **GENERAL**

   The GRANTEE shall purchase and maintain insurance to protect the GRANTEE and CITY throughout the duration of the Agreement to which these Requirements are attached (hereinafter "Agreement"). Said insurance shall be provided by an insurance company(ies), "admitted" and "non-admitted" to do business in the State of Iowa, having no less than an A. M. Best Rating of "B+." All policies shall be written on a per occurrence basis, not a claims-made basis, and in form and amounts and with companies satisfactory to the CITY. Certificates of Insurance confirming adequate insurance coverage shall be submitted to the CITY prior to Agreement execution or commencement of GRANTEE'S use or occupancy of CITY property including that of GRANTEE'S officers, agents, employees, contractors, subcontractors, and any other party working for, through, or on behalf of GRANTEE.

   The City of Des Moines, Iowa hereby reserves the right to revise and enforce the requirements in this Attachment over the term of this Agreement but only after providing GRANTEE at least sixty (60) days advance written notification of any such change

2. **INSURANCE REQUIREMENTS**

   A. <u>COMMERCIAL GENERAL LIABILITY INSURANCE</u>: Commercial General Liability insurance on an occurrence basis with limits of liability not less than $1,000,000 per occurrence and $2,000,000 aggregate combined single limit covering Personal Injury, Bodily Injury and Property Damage. Coverage shall include: (a) <u>Contractual Liability</u>, (b) <u>Premises and Operations</u>, (c) <u>Products and Completed Operations</u>, (d) <u>Independent Contractors Coverage</u>, (e) <u>Personal and Advertising Injury</u> and (f) <u>Explosion, Collapse and Underground – XCU</u> (when applicable). ***Waiver of Subrogation in favor of the CITY is required as per Paragraph 2.G. below.***

   Coverage shall be no less comprehensive and no more restrictive than the coverage provided by a standard form Commercial General Liability Policy (ISO CG 0001 including standard exclusions or a non-ISO equivalent form).

   B. <u>UMBRELLA/EXCESS LIABILITY INSURANCE</u>: The Liability Insurance requirements above may be satisfied with a combination of primary and Umbrella or Excess Liability Insurance. If the Umbrella or Excess Insurance policy does not follow the form of the primary policies, it shall include the same endorsements as required of the primary policies including a ***Waiver of Subrogation in favor of the CITY is required as per Paragraph 2.G. below.***

   C. <u>WORKER'S COMPENSATION & EMPLOYER'S LIABILITY INSURANCE</u>: As required by State of Iowa Workers' Compensation Law, the GRANTEE shall procure and maintain Worker's Compensation Insurance, including Employer's Liability Coverage. The Workers' Compensation Insurance shall be written with State of Iowa statutory limits. If, by Iowa Code Section 85.1A, the GRANTEE is not required to purchase Workers' Compensation Insurance, the GRANTEE shall have a

copy of the State's Nonelection of Workers' Compensation or Employers' Liability Coverage form on file with the Iowa Workers' Compensation Insurance Commissioner, as required by Iowa Code Section 87.22. ***Waiver of Subrogation in favor of the CITY is required as per paragraph 2.G. below.***

D.     ADDITIONAL INSURED ENDORSEMENT: The General Liability Insurance policy shall include standard ISO endorsements CG 20 26 07 04 and CG 20 37 07 04 or their non-ISO equivalents. GRANTEE'S insurance shall be primary to that of the CITY and noncontributory to any other insurance or similar coverage available to the CITY whether the other available coverage is primary, contributing or excess.

E.     GOVERNMENTAL IMMUNITY ENDORSEMENT: The General Liability Insurance policy shall include the CITY Governmental Immunities Endorsement language as provided below. Standard ISO or insurance carrier "Waiver of Immunity" endorsements are not acceptable.

<div align="center">

**CITY OF DES MOINES, IOWA**
**GOVERNMENTAL IMMUNITIES ENDORSEMENT**

</div>

1.   Nonwaiver of Government Immunity. The insurance carrier expressly agrees and states that the purchase of this policy and the including of the City of Des Moines, Iowa as Additional Insured does not waive any of the defenses of governmental immunity available to the City of Des Moines, Iowa under Code of Iowa Section 670.4 as it now exists and as it may be amended from time to time.

2.   Claims Coverage. The insurance carrier further agrees that this policy of insurance shall cover only those claims not subject to the defense of governmental immunity under the Code of Iowa Section 670.4 as it now exists and as it may be amended from time to time. Those claims not subject to Code of Iowa Section 670.4 shall be covered by the terms and conditions of this insurance policy.

3.   Assertion of Government Immunity. The City of Des Moines, Iowa shall be responsible for asserting any defense of governmental immunity, and may do so at any time and shall do so upon the timely written request of the insurance carrier. Nothing contained in this endorsement shall prevent the carrier from asserting the defense of governmental immunity on behalf of the City of Des Moines, Iowa.

4.   Non-Denial of Coverage. The insurance carrier shall not deny coverage under this policy and the insurance carrier shall not deny any of the rights and benefits accruing to the City of Des Moines, Iowa under this policy for reasons of governmental immunity unless and until a court of competent jurisdiction has ruled in favor of the defense(s) of governmental immunity asserted by the City of Des Moines, Iowa.

5.   No Other Change in Policy. The insurance carrier and the City of Des Moines, Iowa agree that the above preservation of governmental immunities shall not otherwise change or alter the coverage available under the policy.

F.     CANCELLATION & NONRENEWAL NOTIFICATION ENDORSEMENT: The Workers Compensation Insurance, General Liability Insurance and Automobile Liability Insurance policies shall include a policy endorsement providing the CITY with no less than thirty (30) days Advance Written Notice of Cancellation, forty-five (45) days Advance Written Notification for Nonrenewal and ten (10) days Written Notification of Cancellation due to non-payment of premium. ***Written notifications shall be sent to: City of Des Moines, Real Estate Division, City Hall, 400 Robert D. Ray Drive, Des Moines, Iowa 50309.***

G.   <u>WAIVER OF SUBROGATION:</u>  To the fullest extent permitted by law, GRANTEE hereby releases the CITY from and against any and all liability or responsibility to the GRANTEE or anyone claiming through or under the GRANTEE by way of subrogation or otherwise, for any loss without regard to the fault of the CITY or the type of loss involved, including loss due to occupational injury.  This provision shall be applicable and in full force and effect only with respect to loss or damage occurring during the time of this Agreement.  The GRANTEE'S policies of insurance shall contain either a policy provision or endorsement affirming the above stated release in favor of the CITY including its elected and appointed officials, agents, employees and volunteers, and others working on its behalf.

H.   <u>PROOF OF INSURANCE:</u>  The GRANTEE shall provide the following proof of insurance to the CITY:
- <u>Certificates of Insurance</u> evidencing all insurance coverage as required in paragraphs A through G above utilizing the latest version of the ACORD form.  The Certificate(s) of Insurance shall specify the <u>Title of the Agreement</u> under "Description of Operations/Locations/Vehicle/Special Items" and indicate <u>Waiver of Subrogation</u> by marking the corresponding boxes on COI and/or including a statement of compliance under Description of Operations.
- A copy of the <u>Cancellation and Nonrenewal Notification Endorsements</u> required in paragraph 2.F. above, or its equivalent.
- Copies of <u>Additional Insured Endorsements</u> ISO CG 20 26 07 04 and ISO CG 20 37 07 04 or their equivalents as required in paragraph 2.D. above.

  ***Mail Certificate of Insurance to:  City of Des Moines, Real Estate Division, City Hall, 400 Robert D. Ray Drive, Des Moines, Iowa 50309.***

I.   <u>AGENTS, CONTRACTORS AND SUBCONTRACTORS:</u>  The GRANTEE shall require all its agents, contractors and subcontractors who perform work and/or services on behalf of the GRANTEE to purchase and maintain the types of insurance customary to the industry or trade related to the services being provided.

J.   <u>RESPONSIBILITY FOR THE PROPERTY OF OTHERS</u> – GRANTEE shall assume full responsibility for all loss or damage from any cause whatsoever to any property brought onto CITY property that is owned or rented by GRANTEE, or any of GRANTEE'S employees, agents, contractors, subcontractors or any other party working for, through, or on behalf of GRANTEE.

3.  **INDEMNIFICATION REQUIREMENTS**

To the fullest extent permitted by law, GRANTEE agrees to defend, pay on behalf of, indemnify, and hold harmless the CITY against any and all claims, demands, suits, damages or losses, together with any and all outlay and expense connected therewith, including, but not limited to, attorneys' fees and court costs, that may be asserted or claimed against, recovered from or suffered by the CITY by reason of any injury or loss, including, but not limited to, personal injury, bodily injury including death, property damage including loss of use thereof, and economic damages that arise out of or are in any way connected or associated with the Agreement and/or GRANTEE'S use or occupancy of CITY property including that of GRANTEE'S officers, agents, employees, contractors, subcontractors and others under the control GRANTEE.

GRANTEE's obligation to indemnify the CITY contained in this Agreement is not limited by the amount or type of damages, compensation or benefits payable under any workers' compensation acts, disability benefit acts, or other employee benefits acts.

The CITY shall not be liable or in any way responsible for any injury, damage, liability, claim, loss or expense incurred by GRANTEE arising out of or in any way connected or associated with the Agreement and/or GRANTEE's use or occupancy of CITY property including that of GRANTEE'S officers, agents, employees,

contractors, subcontractors and others under the control GRANTEE, except to the extent caused by or resulting from the negligence of the CITY.

GRANTEE expressly assumes responsibility for any and all damage caused to CITY property arising out of or in any way connected or associated with the Agreement and/or GRANTEE'S use or occupancy of CITY Property including that of GRANTEE'S officers, agents, employees, contractors, subcontractors and others under the control GRANTEE.

GRANTEE shall ensure that its activities on CITY property will be performed and supervised by adequately trained and qualified personnel, and GRANTEE will observe all applicable safety rules.

# Temporary Right-of-Entry

## "Exhibit A"

The project scope of work is to include decommissioning and removal of the art installation by Mary Miss within Greenwood Park as described here in:

Project Specific Inclusions:

01. General supervision
02. Remove wood overhang walkway
03. Remove freestanding wood elements
04. Remove low wood walkway above water
05. Remove the Walk in Water and pull all vertical post markers and foundations
06. Utilize swamp mats for accessibility to post markers and to protect wetland areas
07. Remove steps and concrete lookout Viewing Pavilion
08. Remove pavilion structures
09. Remove Bird Cage structure
10. Seeding allowance for 600sq of disturbed areas
11. Remove all stone caps along pond retaining walls
12. Install a new 3' wide concrete cap to replace 215 lineal feet of exposed stone cap at sheet piled retaining walls only. Areas that have no cap currently will remain as is
13. Remove all wood cladding from the face of retaining walls at west walkway
14. Remove the three-tiered stone retaining walls at the north end of the property and bring in fill dirt to fully regrade the hillside
15. Install one (1) new straight stone retaining wall at the north hillside
16. Remove all boulders around the site (named boulders with signage to remain in place). Boulders to be hauled away by City of Des Moines
17. Remove the northwest bridge and walkway. Concrete retaining walls to remain in place to protect the waterway inlet and existing beams to be salvaged and hauled away by City of Des Moines
18. Salvage existing railing components to refabricate and install two (2) new guardrails at the removed northwest bridge concrete walls
19. Relocate the electric box currently mounted to the Northwest bridge that is to be removed
20. Pump water for miscellaneous water that enters the pond during demolition after the pond is fully drained by others. Timing for draining the pond is to be coordinated with Neumann Brothers prior to beginning the work
21. Remove three (3) city light poles and remove foundations to a minimum of 1' below grade
22. Dumpsters
23. Install new 5/8" compacted gravel walk paths to replace the south wooden walkways
24. Install a grass walk path at the north edge of the pond to replace the existing wooden walkway
25. Site security fencing
26. City of Des Moines permit fees
27. Daily clean-up of all construction debris
28. Daily supervision.

Project Specific Exclusions:

01. Soil stabilization of any kind
02. Retaining wall
03. Shoring
04. Pond edge work or bank stabilization
05. Dredging or any pond remediation work
06. Burm removal
07. Storm Water Pollution Prevention Plan (SWPPP). 150 lineal feet of erosion control is only included at the north hillside area that is to be regraded
08. Soil Testing
09. Special Inspections
10. Draining and/or refilling the pond
11. Replacement of the north bridge
12. Design Fees
13. Landscaping
14. Any scope of work not specifically described in the "Project Specific Inclusions".

Attachments:

01. Pathways Concept Exhibit for Planning and Design Purposes Only. Founders Garden Club and Native Planting Area for Protection dated April 2, 2024.
02. Proposed Site Logistics Plan dated April 2, 2024.
03. Concrete Cap Detail dated April 2, 2024.



PATHWAYS CONCEPT EXHIBIT FOR PLANNING AND DESIGN PURPOSES ONLY
FOUNDERS GARDEN CLUB AND NATIVE PLANTING AREA FOR PROTECTION

Date: April 2, 2024

Grand Ave

45th St

If the existing hard surface trail is impacted by project work, reconstruction to City standards is required.

Removal of trail and informal pathway. Revetment and restoration of former trail to turf. Seed mix to be coordinated with Parks and Recreation Team for review and approval.

Founders Club and Native Planting Areas to be protected and not disturbed.

Create terminating trail "cul-de-sac" with seating stone. Exact design and location to be coordinated with Parks and Recreation Team for review and approval.

Create terminating trail cul-de-sac with seating stone. Exact design and location to be coordinated with Parks and Recreation Team for review and approval.

Trail should match the existing soft surface pathways to the southeast.

Construction of new trail to match existing soft surface pathways to the east. Revetment may be necessary on south segment. Exact location to be coordinated with Parks and Recreation Team for review and approval.

Strategic installation of limestone blocks for traffic control, replacing existing boulders. Exact location to be coordinated with Parks and Recreation Team for review and approval.

NORTH





neumann

# PROPOSED SITE LOGISTICS PLAN

APPROXIMATE CONSTRUCTION DURATION (4/8/2024 - 8/23/2024)

Date: April 2, 2024

# Concrete Cap Detail

## Concrete Cap Detail Description

The existing stone cap installed as part of the art installation by Mary Miss will be removed and replaced with a new concrete cap per the detail and location identified in the details below.



Indicates area of stone cap to be replaced with a new concrete cap

New crushed stone walkway

3' x 215' x .5' Concrete Cap w/ 12" dropped face curb & WWF

Existing steel plate to remain

Existing sheet pile shoring to remain

Existing earth, add fill as needed for grade and compaction

A1

Date: April 2, 2024