IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| MARY MISS, <br><br>            Plaintiff, <br><br>    vs. <br><br> EDMUNDSON ART FOUNDATION, INC. <br> d/b/a DES MOINES ART CENTER, <br><br>            Defendant. | 4:24-cv-00123-SHL-SBJ <br><br><br> **ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER** |

## I.   INTRODUCTION.

The Des Moines Art Center (the "Art Center") wants to demolish outdoor environmental artwork in Greenwood Park. It agreed in a contract, however, to maintain and protect the artwork and not to damage, alter, relocate, modify, or change it without the prior approval of the artist, Plaintiff Mary Miss, who has not consented to the demolition. Based on the Court's preliminary review, it concludes that Miss has established a sufficient likelihood of success on the merits and irreparable harm to warrant a temporary restraining order enjoining the Art Center from continuing with efforts to remove the artwork. The Court therefore GRANTS Miss's Motion for Temporary Restraining Order. By separate Order, the Court will set a Preliminary Injunction hearing on a date to occur within fourteen days to decide whether the temporary restraining order should be converted into a preliminary injunction or vacated.

## II.   BACKGROUND.

The Des Moines Art Center (the "Art Center") is a museum of modern and contemporary art located in the northeast corner of Greenwood Park in Des Moines, Iowa. (ECF 10-1, ¶¶ 2, 10.) In total, Greenwood Park consists of approximately eighty acres of land, including a pond to the south of the Art Center. (Id., ¶ 11.) By the late 1980s, the pond had fallen into a state of disrepair. (Id., ¶ 12.) Accordingly, in 1989, the Art Center began discussions with Plaintiff Mary Miss, a nationally renowned artist who lives in New York, to design an outdoor installation to revitalize the pond area. (Id., ¶ 12; ECF 1, ¶ 1.)

The land where the pond is located is owned by the City of Des Moines (the "City"). (ECF 10-1, ¶ 16.) In 1990, the Art Center entered an Operating Agreement with the City pursuant to Iowa Code Chapter 28E (the "28E Agreement"). (Id., ¶ 17 and pp. 9–26.) The 28E Agreement

states that the City "desires to cooperate with the ART CENTER in the development of a site-related or environmental sculpture area for the enjoyment of the public in Greenwood Park." (Id., p. 9.) The 28E Agreement recognized that an "environmental sculpture" is a sculpture that "occup[ies] large extents of physical space such that the dimensions are not always obvious to the observer and which incorporate as elements in the sculpture the topography and features of the site." (Id., p. 10, ¶ II.B.) The 28E Agreement required the Art Center to present any potential sculptures to the City Park and Recreation Board (the "Board"). (Id., pp. 10–11, ¶ II.C.) The Board was obligated "to review and comment to the ART CENTER on the plans within thirty (30) days after formal submission of the plans by the ART CENTER." (Id.) The 28E Agreement contains many provisions relating to ownership, installation, and maintenance of any sculptures. (Id., pp. 11–15.) Of particular relevance here, the 28E Agreement states: "The CITY may require the ART CENTER to repair or remove a sculpture if the ART CENTER has failed to either maintain the structural integrity of a sculpture or to correct any unsafe condition within a sculpture." (Id., p. 13, ¶ III.A.) It further states: "The ART CENTER shall restore and/or rehabilitate or remove, at its option, any designated portion of any sculpture damaged or destroyed by any casualty whatsoever, including but not limited to damage caused by fire or storms or vandalism." (Id., p. 14, ¶ III.D.)

In April 1994, the Art Center and Miss entered into an Agreement for Artistic Services (the "Artist Agreement") calling for Miss to design and implement "an environmental sculpture for the Art Center permanent collection" near the pond. (Id., ¶ 19; ECF 1, ¶ 6; ECF 1-1, p. 1.) The Artist Agreement states that title to the artwork shall pass to the ART CENTER upon completion of the project. (ECF 1-1, ¶ 8.) It further states, in relevant part:

- "Art Center agrees that it will not intentionally damage, alter, relocate, modify or change the Work without the prior written approval of the Artist." (Id., ¶ 8.2(i));

- "ART CENTER recognized that maintenance of the Project on a regular basis is essential to the integrity of the Project. ART CENTER shall reasonably assure that the Project is properly maintained and protected, taking into account any instructions provided by the Artist, and shall reasonably protect and maintain the Project against the ravages of time, vandalism and the elements." (Id., ¶ 9.2); and

- "ART CENTER shall have the right to determine, after consultation with a professional conservator, when and if repairs and restorations to the Project will be made. During the Artist's lifetime, the Artist shall have the right to approve all repairs and restorations, provided, however, that the Artist shall be paid a reasonable fee for any such services, provided that the ART CENTER

and the Artist shall agree in writing, prior to the commencement of any significant repairs or restorations, upon the Artist's fee for such services." (Id., ¶ 9.3(i).)

The Artist Agreement states that the covenants imposed upon the Art Center "do attach and run with the Work and shall be binding to and until twenty (20) years after the death of the Artist. However, the obligation imposed upon the Center by sections 9.3 (1) shall terminate on the death of the Artist." (Id., ¶ 8.4.) It further states that "[n]othing contained in this Article 9 [sic.] shall be construed as a limitation on such other rights and remedies available to the Artist under the Visual Arts Rights Act of 1990 or under any other law which may now or in the future be applicable." (Id., ¶ 8.7.) Finally, the Artist Agreement expressly acknowledges the 28E Agreement between the City and Art Center, stating:

> The parties acknowledge that the performance of certain aspects of this agreement requires the cooperation of the Parks and Recreation Department or other units of the government of the City of Des Moines. The failure of the City of Des Moines to perform as contemplated by this agreement shall not be deemed a breach of either party of this contract but may constitute an event causing a failure to fulfill the contractual obligations beyond either party's control. The Artist acknowledges this agreement is subject to the terms of the 28E agreement between the City and the Art Center, a copy of which agreement has been supplied to the Artist prior to the execution of this agreement. The terms of this agreement are subject to the terms of the 28E agreement which shall take precedence over conflicting terms, if any, in this agreement.

(Id., ¶ 15.)

Miss submitted preliminary design plans in late 1994, but the City declined to approve the original design due to concerns about, among other things, user safety, building code compliance, liability, the structural integrity of the materials, and long-term maintenance issues. (ECF 10-1, ¶¶ 20, 22.) A second set of drawings was later submitted and approved. (Id., ¶ 22.) The artwork eventually become known as "Greenwood Pond: Double Site" and was officially completed in 1996, with an estimated total cost of $1.2 million. (Id., ¶¶ 12, 23; ECF 1, ¶ 6.) It has been recognized on numerous occasions by artists, art scholars, art patrons, art critics, architects, and City Commissioners. (ECF 1, ¶¶ 14–15.)

The artwork was initially described as "permanent," although, according to the Art Center, it was built "with ephemeral materials using techniques inappropriate to an outdoor environment." (ECF 10-1, ¶ 24.) The Court understands the "ephemeral materials" to consist largely of wood. According to the Art Center, the artwork has been damaged by weather, floods, vandalism, and

"the wear and tear of everyday use." (Id., ¶ 25.) The Art Center has devoted considerable resources over the years to repair and restore the artwork. (Id., ¶¶ 26–27.) It has been challenging, however, to obtain sufficient funding. (Id., ¶ 29.) Miss herself acknowledged in 2012 that in the absence of a successful major fundraising campaign, it might become necessary to deinstall the artwork. (Id., ¶ 30.)

In October 2023, several aspects of the artwork were taken down or fenced off due to what the Art Center characterizes as "immediate and necessary public safety concerns." (Id., ¶ 31.) For example, according to the Art Center, the structural integrity of certain elements "reached the point of being dangerously unsafe." (Id., ¶ 32.) Similarly, according to the Art Center, "[t]he warming hut and boardwalk along the southern portion of the pond were fenced off because of public safety and structural integrity concerns." (Id., ¶ 33.) In 2023, the Art Center retained an engineering firm to assess the structural integrity and safety of the entire site. (Id., ¶ 34.) The engineering firm concluded that "[t]here are significant structural concerns" with the artwork and said "the wood has deteriorated to a point it is not feasible to replace just a few members." (Id., p. 190.) The firm eventually recommended that the Art Center "close off access to these structures to the public due to life safety/liability issues. It is unclear what type of wood was originally used but it has reached the end of its useful life." (Id., p. 191.)

In October 2023, Kelly Baum, the Director of the Art Center, informed Miss that portions of the artwork were being closed to the public due to their poor condition. (ECF 1, ¶ 17.) The Art Center then demolished a portion of the artwork without obtaining Miss's permission. (Id., ¶¶ 19–20.) On December 1, 2023, the Art Center informed Miss that it intended to "decommission" the entire site and remove it on the basis that the Art Center could "see no other way forward." (Id., ¶ 20.) The Art Center has received a permit from the City for demolition of the artwork. (Id., ¶ 22.) Over the next thirty days, the Art Center will install temporary construction fencing while the pond is drained, following which the artwork will be dismantled. (ECF 10-1, ¶ 40.) There is no evidence in the record to suggest that the City *required* the demolition of the artwork.

Miss was not consulted on the decision to demolish the artwork, nor does she approve of this decision. (ECF 1, ¶¶ 23–24.) Until this litigation, the Art Center also refused to provide her with a copy of the structural report that it believes justifies the decision to demolish the artwork. (Id., ¶¶ 25–26.) If the Art Center were forced to repair and restore the artwork, the cost would

exceed $2.6 million, which is equivalent to approximately one-third of the Art Center's annual operating budget. (ECF 10-1, ¶ 35.)

## III.   LEGAL STANDARDS.

### A.   Temporary Restraining Order Standards.

To determine whether a temporary restraining order is warranted, the Court considers the same *Dataphase* factors that are applicable to a motion for preliminary injunction. *See S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)). These factors include: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase*, 640 F.2d at 113. "No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994). Despite borrowing the *Dataphase* factors, temporary restraining orders serve a "fundamentally different" purpose than preliminary injunctions. *See All. for Wild Rockies v. Higgins*, --- F. Supp. 3d ----, 2023 WL 5813623, at *6 (D. Idaho Sept. 6, 2023). A temporary restraining order serves only to "preserve an existing situation in status quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Id*. (quoting *W. Watersheds Project v. Bernhardt*, 391 F. Supp. 3d 1002, 1008–09 (D. Or. 2019)). Accordingly, the analysis in this ruling "is not designed to replace the thorough consideration contemplated by full proceedings pursuant to a preliminary injunction." *Id*.

"While no single factor is determinative, the probability of success factor is the most significant." *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) (citations omitted). For actions that do not seek to enjoin the enforcement of a statute or regulation, a plaintiff typically must establish only a "fair chance" of prevailing, which is a lesser burden than "likely to prevail." *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999–1000 (8th Cir. 2019); *see also PCTV Gold, Inc. v. SpeedNet, LLC*., 508 F.3d 1137, 1143 (8th Cir. 2007) ("[A] court does not decide whether the movant will ultimately win."). With respect to the remaining three factors, a plaintiff "is not required to prove with certainty the threat of irreparable harm, but it must prove that 'irreparable injury is likely in the absence of an injunction.'" *Sleep No. Corp. v. Young*, 33

F.4th 1012, 1018 (8th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008)). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "In balancing the equities, we weigh 'the threat of irreparable harm' shown by the movant against 'the injury that granting the injunction will inflict on other parties litigant.'" *MPAY Inc. v. Erie Custom Comput. Applications, Inc*., 970 F.3d 1010, 1020 (8th Cir. 2020) (quoting *Dataphase*, 640 F.2d at 113.) This "requires a court to distinguish between weak or illusory injuries and very real threats of injuries." *Rodriguez v. Molina*, 608 F. Supp. 3d 791, 798 (S.D. Iowa 2022) (cleaned up). It considers harm to both the litigants and other interested parties, like the public. *Wachovia Sec., L.L.C. v. Stanton*, 571 F. Supp. 2d 1014, 1047 (N.D. Iowa 2008). The last factor, the public interest, "invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious." *Id*. at 1048.

### B. Visual Artists Rights Act.

Miss seeks relief, in part, under the Visual Artists Rights Act of 1990 ("VARA"). VARA was enacted to "protect two 'moral rights' of artists—the rights of 'integrity' and 'attribution.'" *See Cort v. St. Paul Fire & Marine Ins. Companies, Inc*., 311 F.3d 979, 984 (9th Cir. 2002) (citing H.R. Rep. No. 101-514, at 5, *as reprinted in* 1990 U.S.C.C.A.N. 6915, 6915)). The "right of integrity" allows the artist to "prevent any deforming or mutilating changes to his work, even after title in the work has been transferred." *Id*. at 985 (quoting *Carter v. Helmsley–Spear, Inc*., 71 F.3d 77, 81 (2d Cir. 1995)). The "right of attribution" allows the artist "to be recognized by name as the creator of a work" and includes, among other things, the artist's right to *prevent* his or her name from being used with art that has been distorted since the original production. *Id*.

As relevant here, VARA provides the "author of a work of visual art" with the right "to prevent any destruction of a work of recognized stature." 17 U.S.C. § 106A(a)(3)(B); *see also* Francesca Garson, *Before That Artist Came Along, It Was Just A Bridge: The Visual Artists Rights Act and the Removal of Site-Specific Artwork*, 11 CORNELL J.L. & PUB. POL'Y 203, 224–25 (2001) (the right to prevent destruction is part of VARA's larger aim of protecting an artist's "moral rights of attribution and integrity" in visual art). "Work[s] of visual art" include sculptures like the Greenwood Pond: Double Site. 17 U.S.C. § 101. The term "work of recognized stature" is not defined, but legislative history suggests courts should consider "the opinions of artists, art dealers,

collectors of fine art, curators of art museums, conservators, and other persons involved with the creation, appreciation, history, or marketing of works of visual art" to determine whether the work has become sufficiently "recognized." *See* Garson, 11 CORNELL J.L. & PUB. POL'Y at 227; *see also Scott v. Dixon*, 309 F. Supp. 2d 395, 400 (E.D.N.Y. 2004) (a work has become "recognized" where "members of the artistic community and/or the general public" see it as such). Where a qualifying work is being threatened with destruction, VARA permits the artist to seek injunctive relief. *See* 17 U.S.C. §§ 501(a), 502(a).

## IV.   LEGAL ANALYSIS.

### A.   The <u>Dataphase</u> Factors Weigh in Favor of Granting a Temporary Restraining Order.

#### 1.   <u>Miss Is Likely to Prevail on the Merits.</u>

The parties' dispute revolves in large part around the terms of the Artist Agreement and 28E Agreement. The former gives Miss significant control over the artwork, as illustrated most prominently in Section 8.2(i): "Art Center agrees that it will not intentionally damage, alter, relocate, modify or change the Work without the prior written approval of the Artist." Under any fair reading, the demolition or removal of the artwork falls within the scope of this provision, as it unquestionably will "damage, alter, relocate, modify, or change the Work."

Granted, Section 8.2(i) does not specifically use the words "demolish" or "remove." In context, however, the Court interprets the absence of those words to reflect the intention of both sides for the artwork to be a *permanent* installation that would remain intact until, at minimum, Miss's death. For example, Section 9.3(i) of the Artist Agreement states: "[d]uring the Artist's lifetime, the Artist shall have the right to approve all repairs and restorations…" Similarly, Section 8.4 states that the covenants imposed upon the Art Center "attach and run with the Work and shall be binding to and until twenty (20) years after the death of the Artist." The bottom line is that Section 8.2(i), on its face, prevents the Art Center from removing or demolishing the artwork without Miss's approval.

The question turns, then, to whether some other provision of the Artist Agreement or 28E Agreement supersedes Section 8.2(i) to such a degree that the Art Center has the authority to demolish the artwork over Miss's objection. The Art Center offers several possibilities, which the Court will consider in turn.

<u>First</u>, the Art Center argues that Section 9.3(i) of the Artist Agreement gives it the unilateral authority "to determine, after consultation with a professional conservator, when and **if** repairs and

7

restorations to the project will be made" (emphasis added). The Court agrees with the Art Center that this provision may mean Miss cannot force the Art Center to make repairs and restorations to the artwork. The Court disagrees, however, that it gives the Art Center the unilateral authority to *remove* the artwork. Words like "remove," "demolish," and/or "decommission" are noticeably absent from Section 9.3(i), which is a remarkable omission if the parties intended for it to supersede Section 8.2(i) and give the Art Center the unilateral authority to take down the artwork over Miss's objection. The Court will not interpret Section 9.3(i)'s silence as creating a conflict with the express language of Section 8.2(i). *See Homeland Energy Sols., LLC v. Retterath*, 938 N.W.2d 664, 687 (Iowa 2020) ("The language the parties used is the most important evidence of their intentions, and therefore, we endeavor to give effect to all language of the contract.").

Second, the Art Center turns to Paragraph III.A of the 28E Agreement, which states: "The CITY may require the ART CENTER to repair or remove a sculpture if the ART CENTER has failed to either maintain the structural integrity of a sculpture or to correct any unsafe condition within a sculpture." (ECF 10-1, p. 13, ¶ III.A.) As the Art Center correctly points out, Miss expressly agreed in the Artist Agreement that her relationship with the Art Center "is subject to the terms of the 28E agreement" and that "the terms of the 28E agreement [] shall take precedence over conflicting terms, if any, in this agreement." (ECF 1-1, § 15.) The Art Center suggests that Paragraph III.A of the 28E Agreement conflicts with—and therefore supersedes—Section 8.2(i) of the Artist Agreement and gives it the authority to remove the artwork over Miss's objection.

The Court agrees in part and disagrees in part. The Court agrees that Paragraph III.A of the 28E Agreement would supersede Section 8.2(i) of the Artist Agreement *if* the City required the Art Center to repair or remove Miss's artwork. The Court disagrees, however, that Paragraph III.A of the 28E Agreement gives the Art Center the unilateral authority to remove the artwork over Miss's objection in the absence of a directive from the City. As there is nothing in the record to suggest that the City has ordered, directed, or otherwise "required" the Art Center to remove the artwork, the Art Center cannot rely on Paragraph III.A of the 28E Agreement to justify its decision to remove the artwork.

Third, the Art Center relies on Paragraph III.D of the 28E Agreement, which states: "The ART CENTER shall restore and/or rehabilitate or remove, at its option, any designated portion of any sculpture damaged or destroyed by any casualty whatsoever, including but not limited to damage caused by fire or storms or vandalism." (ECF 10-1, p. 14, ¶ III.D.) This argument is the

Art Center's strongest, as Paragraph III.D uses the magic word "remove." Even so, however, the crucial question is whether Paragraph III.D of the 28E Agreement conflicts with Section 8.2(i) of the Artist Agreement, or if the two provisions can be read in harmony with one another.

The Court concludes, for present purposes, that Miss is likely to prevail in establishing that the two provisions can be read in harmony with one another. Paragraph III.D of the 28E Agreement purports to establish the Art Center's rights vis-à-vis *the City*; as in, the Art Center does not need *the City's* approval to restore, rehabilitate, or remove any portion of the artwork that is damaged or destroyed by any casualty. This is different than whether the Art Center needs *Miss's* approval to take the same actions. As it relates to *her* approval, the Art Center agreed in Section 8.2(i) of the Artist Agreement not to "intentionally damage, alter, relocate, modify or change the Work" without her prior written consent. There is no conflict between the commitments the Art Center made to Miss and the rights the Art Center possesses with respect to the City.

In sum, as it relates to the removal of the artwork without her written permission, Miss has shown that she is likely to prevail on the merits of her breach of contract claim.

Miss's VARA claim presents a closer question. At the outset, VARA only protects "work[s] of recognized stature" from destruction. The Art Center disputes that Miss's artwork has achieved "recognized stature." The term "recognized stature" is not defined in the statute, but the Court finds persuasive the authority from other jurisdictions establishing that, at a minimum, a work achieves "recognized stature" when a combination of the art and general community has acknowledged as much. *See Castillo v. G&M Realty L.P.*, 950 F.3d 155, 166 (2d Cir. 2020) (the "relevant community" includes the artistic community and draws upon "art historians, art critics, museum curators, gallerists, prominent artists, and other experts"), *as amended* (Feb. 21, 2020); *see also Scott*, 309 F. Supp. 2d at 400 (the relevant community may include the general public). The existing record is limited on the issue of "recognized stature," but Miss has submitted some evidence of recognition by artists, art scholars, art patrons, art critics, architects, and City Commissioners. (ECF 1, ¶¶ 14–15.) This is enough for present purposes to establish that Miss has a "fair chance" of succeeding on her claims. *See D.M. by Bao Xiong*, 917 F.3d at 1000–01 (applying "fair chance" standard). However, Miss almost certainly will need to present additional evidence down the road. *See Castillo*, 950 F.3d at 166 ("[A]side from the rare case where an artist or work is of such prominence that the issue of recognized stature need not be tried, expert testimony or substantial evidence of non-expert recognition will generally be required to establish

recognized stature."); *see also Martin v. City of Indianapolis*, 192 F.3d 608, 612 (7th Cir. 1999) (considering newspaper and magazine articles and letters to support showing).

The next issue is whether Miss's artwork is subject to an exception from VARA's protections. Pursuant to 17 U.S.C. § 106A(c)(2), VARA does not apply to "[t]he modification of a work of visual art which is the result of . . . the public presentation." 17 U.S.C. § 106A(c)(2). The parties dispute whether "site-specific" work like Greenwood Pond: Double Site—that is, work for which the location is an "integral element" that "contributes to its meaning"—fits within the presentation exception. *See Phillips v. Pembroke Real Est., Inc*., 459 F.3d 128, 134 (1st Cir. 2006). In *Phillips v. Pembroke Real Estate, Inc*., the First Circuit held that "VARA does not apply to site-specific art at all." 459 F.3d at 143. The Seventh Circuit has stated in dicta that it disagrees with the conclusion that site-specific art is "categorically" excepted from VARA. *See Kelley v. Chicago Park Dist*., 635 F.3d 290, 306 (7th Cir. 2011). Given the limited time available to the Court to evaluate the issue, and because Miss has already established a likelihood of prevailing on the merits of her breach of contract claim, the Court will save further discussion of VARA for the preliminary injunction stage.

2.  Miss Has Shown a Likelihood of Irreparable Harm.

With Miss having established a likelihood of success on the merits, the Court must turn to the remaining *Dataphase* factors, starting with the threat of irreparable harm to the moving party. The Court concludes that Miss has established a sufficient threat of irreparable harm to warrant a temporary restraining order given the unique nature of the artwork and the fact that the Art Center is proposing to remove it once and for all. *See Kammeyer v. United States Army Corps of Eng'rs*, No. EDCV15869JGBKKX, 2015 WL 12791408, at *2 (C.D. Cal. June 3, 2015) ("Plaintiffs have clearly demonstrated that they will be irreparably harmed if the removal of the Mural is allowed to proceed. Once the Mural is destroyed, there is no way to bring it back; moreover, money damages would be difficult to assess for a large-scale, public[ly]-displayed piece of artwork such as the Mural.").

3.  The Balance of Harms Weighs in Favor of a Temporary Restraining Order.

The record is mixed on the balance of harms factor, but the Court again concludes that Miss has done enough to cause this factor to weigh in favor of a temporary restraining order. As noted above, Miss faces a threat of irreparable harm because once the artwork is removed, it can never be restored. By contrast, the alleged irreparable harm to the Art Center is far more speculative. The

Art Center argues that the artwork is an "active public safety hazard," but the existing record contains, at best, mixed support for that proposition. As of July 2022, a condition report stated that the "artwork is in fair condition overall, with some elements in poor condition due to structural instability." (ECF 10-1, p. 138.) The condition report appears not, however, to have suggested demolishing the site or limiting public access to it; instead, there were simply isolated issues. (Id.)

More recent condition reports paint a slightly more pessimistic picture and resulted in the placement of fencing around one element of the artwork (id., p. 141) and the removal of another (id., p. 146). It does not appear, however, that the Art Center has closed off access to more than a small portion of the site. (Id., ¶¶ 32–33.) The rest is still fully open to the public with, at most, simply a missing or warped piece of wood here or there. (Id., pp. 152, 157.) In these circumstances—and solely for purposes of determining whether to issue a temporary restraining order—the record does not reflect an imminent safety issue resulting from the presence of the artwork. It follows that the balance of harms factor weighs in favor of Miss.

4.  <u>The Public Interest Factor Is Essentially Neutral.</u>

Finally, the public interest factor is essentially neutral. The Art Center appears to genuinely believe that the useful life of the artwork has ended, and there are legitimate reasons supporting this belief. The Art Center has not, however, established that there is more than a modest public interest in having demolition begin immediately. By contrast, there is at least an equally strong public interest in ensuring that parties honor their contractual obligations, particularly when those obligations relate to public art. The public interest factor therefore does not weigh heavily in either direction.

5.  <u>Summary.</u>

The most important *Dataphase* factor—the likelihood of success on the merits—weighs in favor of granting the temporary restraining order. The threat of irreparable harm and balance of harms factors weigh in the same direction. For these reasons, the Court GRANTS Miss's Motion for Temporary Restraining Order.

B.  *The Court Will Order a Nominal Bond of $100 Pending the Preliminary Injunction Hearing.*

Fed. R. Civ. P. 65(c) states that the Court may issue a temporary restraining order "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Here, although the Art Center requests a multi-million-dollar bond, it has not offered sufficient evidence to show that

it actually faces a meaningful risk of suffering costs or damages in that amount if a temporary restraining order is entered. Indeed, as noted above, it has not closed off access to more than a small portion of the artwork despite the alleged public safety risk. In these circumstances, the Court will require a nominal bond of $100. *See, e.g.*, *Interbake Foods, L.L.C. v. Tomasiello*, 461 F. Supp. 2d 943, 979 (N.D. Iowa 2006) (imposing nominal bond). The Court will reconsider this amount at the preliminary injunction hearing (if it grants the preliminary injunction at all).

## V.      CONCLUSION.

The Court GRANTS Miss's Motion for Temporary Restraining Order. (ECF 2.) The Art Center is hereby ENJOINED from further demolition of the Greenwood Pond: Double Site artwork pending a decision on Miss's Motion for Preliminary Injunction. The Court will set a hearing on the Motion for Preliminary Injunction by separate order.


IT IS SO ORDERED.

Dated: April 8, 2024                    _____
                                        STEPHEN H. LOCHER
                                        U.S. DISTRICT JUDGE