IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| MARY MISS<br><br>Plaintiff<br><br>v.<br><br>EDMUNDSON ART FOUNDATION, INC., d/b/a DES MOINES ART CENTER<br><br>Defendant | CASE NO. 4:24-cv-00123<br><br><br>**PLAINTIFF'S BRIEF IN SUPPORT OF PRELIMINARY INJUNCTION** |

COMES NOW, the Plaintiff, Mary Miss, by and through the undersigned, and submits the following brief in support of a preliminary injunction in this matter.

# Table of Contents

INTRODUCTION AND STATEMENT OF INTENT ........................................................... 2

RELEVANT FACTUAL BACKGROUND ............................................................................ 2

   I.   The Art Center's Misleading Narrative Regarding the True Condition of GPDS Lacks Support. ........................................................................................................................ 2

   II.   Deaccession Is Not the Norm and Is Not Warranted. ............................................. 3

LEGAL STANDARDS AND ANALYSIS ............................................................................ 6

   I.   STANDARDS FOR A PRELIMINARY INJUNCTION ............................................. 6

      a.   Threat of Irreparable Harm Exists Absent an Injunction. ................................. 8

      b.   The Balance of Harms Favors the Entry of an Injunction. ................................ 8

      c.   Mary Miss Is Likely to Succeed on the Merits. ..................................................... 9

      d.   The Public Interest ................................................................................................ 14

CONCLUSION ........................................................................................................................ 15

**INTRODUCTION AND STATEMENT OF INTENT**

Mary Miss seeks a preliminary injunction for a single purpose – to prevent the further demolition and destruction of a work of art known as "Greenwood Pond: Double Site" (hereinafter "GPDS"). The Court should grant the injunction for the reasons set forth herein.

Mary Miss does not seek an injunction that would require the Edmundson Art Foundation, Inc. (hereinafter "Art Center") to immediately remove and replace GPDS in its entirety.

**RELEVANT FACTUAL BACKGROUND**

The Court recently issued a temporary restraining order [Doc. 12] setting forth the history of GPDS and the relationship between the parties. This section will focus specifically on the facts necessitating a preliminary injunction.

I. **The Art Center's Misleading Narrative Regarding the True Condition of GPDS Lacks Support.**

The Art Center declares GPDS "is in poor condition and unworthy of conservation even for study purposes or requires conservation in excess of its value." Doc. 10-1 at 199. The Art Center has decided without expert guidance that the only solution is to take it out, declaring that the cost to rebuild the "compromised sections" would be in excess of $2.6 million dollars. *Id.* at 200. Yet, when this price tag is examined, it is not in fact the cost to rebuild the "compromised sections," but instead constitutes the price tag for tearing out all existing features of GPDS and then replacing them. *Id.* at 194.

This hefty price tag was created by Neumann Brothers, Inc. on or about November 10, 2023. *Id.* Prior to this, Neumann Brothers (a construction firm), according to the documents provided by the Art Center, had never been engaged to perform any analysis on GPDS, its necessary maintenance, or any potentially needed repairs. *See generally id.*

2

It is not clear from the documents produced by the Art Center whether Neumann Brothers believes the site is in such a poor condition that it must be torn out in its entirety.

In fact, it appears that the only analysis commissioned and received by the Art Center in 2023 or 2024 was from Raker Rhodes Engineering (hereinafter "Raker Rhodes"). *Id*. at 190-191. The analysis states that Raker Rhodes "walked through" GPDS in October 2023. *Id*. It nowhere reports undertaking any sort of structural analysis, instead merely stating that in the opinion of engineer John Rhodes, the wood on the warming hut and the wood comprising the southern boardwalk needs to be replaced. *Id*. Mr. Rhodes updated his report in February of 2024; yet, that update states he was still relying on the "walk through" from October of 2023. *Id*. at 190.

Mr. Rhodes did not advise replacing the entirety of GPDS. The Art Center has no documentation from any source suggesting GPDS is in such poor condition that an entire rebuild is necessary, and yet, the estimate from Neumann Brothers addresses only the cost for rebuilding almost the entire project.

All other documentation from the Art Center points to the existence of reasonable, much less costly steps, that it could take for the reasonable maintenance and upkeep of GPDS. For example, a 2004 condition report opines that the Art Center could undertake preventative maintenance at GPDS for $2,500 per year. *Id*., pg. 106. Much more recently, in July of 2022, the Midwest Art Conservation Center [MACC] noted that GPDS is "in fair condition overall, with some elements in poor condition due to structural instability." *Id*. at 138. MACC also urged the Art Center to "Develop a comprehensive maintenance plan that includes regular graffiti removal, hardware checks, pump maintenance, repair or replacement of broken elements, etc." *Id*.

To date, the Art Center has declined to share the entirety of MACC's recommendations, but from what is known, MACC informed the Art Center that MACC could begin caring for GPDS for as little as $1,600.00 in under 10 hours. *Id*.

II. **Deaccession Is Not the Norm and Is Not Warranted.**

"Deaccession" is the official removal of a listed item from the holdings of a library,

3

museum, or art gallery. Deaccession is not something lightly undertaken by such entities. *See, e.g.,* Marie C. Malaro & Ildiko Pogany DeAngelis, <u>A Legal Primer on Managing Museum Collections</u>, 256-66 (3d Ed. 2012); Walter G. Lehmann, <u>Museum Administration, Law and Practice</u>, 508-12 (2d Ed. 2022). When deaccession occurs, the expected result is a transfer donation, trade, or sale of the deaccessioned piece to another reputable owner, *see* **Exhibit 1** at 23, IV(A), not its destruction.

The Art Center has attempted to deaccession GPDS. As discussed below, the attempt was fatally flawed and thus invalid. The Art Center purports to justify its decision to destroy GPDS through "guid[ance] by three documents: the Art Center's 1990 agreement with the City of Des Moines; our Collections Management Policy; and the Association of Art Museum Directors." Doc. 10-1 at 199. Notably absent from this necessary underlying support is the contractual agreement between the Art Center and Mary Miss. Doc. 10-1 at 201. The Art Center's analysis of these documents and the conclusions drawn therefrom do not survive even a modicum of scrutiny in light of its agreed-upon contractual obligations to Ms. Miss and the high standards imposed on any deaccessioning process.

The Art Center writes that "in October 2023…the Art Center…hir[ed] a licensed structural, industrial, and civil engineering firm to conduct a complete structural review of [GPDS]." Doc. 10-1 at 199. Unless documents have been withheld, this statement lacks factual support as it appears to refer to the "walk through" performed by Raker Rhodes. *Id.* at 190-191. The one-page document provided by Raker Rhodes in no way demonstrates that Raker undertook a "complete structural review." *Id.*

The Art Center also favors deaccession because of its belief that "[its] agreement with the City compels [it] to remove the work from the Park, to protect the public from harm." *Id.* at 199. There is no language in the Art Center's contract with the City to directly support this conclusion.

The Art Center next attempts to justify deaccession in the form of destruction because it claims the cost to repair GPDS exceeds its value. The Art Center incorrectly

4

assumes that the cost of installation equals the value of the art in stating: "We rely on the work's original cost - $1,200,000.00 – to establish its current value." *Id.* at 199. The Art Center relies only on the absence of assistance from Christies[1] to reach this conclusion. Value, however—especially when dealing with artwork—is intrinsically different from cost. It is only by incorrectly equating "cost" as "value" that the Art Center arrives at its dubious conclusion that GPDS "requires conservation far in excess of its value." *Id.* at 199-200.

It is only from this incorrect and faulty starting point that the Art Center is able to support its deaccession process for GPDS. *Id.* at 199-200. Even here, however, the Art Center's deaccession recommendation is dubious at best. Without proper citation, the Art Center claims "Professional Practices in Art Museums," permits deaccession (here, what this means is "destruction") as "justified' in "eight cases." *Id.* at 200. Given that the Art Center only cites to two of the eight types of cases, it must be assumed the other six would not justify deaccession. Neither of the instances that the Art Center relies on compel the result here, and moreover, the Art Center's decision likely violates other strictures in the guidelines, as detailed below.

The Art Center first claims deaccession is appropriate where "restoration is not practicable or would compromise the work's integrity or the artist's intent. Works damaged beyond reasonable repair that are not of use for study or teaching purposes may be destroyed." *Id.* As stated above, the impracticability of restoration has not been established. The Art Center has not sought Mary Miss's opinion or consent on what restoration work could occur. If consented to, restoration work that may impact GPDS overall would not compromise her intent as the artist. Moreover, even if the Art Center were able to show that certain parts of elements of GPDS have been "damaged beyond reasonable repair," destroying it would still not be warranted because, as Mary Miss will show through testimony of Professor Barbie Yost at the preliminary injunction hearing,

---

[1] Assumed to be the famous auction-house, which is not believed to be known as a popular location for evaluating site specific work such as GPDS.

the site is in fact still used by academics for teaching purposes.

The second justification cited by the Art Center's reliance on "Professional Practices" is that "the museum is unable to care adequately for the work because of the work's particular requirements for storage or display or its continuing need for special treatment." *Id*. The Art Center is only able to reach this conclusion by ignoring the contractual obligations it voluntarily undertook in the first place to maintain and protect GPDS when it decided to commission and accession GPDS. Furthermore, the Art Center's decision to deaccession GPDS utterly fails to consider its contract with Mary Miss, which likely poses a violation of the very guidelines upon which the Art Center purports to rely.

The Association of Art Museum Directors has adopted guidelines called "Professional Practices in Art Museums" (hereinafter "PPAM"), a copy of which is attached hereto as **Exhibit 1.** Plaintiff can only assume that this is the guidance the Art Center relied on in recommending deaccession. If this is the case, however, the Art Center violates those very terms in so doing. The PPAM explicitly states: "Deaccessioning …**must** observe any terms or obligation that pertain to the acquisition of the work by the museum." Exhibit 1 at 22, III.A (emphasis added). Because the Art Center did not consider its contractual obligations to Mary Miss when deaccessioning, the deaccession is also invalid under the PPAM.

Of further interest to this Court for purposes of a Preliminary Injunction, the PPAM also states that "(2) Third-party review and appraisal may be considered in the case of objects of substantial value. (3) In the case of work(s) by a living artist, special consideration may apply." *Id*. at 22, III(C)(2)-(3). Mary Miss is the living artist. She should have the opportunity to submit such a third-party review.

### LEGAL STANDARDS AND ANALYSIS

I.        STANDARDS FOR A PRELIMINARY INJUNCTION

The standard for the issuance of a preliminary injunction is "identical" to the standard for the issuance of a temporary injunction recently cited by this Court. [Doc. 12,

pg. 5-6]; *Kammeyer v. U.S. Army Corps of Engineers*, 2015 WL 12791408 at *1 (D. Cal, June 3, 2015).

Referred to in this Circuit as the *Dataphase* factors, in order to obtain a preliminary injunction the moving party must show: (1) threat of irreparable harm absent an injunction; (2) that the balance of harms between the harm movant seeks to prevent and the harm imposed on the opposing party by the granting of an injunction; (3) that the movant is likely to succeed on the merits; and; (4) that the public interest favors the entry of injunctive relief. *Dataphase Sys. Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).

While all elements must be balanced, the "likelihood of success" is typically considered the most important factor. However, it is a "speculative" question, and therefore no "wooden or mathematical" formula exists for determining a likelihood of success on the merits. *United Indus. Corp. v. Clorox, Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998). Rather, "a court should flexibly weigh the case's particular circumstances to determine" the appropriateness of a preliminary injunction. *Id*.

If a material factual controversy exists, the Court must hold an evidentiary hearing prior to the issuance of a preliminary injunction. *United HealthCare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 744 (8th Cir. 2002) (citation omitted). During the hearing, the Federal Rules of Evidence should be less strictly applied, and an injunction may issue even if the proffered evidence in support of the injunction would ultimately be found to be inadmissible. *Osthus v. Ingredion., Inc.*, 2016 WL 4098541 at *3, fn. 1 (N.D. Iowa July 28, 2016) (quoting *Dexia Credit Local v. Rogan*, 602 F.3d 879, 885 (7th Cir. 2010)); *see also Guntert & Zimmerman Const. Div., Inc. v. Gomaco Corp.*, 2020 WL 6948364 at *1 (N.D. Iowa Oct. 14, 2020) (finding affidavits submitted at a preliminary injunction hearing also to not need to meet Rules of Civil Procedure or Evidence requirements, but rather the contents of the affidavit go to its weight) (citing *Bracco v. Lackner*, 462 F. Supp. 436, 442 (N.D. Cal 1978)).

The movant bears the "burden of establishing the necessity of [the] equitable

remedy" of a preliminary injunction. *General Motors Corp. v. Harry Brown's LLC*, 563 F.3d 312, 316 (8th Cir. 2009). On appeal, factual findings are reviewed for clear error; legal conclusions *de novo*; and the exercise of equitable judgment for abuse of discretion. *Id.*

## II. A PRELIMINARY INJUNCTION IS WARRANTED HERE

An analysis of the applicable standards demonstrates the necessity of a preliminary injunction in this matter. Below, Mary Miss addresses each of the *Dataphase* factors in turn.

### a. Threat of Irreparable Harm Exists Absent an Injunction.

The Art Center has made clear its intention to completely demolish GPDS. Doc. 10-1. Because GPDS is a unique piece of art that exists nowhere else in the world, Mary Miss, and the public, face the threat of irreparable harm. *See Kammayer v. United States Army Corps of Eng'rs*, 2015 WL 12791408, at *2 (C.D. Cal. June 3, 2015) ("Plaintiffs have clearly demonstrated that they will be irreparably harmed if the removal of the Mural is allowed to proceed. Once the Mural is destroyed, there is no way to bring it back; moreover, money damages would be difficult to access for a large-scale, public[ly]-displayed piece of artwork such as the Mural.").

The existence of statutory damages under the Visual Artists Rights Act of 1990 ("VARA") does not negate the threat of irreparable harm. Injunctive relief is permitted in cases involving VARA. *See id.* Congress has specifically provided for injunctive relief to VARA claimants under title 17 of the United States Code. *See* 17 U.S.C. 502(a).[2]

### b. The Balance of Harms Favors the Entry of an Injunction.

As this Court notes in its TRO, the balance of harms favors Mary Miss due to the definite nature of harm she faces, and the speculative nature of harm faced by the Art Center. [Doc. 12]. Speculative damages facing the non-moving party tip the balance in

---

[2] "Any court having jurisdiction of a civil action arising under this title may, subject to the provisions of section 1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."

favor of the moving party, and thus an injunction is warranted. *Hutchinson Telephone Co. v. Fronteer Directory Co. of Minnesota, Inc.,* 640 F. Supp. 386, 390 (D. Minn 1986) ("When the claimed injuries resulting from the issuance of an injunction to the non-moving party are as speculative on one hand and as disingenuous on the other, the Court finds that the balance of harms presented here tips decidedly in favor of the injured plaintiff.").

In *Hutchinson*, the Court noted that any damage the opposing party faced was "entirely of its own making." *Id.* at 389. Such is the case here, given the Art Center's contractual obligations and its apparent failure to abide by them. *See infra*, Section II (C)(2).

   c. *Mary Miss Is Likely to Succeed on the Merits.*

      1. GPDS is protected by VARA.

Mary Miss will establish via the testimony of Dr. Sussaneh Bieber, Associate Professor at the School of Performance, Visualization & Fine Arts, and School of Architecture, Texas A&M University; Barbi Yost, Associate Professor at Iowa State University; and Michael Draper, Des Moines resident, that GPDS qualifies for protection under VARA because it meets the definition of a piece of art of "recognized stature." *See* 17 U.S.C. § 106(a)(3)(B). VARA protects GPDS from demolition.

After qualifying for VARA protection, no exceptions apply to GPDS. The Art Center relies on the First Circuit's decision in *Phillips v. Pembroke Realty*, 459 F.3d 128 (1st Cir. 2006) that "VARA does not apply to site-specific work at all." *Phillips*, 459 F.3d at 139. However, the Seventh Circuit has questioned this "categorical" exclusion in dicta. *See Kelley v. Chicago Park Dist.*, 635 F.3d 290, 306 (7th Cir. 2011). The Seventh Circuit gave two valid reasons for its skepticism. It noted that the exclusion of "site-specific art" from VARA's protection is a judicially created remedy that does not appear in the law. *Id*. Further, perhaps understanding that site-specific art can be just as varied and wonderful

as its less well-named cousin "plop art,"[3] the Seventh Circuit found site-specific art is not well suited to an "all-or-nothing" approach.

Accordingly, and as detailed below, this Court should reject the First Circuit's "all-or-nothing" approach to a judicially created remedy because applying this approach to GPDS cannot and does not harmonize with the intent and purpose of VARA. The first problem is that the district court and the First Circuit in *Phillips* chose the wrong starting point in relying on *Bd. of Managers of Soho Int'l Arts Condo v. City of New York* as "one of the few relevant cases." *See Phillips*, 459 F.3d at 138. To be sure, the *Soho* case involved VARA. However, *Soho* specifically considered VARA section 113(d)[4], an exception to VARA protection that explicitly deals with art affixed to buildings (and hence "site-specific."). *See Soho*, 2003 WL 21403333 at *10 (S.D.N.Y. June 17, 2003).

This is the wrong starting point because the very existence of section 113(d) creates a flaw in the First Circuit's rationale. If all site-specific art was meant to be excluded from VARA protections, this would render section 113(d) completely superfluous. Therefore, the First Circuit's reasoning violates a major tenet of statutory interpretation. *See National Endowment for the Arts v. Finley*, 524 U.S. 569, 609 (1998) ("Statutory interpretations that 'render superfluous other provisions of the same enactment' are strongly disfavored.") (quoting *Fretag v. Commissioner*, 501 U.S. 868, 877 (1991)).

Beyond this error in interpretation, the First Circuit's approach seems to directly conflict with Congressional intent with respect to site specific art, which states: "Generally, the removal of a work from a specific location comes **within** the exclusion because the location is a matter of presentation, **unless** the work **cannot** be removed without causing the kinds of modifications described in proposed subsection 106A(a)(3)."

---

[3] *Phillips*, 459 F.3d at 141.

[4] "In a case which (A) a work of visual art has been incorporated in or made part of a building in such a way that removing the work from the building will cause the destruction, distortion, mutilation, or other modification of the work as described in section 106A(a)(3)…then the rights conferred by paragraphs (2) and (3) of section 106A(a) shall not apply." 17 U.S.C. 113(d)(1)(A).

*See* 1990 U.S.C.C.A.N. 6915, 6927 (emphasis added). The record suggests Congress anticipated the issue of site-specific art and wanted VARA protection to apply if "removal" of the art would cause "intentional distortion, mutilation, or modification,"[5] as would happen in this case.

The First Circuit's categorical exclusion of any art that can be said to be site-specific is also incorrect in that it fails to recognize VARA's desire to promote *long lasting* art:

> Artists *** must sustain a belief in the importance of their work if they are to do their best. If there exists the real possibility that the fruits of this effort will be destroyed after a mere ten to twenty years the incentive to excel is diminished and replaced with a purely profit motivation. The Visual Artists Rights Act mitigates against this and *** protects our historical legacy.

1990 U.S.C.C.A.N. 6915, 6917.

Three logical positions can be deduced from this. First, because VARA is designed to protect art for more than "a mere ten to twenty years," Congress wanted to encourage the creation of permanent art. Second, because site-specific art is, by definition, integrated into the land itself and, absent a catastrophe, land does not change year over year, site-specific art is *exactly* the type of permanent art Congress wanted to promote. Third, at the end of the day, VARA is a law of "mitigation." It balances the American desire to promote the creation of permanent top-of-the-line art with a recognition that nothing lasts forever. To achieve this balance, VARA protects art only for the life of the artist. *See* 17 U.S.C. §106A(d). This Court should not adopt any characterization of VARA enforcement that creates an unreasonable "veto" right held by the artist over the property owner. VARA is a mitigating statute that allows for harmony between the desire for permanency and the acknowledgment of change. The facts of this case demonstrate that VARA protection is available and appropriate.

---

[5] Section 106A(a)(3) states that it is "subject to the limitations set forth in section 113(d)" (building exclusion) thus further promoting the idea that Congress **only** intended to deny VARA protection to works of site specific art affixed to buildings.

11

Finally, the *Phillips* holding should not apply here because it is entirely factually distinguishable from this case. In *Phillips*, the defendant owner had proposed to move the artwork to a different location to satisfy the artist. 288 F. Supp.2d at 99. By contrast, the Art Center's intended course of action involves the destruction, and not the presentation, of the art at issue, in direct contravention of the artist's desire to protect GPDS (not to mention her contractual rights). There is no plan to relocate GPDS – the plan is to destroy it.

2. GPDS Is Contractually Protected

Mary Miss's request for a preliminary injunction is also predicated on her contractual rights *vis-à-vis* her agreement with the Art Center that prohibits destruction of GPDS without her approval. There is a strong likelihood that she will succeed in holding the Art Center accountable for its alleged breach in destroying GPDS and in failing to maintain it up to this point. This is so given the clear language of the contract between the parties and the ease with which it can be read in tandem with the Art Center's 28E Agreement with the City of Des Moines. Because the factors are identical, the Court's analysis and conclusion that Mary Miss is likely to prevail on the merits in its TRO Order applies with equal force here to support the issuance of a preliminary injunction.[6]

Iowa law is well-settled that "[t]he cardinal rule of contract interpretation is the determination of the intent of the parties at the time they entered into the contract." *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 77 (Iowa 2011). Contractual language is the most important evidence of the parties' intentions. *Id*. The Court must "strive to give effect" to all of the language used and assume none of it is superfluous. *Id*. Moreover, "an

---

[6] Although the Court in its TRO signals some agreement (and/or potential for agreement) with the Art Center's arguments in part, none of this is sufficient to overcome the Court's analysis at this stage of the proceedings that Mary Miss is likely to prevail on the merits. In citing to the Court's TRO Order and arguing that the Court should reach the same conclusion to enter a preliminary injunction, Mary Miss does not waive or otherwise concede any of these points. She expressly reserves the right to present alternative argument to the Court at the appropriate stage in the proceedings.

interpretation which gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." *Id.* (quoting *Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp.*, 266 N.W.2d 22, 26 (Iowa 1978)); *see also Homeland Energy Sols., LLC v. Retterath,* 938 N.W.2d 664, 687 (Iowa 2020) ("great weight" given to the ascertainable principal purpose of the parties in contracting); *Raders v. Price,* No. 22-1786, 2024 WL 950743, at *3 (Iowa Ct. App. Mar. 6, 2024) (rejecting proposed contractual interpretation where it would be "impossible" to do so without ignoring the "clear language" in the agreement).

The parties' intention in Mary Miss's 1994 agreement with the Art Center ("Artist Agreement") is readily ascertainable: to preserve GPDS unless Mary Miss agrees otherwise, at the very least until her death. The agreement unequivocally states: "Art Center agrees that it will not intentionally damage, alter, relocate, modify or change the Work without the prior written approval of the Artist." *See* Doc. 1-1 at 7, § 8.2(i). As the Court recognized in its TRO, "any fair reading" of this language subjects demolition or removal of GPDS to its terms, as such acts would "unquestionably" "damage, alter, relocate, modify, or change the Work." *See* Doc. 12 at 7 (further interpreting the Artist Agreement as signifying the parties' intent that GPDS be a "permanent installation that would remain intact until, at minimum, Miss's death" (citing § 9.3(i) and § 8.4 of the Artist Agreement)). Any other interpretation of these provisions would render them superfluous in contravention of longstanding Iowa law.

The parties' clear language also demonstrates their shared intent that the Art Center shoulder the burden of preservation—in the face of the very circumstances that the Art Center now identifies as problematic to meeting its obligations under the Agreement. The parties indisputably intended and specifically stated that regular maintenance is "essential to the integrity of the Project." *See* Doc. 1-1 at 8, § 9.2. The potential battering of Iowa's "dramatic weather cycles, floods, rampant vandalism, and the wear and tear of everyday use" (Doc. 10-1 (Baum Dec.) at 4, ¶ 25)) were within the Art Center's contemplation at the time it entered into the Artist Agreement. This is evidenced by the

Art Center's contractual promise to "reasonably assure that the Project is properly maintained and protected," and its explicit, specific contractual promise to "reasonably protect and maintain the Project against the ravages of time, vandalism and the elements." *See* Doc. 1-1 at 8, § 9.2.

There is nothing in the Artist Agreement or in the Art Center's 28E Agreement with the City of Des Moines that overcomes the Art Center's promise to Mary Miss that it will not remove or demolish GPDS without her approval. The Court has already rejected the Art Center's attempts to argue otherwise (as it concerns the likelihood of Mary Miss prevailing on the merits). *See* Doc. 12 at 7-9 (finding that Section 9.3(i) of the Artist Agreement does not give the Art Center unilateral authority to remove the artwork; that Paragraph III.A of the 28E Agreement does not authorize the Art Center to remove GPDS over Mary Miss's objection because there is nothing in the record suggesting the City has ordered, directed, or otherwise "required" the Art Center to do so; and that Paragraph III.D of the 28E Agreement can be read in harmony with Section 8.2(i) of the Artist Agreement, which is controlling as to whether the Art Center needs approval from Mary Miss). "There is no conflict between the commitments the Art Center made to Miss and the rights the Art Center possesses with respect to the City." *See* Doc. 12 at 9.

Based on the foregoing, Mary Miss is likely to prevail on the merits that GPDS is contractually protected from removal or destruction without her consent. Accordingly, this factor weighs in favor of granting her request for a preliminary injunction.

d. *The Public Interest*

The Court has stated that the public interest in this matter is neutral.  [Doc. 12.]. When a *Dataphase* factor is considered to be neutral, the other factors will carry the day for either the grant or denial of a preliminary injunction. *See In re Travel Agency Comm'n Antitrust Litig.*, 898 F. Supp. 685, 689 (D. Minn. 1995) (finding a neutral public interest and denying injunctive relief ); *Poet Plant Mgmt., LLC v. Simpson*, No. CIV 07-

4116, 2007 WL 2493514, at *1 (D.S.D. Aug. 29, 2007) (finding a neutral public interest and granting injunctive relief).

## CONCLUSION

For the reasons set forth herein plaintiff has carried her burden and met all elements necessary for the entry of a preliminary injunction.  Plaintiff Mary Miss prays that the Court enter a preliminary injunction directing the Art Center to not commence with the removal, destruction, or alteration of GPDS without her express consent, for the remainder of this litigation.

Respectfully submitted,

**WANDRO KANNE & LALOR, P.C.**

/s/ Ben Arato
Alison F. Kanne           AT0013262
Benjamin G. Arato         AT0010863
2015 Grand Avenue Suite 102
Des Moines, IA 50312
Telephone: (515) 717-7455
Facsimile: (515) 608-4645
Email: akanne@wandrolaw.com
       barato@wandrolaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served upon the counsel of record by CM/ECF on April 17, 2024

/s/ Ben Arato