IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| MARY MISS,<br><br>   Plaintiff,<br><br>v.<br><br>EDMUNDSON ART FOUNDATION, INC.<br>d/b/a DES MOINES ART CENTER,<br><br>   Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CASE NO. 4:24-CV-00123

**PRE-HEARING BRIEF**

## <u>INTRODUCTION</u>

"Deaccessioning is about making difficult but realistic decisions in the interests of the museum and its community."[1]  As the Court knows, over 30 years ago, the Des Moines Art Center engaged New York resident Mary Miss to design a landscape installation, Greenwood Pond: Double Site ("Double Site").  The work is comprised almost exclusively of natural materials, some anchored directly into the ground and embedded within Greenwood Park.  Despite years of regular maintenance and repairs, as detailed below, parts of the Double Site have deteriorated to a state of disrepair and constitute a public nuisance.  Instead of replacing significant portions of the Double Site, the Art Center made the difficult decision to deaccession the work in its entirety.

Mary Miss sued the Art Center and requests injunctive relief preventing removal of the Double Site.  But even if she disagrees with the Art Center's decision to remove, Miss has no basis to demand the Art Center replace the Double Site.  Thus, the Court is faced with this question: Should it order a safety hazard and public nuisance to remain in Greenwood Park pending the outcome of this litigation?  Because the answer is no, injunctive relief should be denied.

---

[1] Patricia Ainslie, *The Deaccessioning Strategy at Glenbow, 1992-1997*, 15 Museum Mgmt. & Curatorship 21 (1996).

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 7

I.     THE ART CENTER IS LIKELY TO SUCCEED ON THE MERITS. ............................ 8

     A.     VARA's Protections Do Not Extend to the Double Site. ...................................... 8

     B.     The Artist Agreement Does Not and Cannot Prevent the Art Center From Removing the Double Site Under These circumstances. ....................................... 9

          1.     The Art Center is permitted to remove the Double Site once it makes the reasonable decision it will not repair, restore, or replace the work. ............................................................................................. 10

          2.     The Art Center Must Remove the Double Site When It Constitutes a Public Nuisance. .................................................................................... 13

          3.     The Plaintiff Cannot Unreasonably Withhold Her Approval to Remove the Double Site. ........................................................................ 16

     C.     The Art Center Cannot Be Compelled to Rebuild the Double Site Through an Equitable Remedy Such as Specific Performance. ......................................... 18

II.     BECAUSE ALL OTHER FACTORS FAVOR THE ART CENTER, FURTHER INJUNCTIVE RELIEF SHOULD BE DENIED. ........................................................... 19

     A.     Miss Must Show More Than an Irreparable Act. ................................................ 19

     B.     The Public Safety Consequences of Granting Injunctive Relief Cannot Be Avoided. ............................................................................................................. 20

     C.     The Public Has an Interest in Its Safety, Property, and Contracts. ...................... 21

III.     THE COURT MUST IMPOSE BOND IN AN AMOUNT TO ADDRESS THE RISK OF LIABILITY MOVING FORWARD. ............................................................. 21

CONCLUSION .................................................................................................................. 21

## FACTUAL BACKGROUND

The Art Center incorporates its prior briefing of the factual background in this matter, including the Declaration of Dr. Kelly Baum and Exhibits A-R attached to Dr. Baum's Declaration. (ECF No. 10, at 3-9; ECF No. 10-1.)  Several additional points bear mention.

The Double Site is not a monolithic sculptural installation.  Instead, the Double Site consists of 20 identified elements around Greenwood Pond, 14 of which are addressed in the 2024 Condition Report.  (Declaration of Kelly Baum ¶ 3 (hereinafter "Baum Decl."); ECF No. 10-1, Ex. L.)  All elements taken together make up the Double Site, not its individual components.  (Baum Decl. ¶ 4.)[2]  Three major elements are at issue here, the Pavilion with Metal Roof, Free Standing Wood Elements, and Overhanging Wood Walkway (the "Unsafe Elements").  (Baum Decl. ¶ 5.) Exhibit L details the condition of the Double Site and, as reflected in Exhibits N, O, and L, the three elements noted above were found to raise life safety concerns in the fall of 2023.  (Baum Decl. ¶ 5; *see* ECF No. 10-1, Exs. N, O, L.)  Due to the risk of collapse, the Free Standing Wood Elements were removed in October.  (Baum Decl. ¶ 6.)

Notably, this is not the first time the Art Center has been faced with buckling walkways and a decision of how to proceed.  (Baum Decl. ¶ 7.)  In 2012, also faced with buckling walkways and safety concerns, Plaintiff recognized the issue and made clear she did not want her art to be represented in that way.  (*See* ECF No. 10-1, Ex. M.)  Nor did she want only part of the installation to remain if portions were removed:

> There are priorities I have in the restoration of the project.  For one thing I feel that it is imperative that a notice be put up that the project is in a state of restoration with an image of the original work so that people won't be misled by what they see on site.  It is my preference that all damaged elements and walkways be removed.

---

[2] According to a profile of the Double Site on Mary Miss's website, "[T]he visitor constructs an understanding of the site through the experience the multiple elements and the relationship created between them."  (Baum Decl. ¶ 4.)

I would rather see a section of walkway removed with appropriate guard rails installed than a buckling walkway.

…

Finally I think there should be a time limit for all this to happen and that we would agree to remove the entire work if the funding for repairs is not forthcoming.  It would be unacceptable for portions of the work to remain onsite.

(ECF No. 10-1, Ex. M.)  Fortunately, from 2012 to 2015, the Art Center was able to sustain a major campaign to repair and restore numerous elements of the Double Site that sustained damage through environmental degradation as well as 2011 flooding.  (ECF 10-1, ¶ 28.)  The Art Center raised $304,000 and allocated about $196,000 from its operating budget for an approximate total of $500,000 to complete the restoration.  (Baum Decl. ¶ 8.)  The Art Center also was able to partner with the City of Des Moines, which invested approximately $300,000 to improve the watershed above Greenwood Pond in 2013.  (Baum Decl. ¶ 9.)  The City also invested significant resources in 2015 to dredge, improve, and clear Greenwood Pond as part of an $800,000 investment in Greenwood Park.  (Baum Decl. ¶ 10.)  While not an exhaustive list, this multi-million dollar investment and restoration was completed around 2016 and included the City's changes to the watershed and pond, a restoration of the existing water outlet structure, lowering the water elevation of the pond, reconstruction of the support structure of the boardwalk, replacement of piers, beams, and decking, draining of the pond, installation of a sump pump in the observation box, regrading of a stream channel, and a replacement of some original wood materials with a harder, more expensive type of wood.  (Baum Decl. ¶ 12.)

Both before and after that significant restoration, the Art Center took seriously its obligation to "reasonably protect and maintain the [Double Site] against the ravages of time, vandalism and the elements." (Baum Decl. ¶ 13; ECF No. 10-1, Ex. C at 8).  In the nearly 30 years since the Double Site was completed, the Art Center has met its obligation by devoting major staff

and financial resources of approximately $1,000,000 to the Double Site separate from the 2012-2015 restoration.  (ECF No. 10-1 ¶ 27.)  While not an exhaustive list, Art Center staff has rebuilt wood benches, galvanized metal components, leveled gravel paths, replaced rotten or deteriorated wood planks, remove vandalism from the work, redesigned railings, replaced stone caps, replaced wooden spindles on the boardwalk, repaired glass panes in the warming hut, replaced and restructured floating wood walkways after flooding, removed bird guano, constructed metal walkways, repaired legs of the freestanding arches, replaced bolts and various steel components, redesigned the pump station, and replaced zinc fasteners with stainless steel brackets on boardwalks.  (Baum Decl. ¶ 14; *see, e.g.*, Exs. U, V.)  Most recently, over $17,000 was expended to rehabilitate the Overhanging Wood Walkway in the summer of 2022, and additional investments were made in 2023 prior to the life safety alert.  (Baum Decl. ¶ 15; Ex. W.)

Notwithstanding the Art Center's reasonable maintenance and protection of the Double Site, key elements are in a state where the only option is replacement or removal of the work.  (Baum Decl. ¶ 16; Declaration of John Rhodes ¶ 10, Ex. AA (hereinafter "Rhodes Decl.").)  Replacement of the Unsafe Elements necessarily requires removal and replacement of the entire element.  (Baum Decl. ¶ 17; Rhodes Decl., Ex. AA.)  For example, the entire Overhanging Wood Walkway would need to be removed to access the cantilevered supports and underwater portions in need of replacement.  (Baum Decl. ¶ 17.)  In September 2023, the City contacted the Art Center due to an "increased level of inquiries" about the Unsafe Elements.  (Baum Decl. ¶ 19; Ex. X.)  The Art Center retained an engineer in October 2023, who concluded there were significant structural concerns with the Unsafe Elements.  (Baum Decl. ¶ 20, Ex. Y; ECF No. 10-1 Exs. N, O.)  In the engineer's opinion, "the wood [in those structures] has deteriorated to a point it is not feasible to replace just a few members.  Total replacement with new treated wood or a more durable

wood species (Ipe is one option) is the best route forward." (ECF No. 10-1, Ex. N.) The Art Center obtained a cost estimate of $2,652,675.00 from the same contractor who completed previous work on the Double Site to replace only the wooden and metal sections of the Double Site back to its original condition, i.e., a 1:1 rebuild of the original design but with materials more appropriate for an outdoor environment. (ECF No. 10-1 ¶ 35.) The cost to replace only the Unsafe Elements totaled $1,858,200.00. (ECF No. 10-1, Ex. P).

The Art Center's decision to recommend the deaccessioning of the Double Site was not an easy one. The decision was made using the Operating Agreement, the Art Center's Collections Management Policy, and the Association of Art Museums Directors' rigorous deaccessioning protocols. (Baum Decl. ¶ 21.) Because the Unsafe Elements are primary, visual hallmarks of the Double Site, the Art Center decided to remove the entire work. (Baum Decl. ¶ 22.) This decision was made because it was consistent with the Artist Agreement, Miss's prior stated wishes, the Art Center's understanding of her current wishes, and out of respect for the artistic integrity of the work. (Baum Decl. ¶ 23.) In particular, the following compelled the Art Center to conclude the entire work should be removed:

> Section 8.2(ii) of the Artist Agreement: "Art Center shall notify the Artist of any proposed alteration of the Site that would affect the intended character and appearance of the Work and shall consult with the Artist in the planning and execution of any such alteration and *shall make a reasonable effort to maintain the integrity of the Work*." (emphasis added) (ECF No. 10-1, Ex. C at 7.)

> The artist's prior stated wishes: "[T]here should be a time limit for all this to happen and that we would agree to remove the entire work if the funding for repairs is not forthcoming. It would be unacceptable for portions of the work to remain onsite." (ECF No. 10-1, Ex. M).

> The Art Center's understanding of the artist's current wishes: Replacements to elements, over time, using "similar grade" materials. (ECF No. 1-2 at 1) Miss declined to articulate any

proposal for the Art Center other than complete replacement, despite having multiple opportunities to do so.  (Baum Decl. ¶ 24.)

While additional repairs and maintenance may be needed on other aspects of the Double Site, the Art Center agrees they have not posed an imminent safety threat and thus, they have been left open to the public during the Art Center's deliberation process.  (Baum Decl. ¶ 25.)[3]

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Rather, the movant bears the burden of establishing the propriety and necessity of an injunction considering the *Dataphase* factors. *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011); *see Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  Importantly, a preliminary injunction preserves the status quo and cannot be used to require a defendant to take affirmative action. *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 489-90 (8th Cir. 1993).  When granting a preliminary injunction would give the movant substantially the same relief it would obtain after a trial on the merits, the movant's burden "is a heavy one."  *Id.* (quoting *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir. 1991)).

---

[3] During the prior hearing, Plaintiff's counsel made repeated reference to the need for a replacement pump for the sunken observation box element.  The sunken observation box element is currently filled with water due to a poorly designed pump system that constantly clogs with silt, burning out the motor.  (Baum Decl. ¶ 18.)  Although it does not present a life-safety issue as urgent as the three other Unsafe Elements, the Art Center has blocked access to it to avoid visitors attempting to use the observation box in ways contrary to its intended purpose, putting them at risk of being submerged in several feet of water.  (Baum Decl. ¶ 18.)  Rehabilitation of this element is impractical if not impossible due to the problems noted above as well as the increase in the average water height of the pond over the prior 30 years.  (Baum Decl. ¶ 18.)

I.      **THE ART CENTER IS LIKELY TO SUCCEED ON THE MERITS.**

A.      VARA's Protections Do Not Extend to the Double Site.

As a threshold matter, protections under the Visual Artists Rights Act of 1990 (VARA)
only apply to works of a "recognized stature."  17 U.S.C. § 106A(a)(3)(B).  The district court's
decision in *Carter v. Helmsley-Spear, Inc.*, 861 F. Supp. 303 (S.D. N.Y. 1994), *reversed in part
on other grounds by* 71 F.3d 77 (2d Cir. 1995), is seen as the seminal case interpreting the phrase
"recognized stature," which is undefined in statute.  *Cohen v. G & M Realty L.P.*, 320 F. Supp. 3d
421, 437 (E.D. N.Y. 2018).  Under *Carter* and its progeny, the Plaintiff must make a two-tiered
showing:  "(1) that the visual art in question has 'stature,' i.e. is viewed as meritorious, and (2) that
this stature is 'recognized' by art experts, other members of the artistic community, or by some
cross-section of society."  861 F. Supp. at 325.

It is universally recognized that a plaintiff must establish "recognized stature" through
expert testimony.  *Id.*; *accord Martin v. City of Indianapolis*, 193 F.3d 608, 612 (7th Cir. 1999);
*Hunter v. Squirrel Hill Assocs., L.P.*, 413 F. Supp. 2d 517, 520 (E.D. Pa. 2005); *Scott v. Dixon*,
309 F. Supp. 2d 395, 400 (E.D. N.Y. 2004); *Phillips v. Pembroke Real Estate, Inc.*, 288 F. Supp.
2d 89, 98 (D. Mass. 2003).  The Double Site does not satisfy the recognized-stature test.  Courts
do not look to the recognized stature of the *artist*, but to the *particular work* at issue in the case.
*Scott*, 309 F. Supp. 2d at 400 (rejecting a finding of recognized stature because "[w]hile Plaintiff
has achieved some level of local notoriety, that stature is not so great as to afford VARA protection
to each and every work she creates").  Just because a project is "art" does not mean it is entitled to
protections under VARA.  *See, e.g.*, *Pollara v. Seymour*, 344 F.3d 265, 269 (2d Cir. 2003) ("Not
every artist has rights under VARA, and not everything called 'art' is protected by such rights.").
Similarly, many well-designed landscape architecture installations have artist merit.  That is not

sufficient to entitle all installations to VARA protection.  There is no evidence the Double Site meets this rigorous test.

Even assuming Miss can demonstrate the Double Site is a work of recognized stature, the work is no doubt site-specific:  its location is an "integral element" of the work.  *Phillips v. Pembroke Real Est., Inc.*, 459 F.3d 128, 134 (1st Cir. 2006).  Thus, removal of the Double Site is exempt from VARA protection under the presentation exclusion contained in 17 U.S.C. § 106A(c)(2).  Finding otherwise would not only "dramatically affect real property interests" present in this case, *id.* at 142, the consequences would result in an ongoing public safety concern for park visitors.  *See, e.g.*, *Kammeyer v. Oneida Total Integrated Enters.*, No. EDCV 15-869, 2015 WL 5031959, at *5-*6 (addressing the "life-long veto problem" and concluding a mural painted onto a dam was not protected by VARA because "[t]he dam is a large infrastructural component whose upkeep implicates serious public safety and environmental concerns").  The Art Center incorporates its prior briefing on the presentation exclusion and why it prevents any relief for the Plaintiff in this case.

B.  <u>The Artist Agreement Does Not and Cannot Prevent the Art Center From Removing the Double Site Under These circumstances.</u>

In its order granting temporary relief, this Court recognized Plaintiff cannot compel the Art Center to repair or restore the Double Site.  (ECF No. 12 at 8).  The Court also concluded the Art Center does not have authority to remove the Double Site without Miss's approval (or compulsion by the City).  (ECF No. 12 at 7-9).  This impasse must be resolved considering the public safety

risks present at the Double Site.  There are at least three ways to resolve the issue and recognize the Art Center's ability to remove and deaccession this work from its collection.[4]

    1.    <u>The Art Center is permitted to remove the Double Site once it makes the reasonable decision it will not repair, restore, or replace the work</u>.

Section 9.3(i) of the Artist Agreement gives the Art Center the unilateral right to determine "when and if" repairs or restorations will be made to the project.  (ECF No. 10-1, Ex. C at 8).  For the Unsafe Elements, the only way to "repair" or "restore" them would be to replace them in their entirety.  *See* Bryan A. Garner, *Garner's Modern English Usage* 788 (4th ed. 2016) (recognizing replace as a synonym for repair, "Replace; Re-place.  See Repairs."); *see also* EFC No. 10-1, Exs. N, O; Rhodes Decl. Ex. AA (engineering reports requiring total replacement).  Unfortunately, replacement is extremely costly.  Looking at the Unsafe Elements alone, replacement would cost $1,858,200.  (ECF No. 10-1, Ex. P).  Thus, the Art Center concluded it would not repair or restore the Unsafe Elements and decided, instead, to deaccession and remove the Double Site.  This decision is consistent with the Artist Agreement.

In 1994, the parties had a mutual interest in beautifying Greenwood Park and presenting an outdoor work that integrated its materials into the land.  (ECF No. 10-1, Ex. C at 1.)  But both parties understood and acknowledged the project was made of natural, ephemeral materials— namely, treated lumber buried or submerged into wetlands.  (*See, e.g.*, ECF No. 10-1 ¶¶ 20, 22, 24; Ex. T.)  Wood deteriorates under these conditions.  *See, e.g.*, *Std. Structural Steel Co. v. Bethlehem Steel Corp.*, 597 F. Supp. 164, 197 (D. Conn. 1984) (recognizing as "inevitable" the "natural deterioration of unfinished wood when exposed to the elements over a period of time");

---

[4] The Art Center incorporates its prior briefing on the significance of the Operating Agreement with the City of Des Moines and its arguments related to impracticability and frustration of purpose.

*Finnegan v. McGavock*, 283 N.W. 321, 325 (Wis. 1939) (recognizing that the deterioration of a 20-year-old wooden structure gave "a typical picture of a building worn out by use and the normal impact of the weather"); *Rehg v. Vermilion Boat & Outing Co.*, 231 N.W. 611, 612 (Minn. 1930) ("Every one knows that wood and timbers are affected by decay.").  When a wooden structure deteriorates, it must be *repaired* or *restored*.  The parties gave the Art Center the right to decide if and when repair or replacement would be undertaken.  In short, the Artist Agreement reflected the parties' understanding that as the Double Site degraded over time, the Art Center would need to decide, "if and when," it would repair or replace it.  Indeed, in 2013 before the Art Center's restoration, Miss knew it may be gone forever:  "I was beginning to loose [sic] hope that this project could ever be brought back to life!"  (Baum Decl. ¶ 11; Ex. S; *see also* Ex. T.)

Some logic must be read into the Artist Agreement.  *See Winfield State Bank v. Snell*, 226 N.W. 774, 777 (Iowa 1929) (recognizing that construction of a contract should be "reasonable and fair and not absurd").  One cannot repair, restore, or replace the structural wood components of the Double Site without removing them.  It would be illogical to give the Art Center sole discretion to determine whether repairs or restorations are made while giving Miss control over whether the wood can be removed.  In the ruling on temporary restraining order, the Court concluded the Art Center could not *remove* the Double Site because Section 9.3(i) must yield to the "express language" of Section 8.2(i), in which the Art Center agreed it would not "intentionally damage, alter, relocate, modify, or change" the Double Site without Plaintiff's approval.  (ECF No. 10-1, Ex. C at 7).  But, as the Court recognized, Section 8.2(i) *does not* expressly address "removal" or "demolition" of the project.  Notably, those terms have defined, recognized meanings in this context apart from the terms chosen by the parties and used in Section 8.2(i).  *See, e.g.*, 2021 International Building Code ch. 1, § 101.2 (requiring certain permits for "the construction,

11

alteration, relocation, enlargement, replacement, repair, equipment, use and occupancy, maintenance, _removal and demolition_" of structures" (emphasis added)); *see also* Des Moines City Ordinances § 26-301(a) (incorporating the International Building Code into its local ordinances).

Section 8.2(i) does not contain general words followed by a series of specific acts. *See* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 111 (2012) ("The legislature could have easily written 'any public property, including highways, bridges, and sidewalks,' but it did not."). The words chosen by the parties in Section 8.2(i) are not umbrella terms that pull all related words and phrases within their orbit. For example, although the work is "changed" when it is "repaired," repairs do not fall within Section 8.2(i). The work is "modified" through regular "maintenance," but maintenance is not addressed by Section 8.2(i), either. "Removal" and "demolition" are simply not contemplated by Section 8.2(i) or the entire Artist Agreement. Therefore, those terms should not be implicitly read into a provision when they were excluded. *See Peak v. Adams*, 799 N.W.2d 535, 548 (Iowa 2011) ("[T]he expression of one thing of a class implies the exclusion of others not expressed." (quoting *Maytag Co. v. Alward*, 112 N.W.2d 654, 656 (Iowa 1962))).

Just as the Art Center can remove the wood if it decides to proceed with a repair or restoration, it must be able to remove an unsafe wood structure if it decides *not* to proceed with a repair or restoration. This interpretation of Section 8.2(i) is more consistent with the natural reading of an agreement *for artwork*, which this Court should give great weight. *See Pillsbury Co., Inc. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008) ("Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade." (quoting Restatement (Second) of Contracts § 202(5) (1979))). Section 8.2(i) protects the

Plaintiff's rights of the aesthetic nature of the Double Site and secures her moral rights to the work. *See Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 81 (2d Cir. 1995).  But it does not secure any right against the complete *removal* of the work.  It would indeed be strange to allow an artist to prevent the "removal" of more traditional artwork from a museum's gallery—the Art Center can choose what it displays and what it does not.  The Artist Agreement is *silent* as to the removal, deaccessioning, or disposal of the project.[5]  On the other hand, context matters and it makes sense that an artist could prevent a museum from tearing the artwork in half (intentionally damage), painting it yellow (alter), or slicing it in three distinct pieces for a different visual effect (modify). The Art Center does not damage, alter, or modify the Double Site by removing it entirely, and thus, the Plaintiff need not approve of the Art Center's decision.

   2. <u>The Art Center Must Remove the Double Site When It Constitutes a Public Nuisance.</u>

   If Section 8.2(i) requires Miss's approval before removing the Double Site, it would contravene public policy to require the Art Center to maintain a public nuisance and violate the law.  Integral elements of the Double Site are dangerous, unsafe, and structurally unsound.  (*See* EFC No. 10-1, Exs. N, O; Rhodes Decl., Ex. AA.)  According to an engineer retained by the Art Center, "***If the guardrail or the boardwalk framing fell into the pond someone could be pinned under the water and drown***." (emphasis added) (Rhodes Decl., Ex. AA).  Especially because those structures are in the middle of a city park, it would be absurd for the Art Center to violate the law and place the public in danger of death or serious injury.

---

[5] Deaccessioning is defined as the "formal process of removing an accessioned object or group of objects from the museum's collections.  A museum still owns a deaccessioned object until it disposes of it but no longer holds it in the public trust.  Removing the object from the museum's possession is commonly referred to as disposal."  National Standards & Best Practices for U.S. Museums 88, American Association of Museums (2008).

A contract that contravenes public policy will not be enforced by Iowa courts. *Wunschel Law Firm, P.C. v. Clabaugh*, 291 N.W.2d 331, 335 (Iowa 1980). While the term "public policy" is "not susceptible of exact definition," *Walker v. Am. Family Mut. Ins. Co.*, 340 N.W.2d 599, 601 (Iowa 1983), "it may be said that any contract which conflicts with the morals of the times or contravenes any established interest in society is contrary to public policy." *In re Marriage of Witten*, 672, N.W.2d 768, 780 (Iowa 2003) (quoting *Liggett v. Shriver*, 164 N.W. 611, 612-13 (Iowa 1917)). The right of to be safe from death or serious injury in a city-owned park is an established interest in society. *See Livingston v. Chi. & Nw Ry. Co.*, 120 N.W. 1040, 1041-42 (Iowa 1909) (holding that a railroad corporation must use "every reasonable precaution for the safety of the traveling public"). Consequently, this Court must balance the real public safety concerns present in this case against Miss's interests in the Artist Agreement. *In re Marriage of Witten*, 672, N.W.2d at 780 ("To strike down a contract on public policy grounds, we must conclude that the preservation of the general public welfare outweighs the weighty societal interest in the freedom of contract." (quoting *Grinnell Mut. Reinsurance Co. v. Jungling*, 654 N.W.2d 530, 540 (Iowa 2002) (cleaned up))). Requiring the Art Center to maintain the Double Site in its current condition, once it has reasonably exercised its option to not further repair or replace the Double Site, endangers the public. That cannot be the just and appropriate resolution of this dispute.

Ignoring the real public safety concerns also would require the Art Center to violate the law. All parties to an agreement, including Miss, are presumed to contract "in reference to the existing law, which becomes a part of the contract." *Matter of Mt. Pleasant Bank & Trust Co.*, 426 N.W.2d 126, 134 (Iowa 1988); *accord United Suppliers, Inc. v. Hanson*, 876 N.W.2d 765, 780 (Iowa 2016). City ordinances deem <u>*any*</u> of the following "dangerous and a public nuisance":

14

- "Any portion of a building, structure or appurtenance that has been damaged by…deterioration…or by any other cause to such an extent that it is likely to partially or completely collapse, or to become detached or dislodged."

- "The building or structure, or part of a structure, because of…deterioration, decay…is likely to partially or completely collapse, or some portion of the foundation or underpinning of the building or structure is likely to fail or give way."

- "The building or structure, or any portion thereof, is clearly unsafe for its use and occupancy."

- "The building or structure is…damaged, dilapidated, unsecured…so as to become an attractive nuisance to children who might play in the building or structure to their danger…."

- "Whenever the condition or maintenance of the premise creates a nuisance that endangers the health and safety of the residents or public."

- "Structural members that have evidence of deterioration or that are not capable of safely supporting all nominal loads and load affects."

Des Moines Code of Ordinances § 60-192 (1), (2), (3), (4), (6), & (13).  Courts are required to avoid the construction or interpretation of a contract in a way that requires a party to violate the law.  *Matter of Mt. Pleasant Bank & Trust Co.*, 426 N.W.2d at 134; *Fortgang Bros., Inc. v. Cowles*, 85 N.W.2d 916, 920 (Iowa 1957) ("[I]n determining the true intention of parties to such an agreement, if a contract is susceptible of two meanings, one legal and the other not, that meaning will be given to it which will make the contract legal.").[6]

---

[6] The Art Center maintains its position that the Artist Agreement and the Operating Agreement, taken together, permit the Art Center to remove the Double Site once it has become deteriorated, unsafe, or damaged by "any casualty whatsoever." (EFC No. 10-1, Ex. A, at 5-6).  Although this Court concluded there is no express conflict between the Art Center's commitments to Miss and its responsibilities to the City, it cannot be that Miss has a life-long veto over the removal of a public nuisance.  *See* Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 180 (recognizing the harmonious-reading canon, under which "[t]he provisions of a text should be interpreted in a way that renders them compatible, not contradictory"); *see also J.E. Faltin Motor Transp., Inc. v. Eazor Exp., Inc.*, 273 F.2d 444, 445 (3d Cir. 1959) ("It would not be good interpretation to disregard language of the parties as meaningless or absurd if that can be avoided").

The terms of a contract cannot be enforced if doing so will result in the Art Center maintaining a public nuisance. The Art Center may be subject to civil liability for any death, serious injury, or loss, *see* Iowa Code § 657.1(1), and maintaining a nuisance after identifying a structure as such could conceivably also result in criminal penalties, *see* Iowa Code § 657.3. Under these circumstances, the terms of the Artist Agreement cannot stand if they compel the Art Center to maintain a nuisance. *See, e.g.*, *Ryan v. Allen*, 138 Ill. App. 52, 55 (Ill. Ct. App. 1907) (holding that because the position and maintenance of a structure was a nuisance, "the contract between [the parties] was in consequence contrary to public policy, illegal and void"); *Lebanon Carriage & Implement Co. v. Faulkner*, 76 S.W. 1083, 1083 (Ky. Ct. App. 1903) ("By the written contract the appellee is under obligations to protect appellants in the peaceable and uninterrupted use and occupation of the premises during the life of the lease, but there is no obligation on her part to protect them from the consequences of maintaining a public nuisance on the leased premises.").

3.    <u>The Plaintiff Cannot Unreasonably Withhold Her Approval to Remove the Double Site</u>.

Assuming Section 8.2(i) requires Miss's approval before removing the Double Site, Iowa law requires Miss to act in good faith in exercising her rights under the Artist Agreement. When Miss broadly refuses to accept the removal of integral elements of the Double Site, despite the state of deterioration of its most integral elements, that refusal is unreasonable and cannot be honored.

"An implied covenant of good faith and fair dealing is inherent in all contracts." *Albaugh v. The Reserve*, 930 N.W.2d 676, 686 (Iowa 2019). The underlying principle of good faith and fair dealing is that "neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Alta Vista Props., LLC v. Mauer Vision Ctr, PC*, 855 N.W.2d 722, 730 (Iowa 2014) (quoting *Am. Tower, L.P. v. Local TV*

*Iowa, L.L.C.*, 809 N.W.2d 546, 550 (Iowa Ct. App. 2011)).  The Artist Agreement was executed to address payments for the project, construction of the project, and its placement within the Sculpture Park Area.  (*See generally* ECF No. 10-1, Ex. C).  No doubt, a key component of the Agreement established the Double Site's ongoing maintenance, repairs, and alterations once built. But especially given the materials used for the Double Site (per Miss's design), the project certainly will not be in existence forever, and likely not even as long as 20 years after Miss's death.[7]  (*See* Rhodes Decl., Ex. AA ("It is unclear what type of wood was originally used but it has reached the end of its useful life. A life span of roughly 30 years for wood fully exposed to the elements is not unreasonable.")).  In other words, everyone contemplated there would be an end (i.e., a *removal*) of the Double Site at some future point in time.  That time, as dictated by the structural integrity of the work, is now.

A refusal to accept the reality of the present circumstances is not reasonable.  Retaining the Double Site, in its current state, endangers the public, impugns Miss's reputation, and requires the Art Center to assume civil liability it did not contemplate when entering into the Artist Agreement. Further, refusing to accept the removal of the Double Site also prevents the Art Center from meeting its obligations under the Operating Agreement, which Miss knows.[8]  Under these limited circumstances, it is unreasonable for Miss to withhold her consent to the removal of the Double Site.  *See Dick Broad. Co., Inc. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 672 (Tenn. 2013) (concluding that a party must act in good faith and in a reasonable manner in withholding consent

---

[7] If the Artist Agreement were to *guarantee* the Double Site's existence until 20 years after Plaintiff's death, the Agreement would have *required* significant repairs and restorations under Section 9.3(i).  *Rehg*, 231 N.W. at 612 ("Every one knows that wood and timbers are affected by decay.").

[8] Plaintiff was provided a copy of the Operating Agreement (under Section 15 of the Artist Agreement), which requires the Art Center to ensure the Double Site "shall not become damaged, deteriorated or unsafe."  (ECF No. 10-1, Ex. A at 5).

to assignment of an agreement); *Tooele Assocs. Ltd. P'ship v. Tooele City*, 284 P.3d 709, 719 (Utah Ct. App. 2012) (concluding a city breached its covenant of good faith and fair dealing by withholding its approval of additional phases of property development); *Richter v. Dairy Queen of S. Ariz.*, 643 P.2d 508, 510 (Ariz. Ct. App. 1982) (concluding as a matter of law a franchisor unreasonably withheld consent to an assignment of its interests).

      C.    <u>The Art Center Cannot Be Compelled to Rebuild the Double Site Through an Equitable Remedy Such as Specific Performance</u>.

It should be reemphasized that Miss seeks specific performance for her contractual claims—a remedy only granted in extraordinary, unusual cases. *Breitbach v. Christenson*, 541 N.W.2d 840, 843 (Iowa 1995). The court must determine whether such relief "would subserve the ends of justice," or rather "produce a hardship or injustice on either party." *Id.* Here, Miss has requested specific performance of "the terms of the contract." (Compl. Count III). It is unclear where Miss's request for injunctive relief ends and her request for specific performance begins.

Nonetheless, if Miss's core grievance is the Art Center has not reasonably maintained and protected the Double Site, that issue involves money damages, and no injunctive relief (or specific performance) is warranted. *Gingerich v. Protein Blenders, Inc.*, 95 N.W.2d 522, 524 (Iowa 1959) ("Specific performance of contracts in relation to personal property will not be enforced ordinarily, or in the absence of special circumstances making the payment of damages inadequate to afford proper relief."). If Miss ultimately requests this Court to *repair*, *restore*, or *replace* the Double Site, such an order for specific performance would be inappropriate, contrary to the Artist Agreement, and produce an immense hardship and injustice on the Art Center. "The basic underlying assumption of an action for specific performance is that the contract at issue was not fully performed, thereby necessitating the court to step in and exercise its equitable powers to order the defendants to perform on the contract." *Breitbach*, 541 N.W.2d at 843. Under this

interpretation, the Art Center has not failed to perform a duty owed to Miss; rather, Miss simply disagrees with the Art Center's performance.  Miss has no contractual right to repairs and restorations, and she cannot secure that remedy through specific performance.  *Id.* ("Although the grant of specific performance is equitable, this court will not remake or revise a contract the parties have freely agreed to….").

Specific performance is even more elusive when the terms of the contract or agreement are unclear as applied to the dispute.  *See Bethlehem Eng'g Export Co. v. Christie*, 105 F.2d 933, 934-35 (2d Cir. 1939) (L. Hand, J.).  Under no circumstances is the Art Center required to repair or restore the Double Site through equitable relief or otherwise.  So, too, when the party seeking specific performance has not acted in good faith or performed its contractual obligations.  *Homeland Energy Sols., LLC*, 938 N.W.2d at 697.  For the reasons stated herein, Miss's withholding of her approval to remove the Double Site, considering the safety and security of park visitors, is not made in good faith.  Specific performance should not compel a different result.

## II.   BECAUSE ALL OTHER FACTORS FAVOR THE ART CENTER, FURTHER INJUNCTIVE RELIEF SHOULD BE DENIED.

The Art Center incorporates its prior briefing on the three remaining *Dataphase* factors.  It will, however, briefly address the points raised by the Court in its order granting temporary relief.

### A.   Miss Must Show More Than an Irreparable Act.

The Art Center's decision to deaccession the Double Site does mean the installation will be removed.  But Miss must establish more than an irreparable *act*—she must demonstrate irreparable harm, "*to the plaintiff*," because of the Art Center's conduct.  *Reg Seneca, LLC v. Harden*, 938 F. Supp. 2d 852, 861 (S.D. Iowa 2013) (emphasis added).  Because the Double Site falls outside the protections of VARA, Miss has no legal right to prevent the removal of the Double Site under federal law.  And while Miss may have a claim for money damages due to the

maintenance of the Double Site (although the Art Center disagrees with the merits of such a claim), she has no right to require the Art Center to replace the Double Site.  Consequently, the irreparable harm factor favors the Art Center.  *See Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 667 (8th Cir. 2022) ("[Plaintiff] has not convinced us that money damages are insufficient to compensate him for the alleged injuries.").

      B.    <u>The Public Safety Consequences of Granting Injunctive Relief Cannot Be Avoided</u>.

The Court determined the Art Center's harm was speculative because the harm may not constitute an active public safety hazard.  (ECF No. 12, at 10-11).  Three individual elements are already closed to the public because a structural engineer determined they prevented "life safety/liability issues."  (EFC No. 10-1, Ex. O).  The Declaration of John Rhodes and accompanying exhibit explains these safety concerns in more detail.  (Rhodes Decl. ¶ 10; Ex. AA). "***If the guardrail or the boardwalk framing fell into the pond someone could be pinned under the water and drown***."  (emphasis added)) (Rhodes Decl., Ex. AA.)  One report from an art conservator a year prior does not undermine this conclusion.  (ECF No. 12, at 10-11).  More importantly, by deciding it will not repair and replace those elements, the harms to the Art Center will fare no better in the weeks, months, or years that follow.  The harm to the public will only increase as additional structural supports of the Double Site continue to deteriorate.  *Std. Structural Steel Co.*, 597 F. Supp. at 197 (recognizing as "inevitable" the "natural deterioration of unfinished wood when exposed to the elements over a period of time"); *see Winter*, 555 U.S. at 24 ("[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982))); *Interbake Foods, L.L.C. v. Tomasiello*, 461 F. Supp. 2d 943, 976 (N.D. Iowa 2006) ("[T]he balance of harm analysis examines the harm of granting or denying the injunction…upon other interested parties, including the public.").

C.     The Public Has an Interest in Its Safety, Property, and Contracts.

The public interest favors public safety, *see Laclede Gas Co. v. St. Charles County*, 713 F.3d 413, 420 (8th Cir. 2013), as well as protecting and enforcing valid property and contract rights, *see Quaker Oats Co. v. QO Chemicals, Inc.*, No. C 93-262, 1995 WL 17217909, at \*11 (N.D. Iowa June 15, 1995).  Thus, the public interest favors the Art Center in this matter.

## III.     THE COURT MUST IMPOSE BOND IN AN AMOUNT TO ADDRESS THE RISK OF LIABILITY MOVING FORWARD.

The Court must set bond "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The Art Center renews its request for a bond in the amount of $2,000,000 in the event the Court issues further injunctive relief.  Should a preliminary injunction issue in this case, the Art Center will be required to maintain a public nuisance for an indeterminate amount of time— weeks, months, years—as this litigation progresses.  It is immaterial whether the *entire* Double Site or only its currently structurally unstable components are closed to the public—the risk of injury and any resulting liability is the same.  The Art Center has done everything within its power to remediate the public nuisance and, without an adequate bond from this Court, its hands will be tied.  A nominal bond is wholly insufficient given the risks presented by further injunctive relief.

## CONCLUSION

Defendant Edmundson Art Foundation, Inc., d/b/a Des Moines Art Center respectfully requests this Court deny the Plaintiff's request for continued injunctive relief.  If the Court grants that requested relief, Defendant respectfully requests the Court require Plaintiff to post bond in the amount of $2,000,000 for the reasons stated herein and in Part V of Defendant's prior resistance.

Dated this 17th day of April 2024.

Respectfully submitted,

BELIN McCORMICK, P.C.

*Kelsey J. Knowles*

Wayne E. Reames
Kelsey J. Knowles
Michael S. Boal
666 Walnut Street, Suite 2000
Des Moines, IA  50309-3989
Telephone: (515) 283-4631
Facsimile:  (515) 558-0631
Email:      wereames@belinmccormick.com
            kjknowles@belinmccormick.com
            msboal@belinmccormick.com
ATTORNEYS FOR DEFENDANTS

D0608\1006\(4413592)