IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| MARY MISS,<br><br>Plaintiff,<br><br>vs.<br><br>EDMUNDSON ART FOUNDATION, INC.<br>d/b/a DES MOINES ART CENTER,<br><br>Defendant. | 4:24-cv-00123-SHL-SBJ<br><br><br>**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** |

## I.    INTRODUCTION.

Although judges should never shy away from deciding difficult issues, there are some problems that the legal system is simply ill-equipped to solve. This is one of those problems. In the 1990s, Plaintiff Mary Miss created outdoor environmental artwork around Greenwood Pond, which is near the Des Moines Art Center (the "Art Center"). For a variety of reasons—mostly related to the type of wood used in the artwork and the unavoidable impact of weather—the artwork is so far from its original condition that both the Art Center and Miss are dissatisfied with its appearance. They disagree, however, on what to do about it. The Art Center believes the artwork is in poor enough condition that it presents a safety risk and must be demolished, while Miss believes it can and should be restored or repaired.

The Court concludes, for reasons set forth below, that neither side is entitled to what it wants. The Art Center cannot demolish the artwork without Miss's consent (which she will not grant) because the Art Center promised in a contract not to do so. The Court therefore must GRANT Miss's Motion for Preliminary Injunction insofar as it seeks to prevent the Art Center from tearing down the artwork. Miss cannot, however, force the Art Center to repair or restore the artwork to its original condition because the same contract gives the Art Center unilateral discretion to decide whether to undertake repairs or restoration, and the Art Center has reasonably decided the cost is too high. Moreover, it is unlikely that Miss will prevail on her claim under the Visual Artists Rights Act of 1990. The end result is therefore an unsatisfying status quo: the artwork will remain standing (for now) despite being in a condition that no one likes but that the Court cannot order anyone to change.

## II.   BACKGROUND.

The Art Center is a museum of modern and contemporary art located in the northeast corner of Greenwood Park in Des Moines, Iowa. (ECF 10-1, ¶¶ 2, 10.) In total, Greenwood Park consists of approximately eighty acres of land, including a pond to the south of the Art Center known as Greenwood Pond. (Id., ¶ 11.) By the late 1980s, the Greenwood Pond area had fallen into a state of disrepair. (Id., ¶ 12.) Accordingly, in 1989, the Art Center began discussions with Miss, a nationally renowned artist who lives in New York, to design an outdoor installation to revitalize the area. (Id., ¶ 12; ECF 1, ¶ 1.)

The land where Greenwood Pond is located is owned by the City of Des Moines (the "City"). (ECF 10-1, ¶ 16.) In 1990, the Art Center entered an Operating Agreement with the City pursuant to Iowa Code Chapter 28E (the "28E Agreement"). (Id., ¶ 17 and pp. 9–26.) The 28E Agreement states that the City "desires to cooperate with the ART CENTER in the development of a site-related or environmental sculpture area for the enjoyment of the public in Greenwood Park." (Id., p. 9.) The 28E Agreement recognized that an "environmental sculpture" is a sculpture that "occup[ies] large extents of physical space such that the dimensions are not always obvious to the observer and which incorporate as elements in the sculpture the topography and features of the site." (Id., p. 10, ¶ II.B.) The 28E Agreement required the Art Center to present any potential artwork to the City Park and Recreation Board (the "Board"). (Id., pp. 10–11, ¶ II.C.) The Board was obligated "to review and comment to the ART CENTER on the plans within thirty (30) days after formal submission of the plans by the ART CENTER." (Id.) The 28E Agreement contains many provisions relating to ownership, installation, and maintenance of any artwork. (Id., pp. 11–15.) Of particular relevance here, the 28E Agreement states: "The CITY may require the ART CENTER to repair or remove a sculpture if the ART CENTER has failed to either maintain the structural integrity of a sculpture or to correct any unsafe condition within a sculpture." (Id., p. 13, ¶ III.A.) It further states: "The ART CENTER shall restore and/or rehabilitate or remove, at its option, any designated portion of any sculpture damaged or destroyed by any casualty whatsoever, including but not limited to damage caused by fire or storms or vandalism." (Id., p. 14, ¶ III.D.)

In April 1994, the Art Center and Miss entered into an Agreement for Artistic Services (the "Artist Agreement") calling for Miss to design and implement "an environmental sculpture for the Art Center permanent collection" near Greenwood Pond. (Id., ¶ 19; ECF 1, ¶ 6; ECF 1-1, p. 1.)

The Artist Agreement states that title to the artwork shall pass to the ART CENTER upon completion of the project. (ECF 1-1, ¶ 8.) It further states, in relevant part:

- "Art Center agrees that it will not intentionally damage, alter, relocate, modify or change the Work without the prior written approval of the Artist." (Id., ¶ 8.2(i));

- "ART CENTER recognized that maintenance of the Project on a regular basis is essential to the integrity of the Project. ART CENTER shall reasonably assure that the Project is properly maintained and protected, taking into account any instructions provided by the Artist, and shall reasonably protect and maintain the Project against the ravages of time, vandalism and the elements." (Id., ¶ 9.2); and

- "ART CENTER shall have the right to determine, after consultation with a professional conservator, when and if repairs and restorations to the Project will be made. During the Artist's lifetime, the Artist shall have the right to approve all repairs and restorations, provided, however, that the Artist shall be paid a reasonable fee for any such services, provided that the ART CENTER and the Artist shall agree in writing, prior to the commencement of any significant repairs or restorations, upon the Artist's fee for such services." (Id., ¶ 9.3(i).)

The Artist Agreement states that the covenants imposed upon the Art Center "do attach and run with the Work and shall be binding to and until twenty (20) years after the death of the Artist. However, the obligation imposed upon the Center by sections 9.3 (1) shall terminate on the death of the Artist." (Id., ¶ 8.4.) It further states that "[n]othing contained in this Article 9 [sic.] shall be construed as a limitation on such other rights and remedies available to the Artist under the Visual Arts Rights Act of 1990 or under any other law which may now or in the future be applicable." (Id., ¶ 8.7.) Finally, the Artist Agreement expressly acknowledges the 28E Agreement between the City and Art Center, stating:

> The parties acknowledge that the performance of certain aspects of this agreement requires the cooperation of the Parks and Recreation Department or other units of the government of the City of Des Moines. The failure of the City of Des Moines to perform as contemplated by this agreement shall not be deemed a breach of either party of this contract but may constitute an event causing a failure to fulfill the contractual obligations beyond either party's control. The Artist acknowledges this agreement is subject to the terms of the 28E agreement between the City and the Art Center, a copy of which agreement has been supplied to the Artist prior to the execution of this agreement. The terms of this agreement are subject to the terms of the 28E agreement which shall take precedence over conflicting terms, if any, in this agreement.

(Id., ¶ 15.)

Miss submitted preliminary design plans in late 1994, but the City declined to approve the original design due to concerns about, among other things, user safety, building code compliance, liability, the structural integrity of the materials, and long-term maintenance issues. (ECF 10-1, ¶¶ 20, 22.) A second set of drawings was later submitted and approved. (Id., ¶ 22.) The artwork eventually become known as "Greenwood Pond: Double Site" and was officially completed in 1996, with an estimated total cost of $1.2 million. (Id., ¶¶ 12, 23; ECF 1, ¶ 6.)

Greenwood Pond: Double Site (which this Order sometimes will refer to as the "Site") has been recognized on numerous occasions by artists, art scholars, art patrons, art critics, architects, and City Commissioners. (ECF 1, ¶¶ 14–15.) The Site is featured, for example, in a book written by Professor Susanneh Bieber of Texas A&M University, who describes Miss as a "towering figure" in Earth art and land art. (Tr. 4–6.) According to Professor Bieber, Greenwood Pond: Double Site is a "fulcrum point" for Miss's work that ties together two phases of her career as an artist. (Tr. 7.) Bieber describes how a feature of the artwork allows the viewer to stand at eye level with the water as if immersed in it, making it "experiential." (Tr. 9.) She says the artwork is noteworthy for how it ties readily-available building materials to the natural environment. (Tr. 10–11.) The Site is also featured in a monograph about Miss published approximately twenty years ago. (Tr. 6.) Iowa State University Professor Bambi Yost takes her graduate and undergraduate students to see Greenwood Pond: Double Site every year because of its significance and the fact it is the only "land art" in the State of Iowa. (Tr. 21–22.) Professor Yost said the artwork is meaningful for architects, landscape architects, and interior design students alike. (Tr. 21.)

Although the original expectation was for the artwork to be "permanent" (ECF 10-1, ¶ 24), the Site ended up being built largely with wood—an ephemeral material—because Miss wanted the Site to consist of materials that were accessible and available to the general public (Tr. 38). Over time, the Site has been damaged by weather, floods, vandalism, and the "wear and tear of everyday use." (ECF 10-1, ¶ 25.) The Art Center has devoted resources over the years to maintaining and repairing the artwork. (Id., ¶¶ 26–27; ECF 19-1, ¶¶ 8–10, 15.) It has been challenging, however, to obtain sufficient funding for major repairs and restoration. (ECF 10-1, ¶ 29.) Miss herself acknowledged in 2012 that in the absence of a successful major fundraising campaign, it might become necessary to deinstall the artwork. (Id., ¶ 30.)

In September 2023, the City of Des Moines Parks and Recreation Department passed along concerns to the Art Center that had been raised by local citizens about safety at the Site. (Tr. 65–

66, 99; ECF 19-7.) The Art Center responded by conducting a safety walk-through in early October 2023, during which Art Center staff concluded there were significant safety risks associated with the freestanding arches, cantilevered boardwalk, and warming hut (or pavilion) portions of the Site, all of which had damaged and/or rotting wood. (Tr. 67, 106–109.) According to Art Center Director of Facilities Michael Gard, the freestanding arches were in particularly bad shape. (Tr. 105, 107.) He said the arches were so structurally unsound that they could be moved "by several feet" simply by one person pushing against them. (Tr. 107.) The Art Center ended up taking the arches down in or around October 2023 without first obtaining Miss's permission. (Tr. 107–08; ECF 1, ¶¶ 19–20.) The warming hut and cantilevered boardwalk have not been removed, but they have been placed off limits to the general public through the use of fencing. (Tr. 100.) The fencing is not, however, a foolproof solution, as teenagers pull it down on weekends. (Tr. 76.)

Following the initial walk-through by Art Center staff, the Art Center retained an engineering firm to assess the structural integrity and safety of the artwork. (ECF 10-1, ¶ 34.) A structural engineer walked the Site in late October and concluded that "[t]here are significant structural concerns" with the artwork and said "the wood has deteriorated to a point it is not feasible to replace just a few members." (Id., p. 190; Tr. 67.) The firm eventually recommended that the Art Center "close off access to these structures to the public due to life safety/liability issues. It is unclear what type of wood was originally used but it has reached the end of its useful life." (ECF 10-1, p. 191.)

In October 2023, Kelly Baum, the Director of the Art Center, informed Miss that portions of the artwork were being closed to the public due to their poor condition. (ECF 1-2, pp. 7–8.) On December 1, 2023, the Art Center informed Miss that it intended to "decommission" the entire site and remove it, as the Art Center could "see no other way forward." (Id., pp. 2–3.) The Art Center has received a permit from the City for demolition of the artwork. (ECF 1-4.) Over the next thirty days, if not enjoined from doing so, the Art Center will install temporary construction fencing while the pond is drained, following which the artwork will be dismantled. (ECF 10-1, ¶ 40.) There is no evidence in the record to suggest that the City has *required* the demolition of the artwork. The City's view, apparently, is that the Art Center is obligated under the 28E Agreement to make the determination in the first instance regarding whether the Site is in such poor condition that it presents a safety hazard and must be taken down. (Tr. 145.)

Miss was not consulted on the decision to demolish the artwork, nor does she approve of the decision. (ECF 1, ¶¶ 23–24; Tr. 52.) According to the structural engineer report obtained by the Art Center, the cost to repair and restore the artwork in its entirety would exceed $2.6 million, which is equivalent to approximately one-third of the Art Center's annual operating budget. (ECF 10-1, ¶ 35; Tr. 72.) The Art Center considered alternative options such as using cheaper wood, but the cost still would be around $2 million. (Tr. 80.) Miss disputes the reliability of the Art Center's estimates but has not obtained an alternative estimate. (Tr. 59.)

## III.   LEGAL STANDARDS.

### A.   Preliminary Injunction Standards.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 664 (8th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "[T]he burden of establishing the propriety of an injunction is on the movant." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021) (citation omitted). The Court must consider four factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)).

"While no single factor is determinative, the probability of success factor is the most significant." *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) (citations omitted). For actions that do not seek to enjoin the enforcement of a statute or regulation, a plaintiff typically must establish only a "fair chance" of prevailing, which is a lesser burden than "likely to prevail." *D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999–1000 (8th Cir. 2019); *see also PCTV Gold, Inc. v. SpeedNet, LLC.*, 508 F.3d 1137, 1143 (8th Cir. 2007) ("[A] court does not decide whether the movant will ultimately win."). With respect to the remaining three factors, a plaintiff "is not required to prove with certainty the threat of irreparable harm, but it must prove that 'irreparable injury is likely in the absence of an injunction.'" *Sleep No. Corp.*, 33 F.4th at 1018 (quoting *Winter*, 555 U.S. at 22)). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "In balancing the equities, we weigh 'the threat of irreparable harm' shown by the movant against 'the injury that

granting the injunction will inflict on other parties litigant.'" *MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020) (quoting *Dataphase*, 640 F.2d at 113.) This "requires a court to distinguish between weak or illusory injuries and very real threats of injuries." *Rodriguez v. Molina*, 608 F. Supp. 3d 791, 798 (S.D. Iowa 2022) (cleaned up). It considers harm to both the litigants and other interested parties, like the public. *Wachovia Sec., L.L.C. v. Stanton*, 571 F. Supp. 2d 1014, 1047 (N.D. Iowa 2008). The last factor, the public interest, "invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious." *Id.* at 1048.

> B.      *Visual Artists Rights Act.*

Miss seeks relief, in part, under the Visual Artists Rights Act of 1990 ("VARA"). VARA was enacted to "protect two 'moral rights' of artists—the rights of 'integrity' and 'attribution.'" *See Cort v. St. Paul Fire & Marine Ins. Companies, Inc.*, 311 F.3d 979, 984 (9th Cir. 2002) (citing H.R. Rep. No. 101-514, at 5, *as reprinted in* 1990 U.S.C.C.A.N. 6915, 6915)). The "right of integrity" allows the artist to "prevent any deforming or mutilating changes to his work, even after title in the work has been transferred." *Id.* at 985 (quoting *Carter v. Helmsley–Spear, Inc.*, 71 F.3d 77, 81 (2d Cir.1995)). The "right of attribution" allows the artist "to be recognized by name as the creator of a work" and includes, among other things, the artist's right to *prevent* his or her name from being used with art that has been distorted since the original production. *Id.*

As relevant here, VARA provides the "author of a work of visual art" with the right "to prevent any destruction of a work of recognized stature." 17 U.S.C. § 106A(a)(3)(B); *see also* Francesca Garson, *Before That Artist Came Along, It Was Just A Bridge: The Visual Artists Rights Act and the Removal of Site-Specific Artwork*, 11 CORNELL J.L. & PUB. POL'Y 203, 224–25 (2001) (the right to prevent destruction is part of VARA's larger aim of protecting an artist's "moral rights of attribution and integrity" in visual art). A "work of visual art" is defined as "a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author." 17 U.S.C. § 101. A "work of visual art" does not include, among other things, "any poster, map, globe, chart, technical drawing, diagram, model, applied art, motion picture or other audiovisual work, book, magazine, newspaper,

periodical, data base, electronic information service, electronic publication, or similar publication
. . . ." *Id.*

VARA does not define the term "[w]ork of recognized stature," but legislative history suggests courts should consider "the opinions of artists, art dealers, collectors of fine art, curators of art museums, conservators, and other persons involved with the creation, appreciation, history, or marketing of works of visual art" to determine whether the work has become sufficiently "recognized." *See* Garson, 11 CORNELL J.L. & PUB. POL'Y at 227; *see also Scott v. Dixon*, 309 F. Supp. 2d 395, 400 (E.D.N.Y. 2004) (a work has become "recognized" where "members of the artistic community and/or the general public" see it as such). Where a qualifying work is being threatened with destruction, VARA permits the artist to seek injunctive relief. *See* 17 U.S.C. §§ 501(a), 502(a).

## IV.    LEGAL ANALYSIS.

Miss argues that she is likely to prevail on the merits of her claims against the Art Center for breach of contract and under VARA. She further argues that the other *Dataphase* factors support the entry of a preliminary injunction preventing the Art Center from removing Greenwood Pond: Double Site. For reasons explained below, the Court concludes she has established a likelihood of success on her breach of contract theory insofar as she argues that the Art Center cannot remove or demolish the Site without her consent. She is not, however, likely to prevail on a claim to require the Art Center to restore or repair the Site, nor is she likely to prevail on her VARA claim. Nonetheless, her likelihood of success on the one aspect of her breach of contract theory is enough, when analyzed in conjunction with the other *Dataphase* factors, to warrant the entry of a preliminary injunction preventing the Art Center from removing or demolishing the Site.

### A.    *Dataphase* Factor One: Likelihood of Success on the Merits.

#### 1.    Miss Is Likely to Prevail on the Merits of Her Breach of Contract Claim to Enjoin Demolition of the Site.

The parties' dispute revolves in large part around the terms of the Artist Agreement and 28E Agreement. The former gives Miss significant control over the Site, as illustrated most prominently in Section 8.2(i): "Art Center agrees that it will not intentionally damage, alter, relocate, modify or change the Work without the prior written approval of the Artist." Miss is likely to succeed in her argument that demolition or removal of the artwork falls within the scope of this provision, as demolition or removal necessarily will "damage, alter, relocate, modify or change the Work."

8

In arguing otherwise, the Art Center focuses on: (i) the failure of Section 8.2(i) to use the specific words "demolish" or "remove"; (ii) the fact that the artwork uses ephemeral materials like wood for which decay and eventual replacement or removal was inevitable; and (iii) the "illogical" situation that would be created if the Art Center has sole discretion to decide whether to repair or restore the artwork but no discretion to remove it without Miss's consent. (ECF 18, pp. 10–12.) These arguments are unpersuasive.

The problem with the first argument—i.e., that the absence of the words "demolish" and "remove" in Section 8.2(i) means the Art Center retained the ability to undertake those actions— is that the plain meaning of the words "damage, alter, relocate, modify or change" is broad enough to cover the removal, demolition, or dismantlement of the Site. Indeed, no one could seriously argue that cutting down and tearing apart the wooden pieces of the artwork would not "damage" or "alter" it. Similarly, even if the Art Center could dismantle the Site without ruining the individual pieces (which does not appear to be the plan), this would still amount to "relocat[ing], modify[ing] or chang[ing]" it. The Court cannot ignore the plain meaning of the language the parties used simply because they also might have used additional words.

To be clear, the absence of the words "demolish" and "remove" in Section 8.2(i) would have significance if a separate provision of the Artist Agreement gave the Art Center the right to undertake those actions. In that scenario, the plain meaning of general words like "damage" and "alter" in Section 8.2(i) would cede to the other provision's use of more specific terminology. *See Homeland Energy Sols., LLC v. Retterath*, 938 N.W.2d 664, 688 (Iowa 2020) ("[W]hen a contract contains both general and specific provisions on a particular issue, the specific provisions are controlling."). The problem for the Art Center, however, is that no such other provision exists. Instead, the Art Center is asking the Court to interpret the Agreement's *silence* on the issues of demolition and removal to outweigh the plain meaning of the contractual restrictions on the Art Center's ability to "damage" or "alter" the Site. This is not how contracts are to be interpreted. *See, e.g.*, *Colwell v. MCNA Ins. Co.*, 960 N.W.2d 675, 680 (Iowa 2021) (refusing to interpret a contract's silence on an issue as granting an affirmative right).

The Art Center tries to get around this problem by relying on Section 9.3(i) of the Artist Agreement, which gives the Art Center the unilateral authority "to determine, after consultation with a professional conservator, when and **if** repairs and restorations to the project will be made" (emphasis added). The Art Center argues that this provision should be interpreted to mean it has

9

the right *not* to repair or restore the Site, and instead to remove it altogether. (ECF 18, pp. 10–11.) According to the Art Center, this interpretation is supported by the fact that the Site consists largely of wood and other ephemeral materials that necessarily will degrade over time. Surely, the Art Center argues, the parties must have intended for it to have the right to remove or deaccession the Site when the degradation reached a certain level.

For at least three reasons, the Court rejects this argument. <u>First</u>, Section 9.3(i) does not use words like "remove," "demolish," or "deaccession." Instead, once again, the Art Center is asking the Court to use the Agreement's *silence* on an issue to outweigh the express restriction in Section 8.2(i) on the Art Center's ability to "damage" or "alter" the Site without Miss's consent. Iowa law does not permit the Artist Agreement to be interpreted in this fashion; instead, the focus must be on the parties' "written words." *UE Loc. 893/IUP v. State*, 997 N.W.2d 1, 9 (Iowa 2023); *see also Retterath*, 938 N.W.2d at 687 ("The language the parties used is the most important evidence of their intentions, and therefore, we endeavor to give effect to all language of the contract.").

<u>Second</u>, in context, there is a better explanation than the one proposed by the Art Center for the Artist Agreement's failure to use words like "demolish" or "remove"; namely, that both sides expected the Site to be a *permanent* installation that would remain intact until, at minimum, Miss's death. The Art Center was, after all, paying hundreds of thousands of dollars to have a well-known artist create an installation that would turn a rundown area of Greenwood Park into a unique blend of natural landscape and art for public enjoyment. Moreover, the Artist Agreement obligated the Art Center to take steps the parties surely believed would prolong the Site's life, such as requiring the Art Center to "reasonably assure that the Project is properly maintained and protected, taking into account any instructions provided by the Artist, and shall reasonably protect and maintain the Project against the ravages of time, vandalism and the elements." (ECF 1-1, ¶ 9.2.) The Artist Agreement also contains two provisions attaching significance to Miss's lifespan. Section 9.3(i) states: "[d]uring the Artist's lifetime, the Artist shall have the right to approve all repairs and restorations . . . ." Similarly, Section 8.4 states that the covenants imposed upon the Art Center "attach and run with the Work and shall be binding to and until twenty (20) years after the death of the Artist." Collectively, these provisions—considered, again, in conjunction with the absence of any provision specifically mentioning removal or demolition—leave the Court to conclude that the parties did not anticipate removal or demolition of the Site during Miss's lifetime

or for twenty years thereafter. This means, again, that Section 8.2(i) is the only provision addressing intentional damage, modification, or alteration to the work.

Third, it is far from clear on the existing record that the parties knew at the time the Artist Agreement was executed what type of wood or other building materials would be used for the Site or which features the Site would include. The Artist Agreement did not specify any materials, but rather contemplated a process in which Miss would prepare and submit design documents to the Art Center (and, eventually, City officials) for approval. (ECF 1-1, ¶¶ 1.1 *et seq.*) The Court therefore cannot conclude, as the Art Center argues, that the parties must have known the Site would degrade and intended to give the Art Center the unilateral right to decide when it needed to be taken down. Nor, in any event, would any such evidence allow the Court to ignore the plain language of Section 8.2(i).

Unable to find persuasive language in the Artist Agreement, the Art Center turns to Paragraph III.A of the 28E Agreement, which states: "The CITY may require the ART CENTER to repair or remove a sculpture if the ART CENTER has failed to either maintain the structural integrity of a sculpture or to correct any unsafe condition within a sculpture." (ECF 10-1, p. 13, ¶ III.A.) As the Art Center correctly points out, Miss agreed in the Artist Agreement that her relationship with the Art Center "is subject to the terms of the 28E agreement" and that "the terms of the 28E agreement [] shall take precedence over conflicting terms, if any, in this agreement." (ECF 1-1, ¶ 15.) The Art Center argues that Paragraph III.A of the 28E Agreement conflicts with, and therefore supersedes, Section 8.2(i) of the Artist Agreement and gives it the authority to remove the Site over Miss's objection.

The Court agrees in part and disagrees in part. The Court agrees that Paragraph III.A of the 28E Agreement would supersede Section 8.2(i) of the Artist Agreement *if* the City required the Art Center to repair or remove the Site. The Court disagrees, however, that Paragraph III.A of the 28E Agreement gives the Art Center the unilateral authority to remove the Site over Miss's objection in the absence of a directive from the City. As there is nothing in the record to suggest the City has ordered, directed, or otherwise "required" the Art Center to do anything, the Art Center cannot rely on Paragraph III.A of the 28E Agreement to justify its decision to remove the artwork.

In arguing otherwise, the Art Center characterizes the issue as follows: "Should [the Court] order a safety hazard and public nuisance to remain in Greenwood Park pending the outcome of this litigation?" (ECF 18, p. 1.) The Court disagrees with this characterization. The City of Des

Moines has the authority to declare something a public nuisance and/or deem it a safety hazard. *See* Des Moines Mun. Code, ch. 42, art. VI, §§ 347, 351, 355 (2024).[1] It presumably would be especially easy for the City to do so on publicly owned land like Greenwood Park. For whatever reason, however, the City has not exercised this authority in connection with the Site. Instead, the City's position appears to be that it delegated such authority to the Art Center. This is not the same as "requir[ing]" the Art Center to do something and therefore does not mean the Art Center can ignore its obligations to Miss as set forth in Section 8.2(i) of the Artist Agreement.

The Art Center similarly misses the mark when it argues that it "would contravene public policy to require the Art Center to maintain a public nuisance and violate the law." (ECF 18, p. 13.) The City has never identified Greenwood Pond: Double Site as a "public nuisance." Instead, the Art Center is unilaterally characterizing it as such. If the Art Center wanted the unilateral authority vis-à-vis Miss to remove the Site after declaring it a "public nuisance," the Art Center should have negotiated for this right in the Artist Agreement. It chose not to do so; instead, the Art Center promised Miss it would *not* damage, alter, or modify the Site without her permission. It does not contravene public policy to require the Art Center to live up to its contractual obligations, particularly when the City itself could solve whatever safety problems exist by declaring the Site a "public nuisance" or otherwise requiring the Art Center to remove it. In other words, the Art Center cannot use "public policy" arguments to disregard contractual obligations or assume for itself powers reserved to the City.

The Court also rejects the Art Center's reliance on Paragraph III.D of the 28E Agreement, which states: "The ART CENTER shall restore and/or rehabilitate or remove, at its option, any designated portion of any sculpture damaged or destroyed by any casualty whatsoever, including but not limited to damage caused by fire or storms or vandalism." (ECF 10-1, p. 14, ¶ III.D.) This argument is the Art Center's strongest, as Paragraph III.D gives the Art Center the power to "remove" portions of the Site without being required to do so by the City. Even so, the Art Center must establish that Paragraph III.D of the 28E Agreement conflicts with Section 8.2(i) of the Artist Agreement before the former will supersede the latter.

The Court concludes that Miss is likely to prevail in establishing that the two provisions can be read in harmony with one another. Paragraph III.D of the 28E Agreement only purports to

---

[1] https://library.municode.com/ia/des_moines/codes/code_of_ordinances?nodeId=MUCO_CH42EN_ARTVINU_S42-347NUCO.

establish the Art Center's rights vis-à-vis *the City*; as in, the Art Center does not need *the City's* approval to restore, rehabilitate, or remove any portion of the artwork that is damaged or destroyed by any casualty. This is different than whether the Art Center needs *Miss's* approval to take the same actions. As it relates to *her* approval, the Art Center agreed in Section 8.2(i) of the Artist Agreement not to "intentionally damage, alter, relocate, modify or change the Work" without her prior written consent, and promised in Section 9.2 to "reasonably protect and maintain the Project against the ravages of time, vandalism and the elements." There is no apparent conflict between the commitments the Art Center made to Miss and the rights the Art Center possesses with respect to the City.

In context, there is good reason for the Art Center to have agreed to obtain Miss's permission, but not the City's, before removing damaged pieces of artwork. The Art Center entered into the 28E Agreement with the City in 1990 for the purpose of facilitating the "development of a site-related or environmental sculpture area for the enjoyment of the public in Greenwood Park." (Id., p. 9.) Because the project would be on City-owned land, the two sides needed clarity about their respective rights and responsibilities. The 28E Agreement helped provide such clarity, establishing that there would be "portions of each sculpture which each party shall maintain," with each side responsible for performing "necessary maintenance to assure that the designated portion of the sculptures for which it is responsible shall not become damaged, deteriorated or unsafe." (Id., p. 13, ¶ III.A.) The 28E Agreement further established that the Art Center would be liable, either directly or through indemnity, for any injuries arising out of the Site or activities related thereto. (Id., p. 16, ¶¶ VI.A, VI.B.) It makes sense in this context for the Art Center to have the unilateral right vis-à-vis the City to remove damaged pieces of the Site as set forth in Paragraph III.D.

By contrast, the Art Center and Miss did not enter the Artist Agreement until 1994, four years after the 28E Agreement was signed. By that time, and as explained above, the parties expected the artwork to remain intact for at least as long as Miss was alive. Accordingly, the Agreement focused largely on protecting Miss's moral rights as an artist; i.e., ensuring the Site would continuously reflect her original intention and spirit. Every subsection of Sections 8 and 9 is geared toward this goal, with Miss being protected against, for example, the use of "the Work in any manner which would reflect discredit on [her] name o[r] reputation as an Artist or which would violate the spirit of the Work" (ECF 1-1, ¶ 8.3), being given veto power over any damage or

alteration to the Site (*id.*, ¶ 8.2(i)), and being given similar veto power over repairs or restorations if the Art Center decided to make them (*id.*, ¶ 9.3(i)). Against this backdrop, it is not inconsistent for the Art Center to need Miss's approval but not the City's before removing portions of the Site.

In sum, as it relates to the removal of the artwork without her written permission, Miss has shown that she is likely to prevail on the merits of her breach of contract claim.

      2.  <u>Miss Is Not Likely to Prevail in Requiring the Art Center to Repair or Restore the Site.</u>

The analysis of the likelihood of success is different if Miss is seeking to force the Art Center to repair or restore the Site. Although Section 9.3(i) of the Artist Agreement does not give the Art Center the unilateral right to *demolish* or *remove* the Site, it does unambiguously give the Art Center the unilateral right to refuse to *repair* or *restore* it, particularly when, as here, the cost to do so is prohibitively high. The Court therefore cannot envision a realistic scenario in which the case would end with the Art Center being ordered to make repairs or restorations to the Site.

Miss's criticism of the $2.6 million cost estimate put forward by the Art Center does not change this conclusion. Miss argues that the Art Center is exaggerating the cost of repairing and restoring the Site by including unnecessary work and/or failing to consider cheaper alternatives. The cost estimate comes, however, from the same reputable structural engineer who performed repair and restoration work on the Site approximately ten years ago. Moreover, the engineer's conclusions comport with common sense and other evidence. The wooden features of the Site have been exposed to the elements for more than twenty-five years and are showing undeniable signs of decay, including rot and structural instability. The Art Center Director of Facilities testified, for example, that before being taken down the freestanding arches were so structurally unsound that they could be moved "by several feet" simply by pushing against them. The Art Center reasonably concluded that isolated repairs are not sufficient to address these problems, and that it is instead necessary to replace substantial portions of the entire Site. Similarly, the Art Center is not acting in bad faith in declining to make such expensive repairs; instead, it is exercising exactly the discretion given to it in Section 9.3(i) of the Artist Agreement.

Granted, the Art Center is also required to perform regular "maintenance" on the Site pursuant to Section 9.2. Miss has offered no meaningful evidence, however, that the Art Center failed to satisfy this obligation. At most, she simply relies on the current condition of the Site to argue that the Art Center must not have maintained it properly. This is unpersuasive. *See Kuhns v. Scottrade, Inc.*, 868 F.3d 711, 717 (8th Cir. 2017) (dismissing contract claim based on "implied

14

premise" that because harm occurred, protective covenant must have been breached). The far more plausible explanation for the Site's current condition is the cumulative impact of twenty-five-plus years of weather and public use on exposed wood. This is not the Art Center's fault, nor is the Art Center obligated under the Artist Agreement to replace or restore it.

The bottom line is that although Miss is likely to succeed in establishing that the Art Center cannot remove or demolish the Site unless required to do so by the City, she is *not* likely to succeed in establishing that the Art Center is obligated to repair or restore the Site. In this regard, Miss's victory on her motion for preliminary injunction may prove to be pyrrhic, as it simply means her work will remain standing, for now, in a condition that she herself does not find satisfying.

### 3.  Miss Is Not Likely to Prevail on Her VARA Claim.

Although Miss's likelihood of success on one part of her breach of contract claim is enough to propel her case to the other *Dataphase* factors, the Court considers it important and helpful to evaluate the merits of her VARA claim, too. The analysis of course starts with the statutory language, which states, in relevant part: "the author of a work of visual art . . . shall have the right . . . to prevent any destruction of a work of recognized stature. . . ." 17 U.S.C. § 106A(a). There are exceptions, however, including, as relevant here, for the "modification of a work of visual art which is the result of . . . the public presentation, including lighting and placement . . . unless the modification is caused by gross negligence." *Id.* § 106A(c)(2).

As a threshold matter, Miss has established a likelihood of success in proving that Greenwood Pond: Double Site is a "work of recognized stature." *Id.* § 106A(a)(3)(B). The Site has been recognized by artists, art scholars, art patrons, art critics, architects, and others. For example, Miss presented testimony from two witnesses establishing that the Site is studied in college classrooms in Iowa and elsewhere, as well as having been featured in a book written by a tenured professor at Texas A&M University and a monograph about Miss's work. This is enough to establish the Site as a "work of recognized stature." *See, e.g.*, *Martin v. City of Indianapolis*, 192 F.3d 608, 613 (7th Cir. 1999) (affirming district court's conclusion that work was of "recognized stature" based on newspaper and magazine articles and letters).

The stature of the Site only matters, however, if it is protected under VARA in the first place. The Art Center argues the Site is not entitled to such protection because the statute applies only to "work(s) of visual art," *see* 17 U.S.C. § 106A(a), which is defined to mean a "painting, drawing, print, or sculpture," *id.* § 101. The Art Center argues that Greenwood Pond: Double Site

15

is none of these. The Art Center further relies on First Circuit precedent establishing that site-specific artwork like the Site—i.e., artwork for which the location is a crucial element—is not protected under VARA anyway. *See Phillips v. Pembroke Real Estate, Inc.*, 459 F.3d 128, 143 (1st Cir. 2006) ("VARA does not protect site-specific art.").

The Court agrees with the Art Center that the Site is not a "painting, drawing, print, or sculpture" and therefore is not entitled to protection under VARA. The testimony of Miss's own witnesses is conclusive, with Professor Bieber testifying as follows:

Q.   It's not a painting; right?

A.   That's correct.

Q.   It's not a drawing?

A.   Yes.

Q.   It's not a photographic print; right?

A.   Yes.

Q.   And it's not any other type of print; right?

A.   Correct.

Q.   And it's not a traditional sculpture either; right?

A.   Correct.

(Tr. 17.) Likewise, Professor Yost's testimony is unequivocal:

Q.   You would agree with me it's not a painting; right?

A.   Correct.

Q.   It's not a drawing?

A.   Correct.

Q.   It's not a print?

A.   Correct.

Q.   It's not a still photo?

A.   Correct.

Q.   And it's not a piece of traditional sculpture; is that right?

A.   Correct.

(Tr. 25–26.)

To the extent Miss believes the Site *is* a "painting, drawing, print, or sculpture," she never says so in her pleadings or briefing despite citing VARA extensively. (*See generally* ECF 1; ECF

15.) Similarly, during her testimony, Miss agreed with the description of her work as "land art." (Tr. 53.) The closest she came to VARA's statutory language is when she testified as follows: "I feel like I'm sculpting the land, and I think it's -- you know, it was Tatlin building -- was he not a sculptor when he did his tower? I think what is considered a sculpture, the definition has been pretty expanded in the 20th century." (Tr. 54.)

The Court appreciates Miss's point and agrees that in some sense or another a builder, designer, or architect could be considered a "sculptor." All the same, when interpreting VARA, the Court's job is to determine what *Congress* meant by the word "sculpture" in 17 U.S.C. § 101, not whether there is some figurative or allegorical use of that word that might be broad enough to capture artwork that would not traditionally be understood as a "sculpture." To that end, the Court agrees with the Seventh Circuit's analysis in *Kelley v. Chicago Park District*: "To qualify for moral-rights protection under VARA, [a work of art] cannot just be 'pictorial' or 'sculptural' in some aspect or effect, it must actually *be* a 'painting' or a 'sculpture.' Not metaphorically or by analogy, but *really*." 635 F.3d 290, 300 (7th Cir. 2011).

Greenwood Pond: Double Site is not *really* a sculpture. Instead, it blends the natural landscape with wooden features like a boardwalk, walking path, warming hut (which resembles the interior framing of a building) and other structures. It is a stretch even to refer to these structures as sculptures in the metaphorical sense; they are surely not sculptures in the literal sense.[2] It follows that the Site is not what Congress had in mind when it granted moral rights protections to artists for their "sculptures." *See id.* ("VARA's definition of 'work of visual art' operates to narrow and focus the statute's coverage; only a 'painting, drawing, print or sculpture' . . . will qualify. These terms are not further defined, but the overall structure of the statutory scheme clearly illuminates the limiting effect of this definition."). The Court therefore concludes that Miss has little chance of prevailing on her VARA claim.[3]

B. *Dataphase Factor Two: Likelihood of Irreparable Harm.*

---

[2] In one place, the Artist Agreement refers to the artwork as an "environmental sculpture." (ECF 20-1, p. 39.) When the parties entered into the Artist Agreement, however, the Site had not yet been fully designed, much less constructed. The Court therefore gives little weight to the Agreement's terminology and instead relies on the testimony of Professors Bieber and Yost in finding that the Site is not a "sculpture" in anything other than a metaphorical sense.

[3] Because it is holding that the Site is not a "sculpture," the Court does not need to decide whether to follow the First Circuit's blanket conclusion in *Phillips v. Pembroke Real Estate, Inc.*, that "VARA does not protect site-specific art." 459 F.3d at 143. It is enough for present purposes to conclude that VARA does not protect *this* site-specific art.

Although Miss has only established a likelihood of success on the merits with respect to one portion of her breach of contract claim, this is enough to require analysis of the remaining *Dataphase* factors, starting with the threat of irreparable harm to the moving party. Here, the analysis is straightforward: Miss has established a sufficient threat of irreparable harm to warrant a preliminary injunction given the unique nature of the Site and the fact that the Art Center is proposing to remove and destroy it once and for all. *See Kammeyer v. United States Army Corps of Eng'rs*, No. EDCV15869JGBKKX, 2015 WL 12791408, at *2 (C.D. Cal. June 3, 2015) ("Plaintiffs have clearly demonstrated that they will be irreparably harmed if the removal of the Mural is allowed to proceed. Once the Mural is destroyed, there is no way to bring it back; moreover, money damages would be difficult to assess for a large-scale, public[ly]-displayed piece of artwork such as the Mural.").

C. *Dataphase Factor Three: Balance of Harms.*

The record is mixed on the balance of harms factor, but the Court again concludes that Miss has done enough to cause this factor to weigh in favor of a preliminary injunction. As noted above, she faces a threat of irreparable harm because once the artwork is removed, it can never be restored. By contrast, the alleged irreparable harm to the Art Center is more speculative. The Art Center argues that the Site is an "active public safety hazard," but the record shows that the public is still being given access to most parts of it. This suggests that the Art Center does not perceive meaningful risks associated with those areas. As to the few sections of the Site where the perceived risk is higher, the Art Center has removed one such section already and placed fencing around others. Although not a perfect solution, this is enough to mitigate any imminent safety risks to a sufficient degree that the balance of harms weighs in favor of Miss.

To the extent the Court's analysis underestimates the safety risks, there is nothing stopping the City of Des Moines from taking appropriate action. As explained above, the Court does not interpret the Artist Agreement—considered in conjunction with the 28E Agreement—as giving Miss the right to stop the removal of the Site if the City orders it.

D. *Dataphase Factor Four: Public Interest.*

Finally, the public interest factor is essentially neutral. The Art Center appears to genuinely believe that the Site has reached the end of its useful life, and there is substantial evidence supporting this belief. The Art Center has not, however, established that there is a significant enough risk to the public to require demolition to begin immediately—or perhaps more precisely,

the Art Center has not shown that the *Court* must decide the extent of the safety risks in a situation where nothing is stopping the City from exercising its authority to order removal of the Site if public safety so compels. By contrast, there is a public interest in ensuring that parties honor their contractual obligations, particularly when those obligations relate to public art. The public interest factor therefore does not weigh heavily in either direction.

   E.  *The Nominal Bond of $100 Will Remain in Place.*

   The final issue is whether the Court should increase the nominal $100 bond. The Art Center argues that it should because Miss's position is perpetuating what the Art Center characterizes as a major risk to public safety. The Court reiterates, however, that the City of Des Moines can—and presumably would—override Miss's position and order the Site to come down if the risk to public safety is as severe as the Art Center claims. In these circumstances, the nominal bond is sufficient to satisfy Fed. R. Civ. P. 65(c). *See, e.g.*, *Interbake Foods, L.L.C. v. Tomasiello*, 461 F. Supp. 2d 943, 979–80 (N.D. Iowa) (imposing nominal bond).

## V.   CONCLUSION.

   The Court GRANTS Miss's Motion for Preliminary Injunction. The Art Center is hereby ENJOINED from further demolition of the Greenwood Pond: Double Site pending trial or other developments impacting the Court's analysis of the parties' respective rights and obligations.


   IT IS SO ORDERED.

   Dated: May 3, 2024                    _____
                                          STEPHEN H. LOCHER
                                          U.S. DISTRICT JUDGE